**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **INTERPLAN ARCHITECTS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 4:08–cv–03181** |
| | § | |
| **C.L. THOMAS, INC., MORRIS &** | § | |
| **ASSOCIATES ENGINEERS, INC., AND** | § | |
| **HERMES ARCHITECTS,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are the following motions: Defendants' Joint *Daubert* Motion to Exclude the Testimony of Plaintiff's Expert, Walter Bratic (Doc. No. 107), Plaintiff's Motion to Strike and Exclude Expert Testimony from (1) Kenneth Kolkhurst; and (2) Cecil R. Spencer (Doc. No. 112), and Plaintiff's Motion to Strike and Exclude Testimony from (1) Andrew M. Noble III; (2) Greg Mitchell; (3) Timothy W. Burrow; (4) James P. Mandel; (5) Francis O. Bologna; and (6) Jeff Johanson (Doc. No. 113).

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that Defendants' Joint *Daubert* Motion to Exclude the Testimony of Plaintiff's Expert, Walter Bratic (Doc. No. 107) should be granted in part and denied in part, Plaintiff's Motion to Strike and Exclude Expert Testimony from (1) Kenneth Kolkhurst; and (2) Cecil R. Spencer (Doc. No. 112) should be granted in part and denied in part, and Plaintiff's Motion to Strike and Exclude Testimony from (1) Andrew M. Noble III; (2) Greg Mitchell; (3) Timothy W. Burrow; (4) James P. Mandel; (5) Francis O. Bologna; and (6) Jeff Johanson (Doc. No. 113) should be granted in part and denied in part.

## I.    BACKGROUND

Interplan Architects, Inc. ("Plaintiff") is a company whose business involves architectural planning, architectural design, and preparation of architectural construction documents, including, but not limited to, architectural site plans, architectural floor plans, architectural exterior elevations, interior designs, and construction documents ("Architectural Documents"). Architectural Documents contain title blocks, which are areas on the document displaying information identifying the project, the company preparing the Architectural Documents, and information about the scope of the document.

Between 2003 and 2004, Plaintiff was hired by C.L. Thomas ("Defendant Thomas") to prepare Architectural Documents for nine different Speedy Stop convenience stores in south Texas. For Speedy Stop store numbers 59 and 82, Plaintiff submitted proposals to Defendant Thomas describing the services it would provide in connection with the projects (the "Design Proposals"). The Design Proposals contained language asserting Plaintiff's ownership of the Architectural Documents it prepared in connection with the projects and limiting Defendant Thomas's ability to copy or distribute the plans without Plaintiff's permission. The Design Proposals were never signed by Defendant Thomas.

Defendant Thomas alleges that, during the design process, it provided Plaintiff with many drawings and files from other third-party vendors, consultants, and even other architects in order to prepare the Architectural Documents. Specifically, Defendant Thomas alleges that it provided Plaintiff with information and ideas about store design and layout derived from another convenience store chain called Quik Trip. In 2003 and 2004, employees of C.L. Thomas requested and received from Plaintiff electronic copies of Plaintiff's Architectural Documents. Plaintiff provided the requested electronic Architectural Documents as CAD files in electronic

format on a computer-readable disk. On certain occasions, Plaintiff sent Defendant Thomas confidentiality agreements (the "Confidentiality Agreements") purporting to restrict Defendant Thomas's ability to copy or use the Architectural Documents. Defendant Thomas never signed any Confidentiality Agreement that was sent by Plaintiff.

In 2004, Defendant Thomas hired Morris & Associates ("Defendant Morris") and Hermes Architects ("Defendant Hermes") to provide architectural design and construction drawings for a total of thirteen different Speedy Stop stores (the "Infringing Stores"), though only some of these stores were ever built. Defendant Thomas admits that it furnished Defendant Morris with CAD files of at least some of Plaintiff's Architectural Documents and that Defendant Morris replaced Plaintiff's title block on the Architectural Documents with its own. Defendant Thomas also admits that it furnished Defendant Hermes with copies of Defendant Morris's Architectural Documents.

In 2006, Plaintiff's president, Marcel Meijer, allegedly discovered the existence of the Infringing Stores. Plaintiff subsequently registered copyrights for architectural works and technical drawings related to the Speedy Stop stores it had designed for Defendant Thomas. Thereafter, Plaintiff filed suit against Defendant Thomas, Defendant Morris, and Defendant Hermes (collectively, the "Defendants") for copyright infringement under 17 U.S.C. § 501(a) and violation of integrity of copyright management information under the Digital Millennium Copyright Act, specifically 17 U.S.C. § 1202.[1] Defendants have asserted various defenses to Plaintiff's claims, including, among others, that Defendant Thomas is a joint author of Plaintiff's Architectural Documents, that Plaintiff granted Defendant Thomas an implied nonexclusive

---

[1] Plaintiff's claim of trade secret misappropriation was dismissed with prejudice by the Court by stipulation of Plaintiff and agreement by Defendants. (Doc. No. 71.)

license to copy and use Plaintiff's Architectural Documents, and that Plaintiff does not hold a valid copyright for architectural works and technical drawings.

## II.      MOTIONS TO EXCLUDE EXPERT OPINION

Defendants move to exclude Plaintiff's damages expert, Walter Bratic.[2] Plaintiff moves to exclude testimony of Andrew Noble, Greg Mitchell, Timothy Burrows, James Mandel, Francis Bologna, and Jeff Johanson, all of whom are Defendant Thomas's architectural or damages experts. In addition, Plaintiff moves to exclude the expert testimony of Cecil Spencer and Kenneth Kolkhurst, Defendant Morris's architectural and damages experts, respectively. Each one of these motions will be examined in turn below.

### A.      Legal Standard

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue. A court is charged with a "gatekeeping function" to ensure expert testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Reliability is analyzed under Rule 702, which requires that: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Experts are permitted to render opinions even if based on inadmissible evidence so long as the inadmissible evidence is of the type reasonably relied upon by experts in that field. *See* Fed. R. Evid. 703; *Daubert*, 509 U.S. at 595. Inadmissible facts or data that serve as a basis for the expert's opinion may not be disclosed to the jury by the proponent of the expert testimony unless a court determines "that

---

[2] Defendants' motion to exclude Plaintiff's architectural expert, Leonard Lane (Doc. No. 106), has been granted in part and denied in part. (Dkt. Entry dated 10/5/2010).

their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

Further, the expert witness must be qualified "by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. A court must exclude an expert witness "if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

The party seeking to rely on expert testimony bears the burden of establishing, by a preponderance of the evidence, that all requirements have been met. *Daubert*, 509 U.S. at 593, n.10; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

**B.    Analysis**

**1.  Walter Bratic**

Walter Bratic is Plaintiff's expert on damages. He is a certified public accountant ("CPA") and possesses an M.B.A. from the Wharton School of Business. He has over twenty-five years of accounting and consulting experience, with a specialty in intellectual property matters. He was retained by Plaintiff to "evaluate the economic issues relating to the alleged actions of C.L. Thomas . . . Morris and Associates . . . and Hermes Architects . . . ." (Bratic Report, Nov. 13, 2009, at 3.) Mr. Bratic's expert report dated November 13, 2009 (the "First Bratic Report") calculated Defendants' gross revenues for purposes of establishing the "infringer's profits" measure of damages. (*Id.* at 5-8.) Mr. Bratic noted that Plaintiff's president would provide testimony as to the second measure of damages (actual damages) sought. (*Id.* at

6.) Mr. Bratic submitted a rebuttal report on February 10, 2010 (the "Second Bratic Report"), the purpose of which was to "evaluate economic issues relating to copyright infringement under the Federal Copyright Act" and to "review and comment, where applicable on several of the [defense experts'] reports." (Bratic Report, Feb. 10, 2010, at 2.) In the Second Bratic Report, Mr. Bratic sought to rebut both the opinions rendered by Defendants' experts regarding infringer's profits and actual damages.

Defendants seek to exclude Mr. Bratic's opinions regarding Defendants' gross revenues. They argue that Mr. Bratic's calculation of gross revenues is unreliable because it is based on faulty methodology and incorrect factual information. In addition, Defendants object to the Second Bratic Report's rebuttal of the defense experts' opinions on actual damages.

### a.  Opinions regarding Defendants' gross revenues

A plaintiff may recover both actual damages and infringer's profits under the Copyright Act. *See* 17 U.S.C. § 504(a). The Copyright Act provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). Infringer's profits may be direct or indirect. *See Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004). Section 504(b)'s burden-shifting provision requires the copyright owner to first establish the infringer's gross revenue when seeking infringer's profits. There is "an initial presumption that the infringer's profits . . . attributable to the infringement are equal to its gross revenue." *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005) (quotation and citation omitted). However, a copyright owner must do more

than simply provide the infringer's total gross revenue from all its profit streams or commercial endeavors. *See MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc.*, No. 08-10521, 2010 U.S. App. LEXIS 20094, at *12 (5th Cir. Sept. 29, 2010); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 511 n.9 (4th Cir. 2002). Gross revenue must bear some "reasonable" relation to the infringement. *Bonner*, 404 F.3d at 294; *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 645 (S.D. Tex. 2007) (requiring plaintiff to prove that defendant's gross revenues are "specifically attributable" to the sale of the infringing works); *Cullum v. Diamond A. Hunting, Inc.*, Case No. SA-07-CV-0076 WWJ, 2009 U.S. Dist. LEXIS 4572 (W.D. Tex. Jan. 21, 2009). Therefore, the copyright owner must demonstrate "some causal link between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply." *Bonner*, 404 F.3d at 294. A court will deny recovery of infringer's profits when they are "only remotely and speculatively attributable to infringement." *Polar Bear Productions*, 384 F.3d at 711 (quoting 4 Nimmer on Copyright § 14.03, 14-34 (2004)). Expert testimony may be used to establish proof of an infringer's profits, but a trial court must evaluate this testimony. *See Estate of Vane v. Fair, Inc.*, 849 F.2d 186, 188 (5th Cir. 1988). Once gross revenue is established, the infringer bears the burden of showing that the revenue was attributable to factors other than the copyrighted work. *Id.*

　　　Mr. Bratic's report calculates the gross revenue of Defendant Thomas by adding realized revenue and projected revenue for eleven Speedy Stop stores (Nos. 14, 86, 87, 91, 95, 301, 302, 303, 305, 306, 309).[3]  Using this method of calculation, Mr. Bratic concludes that Defendant

---

[3] The realized revenue figures were taken from Defendant Thomas's documents produced in discovery, while the projected revenue figures were calculated by a formula. Mr. Bratic's gross revenue calculation did not include revenue from two Speedy Stop stores (Nos. 102, 311) within the group of Infringing Stores. Though the First Bratic Report only identifies the Infringing Stores and the corresponding revenue by letters, in the Second Bratic Report, he acknowledges that the defense expert, James Mandel, has correctly mapped the Speedy Stop store numbers to the letters used in the First Bratic Report. (Bratic  Report, Feb. 10, 2010 at 4.)

Thomas's gross revenue is $511,963,565.49. (Bratic Report, Nov. 13, 2009 at 7.) Mr. Bratic calculates the gross revenue of Defendant Morris by adding together Morris's receipts for the three Infringing Stores that Morris designed for Defendant Thomas (store nos. 301, 303, 309). Defendant Morris's gross revenue totals $156,565.72. (*Id.* at 7.) Similarly, Mr. Bratic calculates the gross revenue for Defendant Hermes as $663,392.07 by adding Hermes's receipts for the eleven Infringing Stores that Hermes designed (store nos. 14, 86, 87, 91, 95, 102, 301, 302, 305, 306, 311). (*Id.* at 8.)

Defendants argue that this method of calculation is incorrect because Plaintiff has not demonstrated a causal link between the alleged infringement of Plaintiff's architectural designs and technical drawings, on the one hand, and Defendants' gross revenue from the Infringing Stores, on the other. Plaintiff responds that it has limited its gross revenue calculation to the Infringing Stores, rather than including revenue from Defendants' other lines of business, thereby demonstrating a reasonable relationship between infringement and gross revenue.

As an initial matter, Defendant Thomas's gross revenue must be distinguished from Defendant Morris's and Hermes's gross revenue. The receipts that serve as a basis for Mr. Bratic's calculation of Defendant Morris's and Hermes's gross revenue correspond to the professional design and drafting services that each of these Defendants provided to Thomas in connection with the allegedly Infringing Stores. Plaintiff contends that these services constitute the acts of infringement. Defendant Morris's and Hermes's realization of profits from its infringing actions are exactly the type of "infringer's profits" that are contemplated by § 504(b). Plaintiff has not included gross revenue from any of Defendant Morris's or Hermes's other design projects or lines of business. Therefore, any gross revenue obtained by Defendant Morris and Hermes from providing services to Defendant Thomas is reasonably related to the alleged

infringement of Plaintiff's copyrights. Plaintiff has met its burden of establishing Defendant Morris's and Hermes's gross revenue, and the burden now shifts to the Defendants to "prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The Court denies Defendants' motion to exclude Mr. Bratic's opinions as to the gross revenue of Defendants Morris and Hermes.

The calculation of Defendant Thomas's gross revenue presents a more difficult issue. This case does not involve a calculation of direct profits that Defendant Thomas made by selling infringing works or services. Rather, this is a case involving indirect profits, where Defendant Thomas used the allegedly Infringing Stores to sell other products, including food, drink, and other merchandise that might have been sold irrespective of Plaintiff's design. *See William A. Graham Co. v. Haughey, et al.*, 68 F.3d 425, 442 (3d Cir. 2009) (stating that "indirect profits" are "profits earned not by selling an infringing product, but rather earned from the infringer's operations that were enhanced by the infringement"); *Straus*, 484 F. Supp. 2d at 645. The question presented here is whether Plaintiff has demonstrated a sufficient "causal link" between the infringement and a particular profit stream by limiting its calculation of gross revenue to the Infringing Stores, or whether Plaintiff is required additionally to demonstrate that the gross revenue of the Infringing Stores is attributable in some way to the architectural design and appearance of the stores.

On one hand, a copyright owner "is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement." *See Polar Bear Productions*, 384 F.3d at 711; *MGE UPS Systems, Inc.*, 2010 U.S. App. LEXIS 20094 at *17. On the other hand, to require Plaintiff to establish that the gross revenue was attributable to infringing work "would be to effectively

eliminate the burden-shifting provision of § 504(b) and place the entire burden on the copyright holder." *Bonner*, 404 F.3d at 294. Plaintiff argues that *Bonner v. Dawson* provides guidance with respect to the calculation of gross revenue derived from infringement of an architectural design. In *Bonner*, a plaintiff architect calculated the infringer's gross revenues under § 504(b) based on the "profits generated by leasing agreements in the infringed building." 404 F.3d at 294. The district court found that this evidence did not meet the "causal link" standard because the plaintiff had not established that "the basis for the profits was the particularized design of the building." *Id.* The Fourth Circuit reversed, holding that the leasing agreement profits were derived exclusively from the infringed building, and that building was designed based on the infringed copyright. *Bonner* held that the plaintiff met its burden of establishing a causal link by limiting gross revenues to those "collected from the use of the specific infringed work" rather than from "outside sources." *Id.*

However, the Court is persuaded by the analysis contained in several other cases involving indirect profits. In *Mackie v. Reiser*, 296 F.3d 909 (9th Cir. 2002), an artist brought suit for copyright infringement against the Seattle Symphony Orchestra and a graphic designer for unauthorized use of his copyrighted artwork in the symphony's promotional brochure. The plaintiff sought infringer's profits based on the symphony's revenue from the particular music series that his artwork accompanied in the promotional brochure.  The Ninth Circuit affirmed the district court's determination that the plaintiff's expert was too "speculative" to support a damages award for infringer's profits. *Id.* at 916. The court noted, "myriad factors . . . could influence an individual's purchasing decisions," including "reasons that have nothing to do with the artwork in question" such as the symphony's reputation, the conductor, a specific musician, or the dates of concerts. *Id.* Similarly, in *Polar Bear Productions*, a plaintiff used its expert

witness to calculate the defendant's profits due to use of an infringing video in trade shows and a soft drink promotion, and as a result of increased brand prestige. The Ninth Circuit held that the expert had properly established a "causal connection" between excitement over the trade booth promotion, which included the infringing video, and a *certain* percentage of trade show sales. *Polar Bear Productions*, 384 F.3d at 711. In contrast, the court held that the plaintiff had not met its burden in establishing gross revenues from increased brand prestige because there was no evidence that the defendant's use of the infringing video increased sales or influenced purchasing decisions at retail stores or other outlets. *Id.* at 714-15.

Cases such as *Andreas v. Volkswagen of America, Inc.*, 336 F.3d 789 (8th Cir. 2003) and *Haughey* may be distinguished as the plaintiffs there demonstrated more than "mere speculation" that defendants' gross revenue was related to the infringing conduct. In *Haughey*, the plaintiff demonstrated not only that the defendants' client proposals contained infringing language, but also that the proposals were important to the defendants' clients, the infringed language contributed to the success of the proposals, and that one of the defendants urged its employees to use the proposals. 68 F.3d at 443. In *Andreas*, the plaintiff showed that the infringing text was a "centerpiece" of an Audi car commercial, that Audi "enthusiastically presented" the commercial to its dealers, that car sales during the airing of the commercial were higher than Audi's projections, and that Audi paid its advertising agency a substantial bonus based on the success of the commercials. *See Andreas*, 336 F.3d at 796-97.

The Court believes that, in this case, Plaintiff is required to do more than simply identify the Infringing Stores and designate all revenue from those stores as a result of the alleged infringement. Plaintiff must provide some "non-speculative evidence" that Defendant Thomas's gross revenue from the Infringing Stores was caused or in some way affected by the architectural

design of the Infringing Stores. *See Mackie*, 296 F.3d at 915; *Bonner*, 404 F.3d at 294. Mr.

Bratic's expert report does not identify or attempt to quantify the impact architectural design has

upon a convenience store's profitability. In fact, Mr. Bratic clearly states the opposite—that he

cannot provide an opinion as to whether any of Defendants' gross revenue is "attributable to the

architectural design" of the Infringing Stores. (Bratic Depo. at 39.). Since Mr. Bratic does not

include the consideration of this factor in his methodology of calculating Defendant Thomas's

gross revenues, his methodology and resulting calculation are unreliable. The Court requires

some evidence that architectural designs and store layout cause, in some way, an increase in the

gross revenue or profit realized from a store. Such evidence does not have to relate specifically

to the convenience store industry, though an analysis or study of convenience stores would be

helpful. Most helpful to the Court would be a comparison between Defendant Thomas's

projected revenue for the Infringing Stores and the realized revenue (which may provide some

support for the proposition that store design had an effect upon the revenue), or between

Defendant Thomas's non-Infringing Stores and the Infringing Stores that controls for variables

such as location, traffic, and pricing. The Court grants Defendants' motion to exclude Mr.

Bratic's opinions as to Defendant Thomas's gross revenues without prejudice to Plaintiff's

resubmission of Mr. Bratic as an expert on this issue.

### b.  **Opinions rebutting Defendants' expert opinions**

There is one additional objection that the Court must consider with respect to Mr.

Bratic's report. In the First Bratic Report, dated November 13, 2009, Mr. Bratic states that he did

not express an opinion as to Interplan's actual damages. In the Second Bratic Report, dated

February 10, 2010, Mr. Bratic criticizes the methodology used by defense damages expert

Kenneth Kolkhurst to calculate Plaintiff's actual damages. During his deposition on February 12,

2010, Mr. Bratic again stated that he had no opinion as to the actual damages suffered by Plaintiff. (Bratic Depo. at 170.) Defendants now seek to exclude the opinions in the Second Bratic Report rebutting the Kolkhurst report, as these opinions, Defendants argue, contradict Mr. Bratic's claim that he would not offer opinions about actual damages.

Federal Rule of Civil Procedure 26(a)(2) governs disclosures of expert testimony. The initial disclosure of an expert witness must be accompanied by a report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Expert testimony for the sole purpose of "contradict[ing] or rebut[ting] evidence on the same subject matter" identified by another expert witness may be made within 30 days of the other party's disclosure. Fed. R. CPiv. P. 26(a)(2)(C)(ii). A rebuttal report may not "offer new substantive expert opinions unless there is substantial justification for failing to timely offer the new opinions or the new opinions offered are harmless." *Shen Wei (USA) Inc. v. Sempermed USA, Inc.*, Case No. 05 C 6004, 2008 U.S. Dist. LEXIS 109486, at *5-*6 (N.D. Ill. June 20, 2008).

The Court finds that the Second Bratic Report is a rebuttal report under Rule 26(a)(2)(C) and was timely filed. Contrary to Defendants' argument, Mr. Bratic was not confined to the scope of the First Bratic Report, but instead, was limited to rebutting the opinions contained in Defendants' expert reports. *See Ritch v. A M Gen. Corp.*, Case No. 93-451-SD, 1997 U.S. Dist. LEXIS 24196, at *3 (D.N.H. Nov. 17, 1997). Mr. Bratic has appropriately limited his rebuttal opinions. His statements that he would not opine on Plaintiff's damages are reasonably understood as a limitation on the scope of his initial expert disclosure rather than a limitation on his rebuttal testimony. Therefore, his references to the Kolkhurst report are permissible.

13

In sum, Defendant's motion to exclude Mr. Bratic's expert opinions is granted in part as to the calculation of Defendant Thomas's gross revenue, and is otherwise denied.

### 2.  Andrew Noble

Andrew Noble is one of Defendant Thomas's experts on architectural and design issues. He is an architect licensed to practice architecture in Florida, Alabama, Arkansas, Arizona, Louisiana and Texas. (Noble Report at 14.)[4] He possesses over sixteen years of experience drafting construction drawings and schematic designs, performing contract administration and project management, and conducting forensic analysis of structural damage due to construction defects and improper design. (Noble Report at 14; Noble Depo. at 17-28.) Mr. Noble's expert report covers various topics. First, he analyzes floor plans produced by Plaintiff, Defendant Morris, and Defendant Hermes to determine similarities and differences among the designs, including size, location, orientation, and points of entry. (Noble Report at 3-5.) Second, Mr. Noble seeks to rebut the expert report of Leonard Lane, Plaintiff's architectural expert. He challenges Mr. Lane's conclusions regarding (a) the effect of unsigned Design Proposals and Confidentiality Agreements upon copyright ownership, and (b) the similarity of Defendant Morris's drawings to Plaintiff's designs as evidence of the former copying the latter. (*Id.* at 5-8.) Finally, Mr. Noble cites various publications of the U.S. Copyright Office regarding copyright law, applies them to the facts presented to him, and concludes that: (a) Defendant Thomas was a joint author with Plaintiff in the design of Speedy Stop Store No. 85; (b) the plans for Store No. 85 were a derivative work; (c) the design of Store No. 85 was not uniquely Plaintiff's; (d) Plaintiff did not acquire transfer of ownership from Defendant Thomas or other contributors for their respective portions of the design; and (e) Plaintiff did not possess sufficient ownership to claim a sole copyright to the Speedy Stop stores. (*Id.* at 8-9.)

---

[4] Citations to Mr. Noble's report are based on the internal page numbering of the report.

The Court agrees with Plaintiff that Mr. Noble's opinions regarding authorship, ownership, and derivative works must be excluded as improper legal opinions. Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); *United States v. Izydore*, 167 F.3d 213, 218 (5th Cir. 1999). "Rule 704, however, does not open the door to all opinions." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Expert witnesses may neither tell the jury what result to reach nor provide legal conclusions. *Id.* Mr. Noble does both in his expert report.

Whether Defendant Thomas is a joint author, whether Plaintiff's designs are derivative works, whether Plaintiff has sufficient ownership to claim copyright, whether Plaintiff's design is unique and gives rise to ownership, and whether Plaintiff acquired ownership from Defendant Thomas are all issues for the trier of fact to decide. *See Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006) (holding that the trial court's exclusion of expert opinion that there was no direct evidence of copying was proper, since this opinion squarely addressed the ultimate issue of fact). Mr. Noble impermissibly uses the legal standards and applies them to the facts of the case in order to make legal conclusions. *See FedEx Ground Package Sys. v. Applications Int'l Corp.*, 695 F. Supp. 2d 216, 221 (W.D. Pa. 2010). Mr. Noble may not tell the trier of fact what result to reach with respect to these issues. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).

Moreover, Mr. Noble's attempt to cite the legal standards applicable to copyright law intrudes upon the role of the trial court. "Our legal system reserves to the trial judge the role of deciding the law for the benefit of the jury." *Askanase*, 130 F.3d at 673 (quoting *Specht v. Jensen*, 853 F.2d 805, 808-09 (10th Cir. 1988)) ("There being only one applicable legal rule for

each dispute or issue, it requires only one spokesman of the law, who of course is the judge.).

Mr. Noble attempts to qualify his statement of legal standards by claiming that he is merely

interpreting the way copyright law "affects an architect" or how "an architect would use or refer

to copyrights." (Noble Depo. at 39.) Such an interpretation carries a high risk of confusing the

issues to be decided by the jury. *See* Fed. R. Evid. 403. Therefore, Mr. Noble may not provide

opinions regarding the legal standards for joint authorship, derivative works, or copyright

ownership, nor how those legal standards are interpreted by architects. *See FedEx Ground*

*Package Sys.*, 695 F. Supp. 2d at 221 (excluding expert opinion regarding "what is and what is

not protected under copyright law"); *Paul Morelli Design, Inc. v. Tiffany & Co.*, 200 F. Supp. 2d

482, 486 (E.D. Pa. 2002) (excluding expert testimony from the former Register of Copyrights

regarding "Copyright Office procedure and legal standards applicable to copyrights").

  The Court grants in part Plaintiff's motion to exclude the expert opinions of Mr. Noble as

to the legal standards of copyright law and to legal conclusions regarding joint authorship,

derivative works, and ownership, and otherwise denies the motion.

### 3. Timothy Burrows

  Timothy Burrows is one of Defendant Thomas's architectural experts. He is an architect

who has been licensed to practice architecture in Tennessee since 1983. (Burrows Report at 8.)[5]

He possesses extensive experience designing various residential, commercial, industrial and

institutional projects, including hospitals, churches, office buildings, retail buildings and strip

malls, condominiums, and luxury homes. (*Id.*) In addition, he appears to have worked for some

time as a general contractor building homes. (*Id.* at 9.)

---

[5] Defendant Thomas states in its Response to Plaintiff's motion to exclude that Mr. Burrows is also a member of the State Bar of Tennessee. (Def.'s Resp. to Pl.'s Mtn. to Exclude at 16.) However, this fact does not appear in Mr. Burrows's report or curriculum vitae. The Court does not believe that Mr. Burrows's membership in the State Bar of Tennessee has a bearing on the propriety of Mr. Burrows's opinions and need not be considered.

Mr. Burrows offers opinions on several topics: (1) that the Interplan floor plan is "substantially similar" to the floor plan of Quik Trip; (2) that Interplan's floor plan is so similar to Quick Trip floor plan, and the Quick Trip floor plan so unique, that Interplan could not have been the author without specific direction by others or by observing the design in public; and (3) that the elevation (i.e. exterior materials and height) of three Speedy Stop stores possessed little aesthetic value.

### a.   Relevance of Mr. Burrows' opinions

Before the Court analyzes Mr. Mitchell's opinions, it is important to distinguish among the various ways in which his opinions regarding originality, uniqueness, unusualness, and similarity are relevant to issues of copyright infringement. To establish copyright infringement, a plaintiff must prove "ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *See Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994)

First, expert opinion may be relevant to the first prong of copyright infringement—i.e., ownership of a valid copyright. Originality is the touchstone of copyright protection. *Feist*, 299 U.S. at 345 (stating that the constitutional minimum of originality requires: (1) the work must be independently created by the author (i.e., not simply copied from another work), and (2) it must possess at least a minimal degree of creativity).

Second, opinions on these matters may be relevant to the second element of copyright infringement—i.e., actionable copying. Actionable copying requires a showing of factual copying and substantial similarity. *See Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 635 (S.D. Tex. 2007).  Factual copying is generally established through evidence of: (1) defendant's access to the copyrighted work prior to the creation of the infringing work; and (2) probative

similarity. *Id.* Probative similarity is made through a comparison of the works in their entirety, both protectable and unprotectable elements, in order to determine whether factual copying may be inferred. *Id.* Experts may render opinions regarding probative similarity. *See West v. Perry*, Case No. 2:07CV200, 2009 U.S. Dist. LEXIS 63422 (E.D. Tex. July 23, 2009). Probative similarity differs from substantial similarity, which is the second step in the actionable copying analysis. Substantial similarity examines whether the copyrighted work and the allegedly infringing work are so similar as to make the factual copying legally actionable. In this analysis, the factfinder makes a side-by-side comparison between the original and the copy to determine whether a layman would view the two works as substantial similar. *Id.* Experts may not provide opinions related to the substantial similarity because it is evaluated using a "layperson" standard, but may provide testimony as to probative similarity. *Sahuc v. Tucker*, 300 F. Supp. 2d 461, 465 (E.D. Tex. 2004). With these legal concepts in mind, we turn to Mr. Burrows's opinions.

### b. Opinions that should be excluded

Mr. Burrows states that he believes the Interplan floor plan to be "substantially similar" to the floor plan of Quik Trip. (Burrows Report at 2, 3.) To the extent that substantial similarity must be shown to establish that Plaintiff copied Quik Trip's designs and therefore cannot meet the constitutional minimum of originality for copyright protection of its designs, *see Feist*, 299 U.S. at 345, Mr. Burrows may not provide an expert opinion on this issue. *See Sahuc*, 300 F. Supp. 2d at 465 (stating that "substantial similarity" must be determined by the trier of fact using a layperson standard). Further, Mr. Burrows's conclusion and use of the phrase "substantially similar" in the context of Interplan and Quik Trip has the potential to confuse the issues and mislead the jury. *See* Fed. R. Evid. 403. The primary issue presented in this case is not the

substantial similarity between Plaintiff's and Quik Trip's designs, but rather the substantial similarity among Plaintiff's, Morris's and Hermes's designs.

Next, Mr. Burrows's opinion concluding that "Interplan could not have been the author of the floor plan" must be excluded. Authorship is a factual question that must be left to the jury. Mr. Burrows's conclusion on the fact of Plaintiff's authorship is an improper legal opinion. *See Owen*, 698 F.2d at 240 (holding that expert witnesses may neither tell the jury what result to reach nor provide legal conclusions).

### c.  Opinions that are permissible

Though Mr. Burrows may not offer a legal conclusion of "substantial similarity," he may compare the floor plans of Plaintiff to those of Quik Trip in order to provide an opinion of whether an architectural firm could have generated a floor plan similar to Quik Trip's designs without copying. Mr. Burrows's opinion on this issue is both relevant and reliable. First, Mr. Burrows's opinion regarding the possibility of copying is relevant to the issue of Plaintiff's authorship, and consequently, the copyrightability and ownership of the architectural works and technical drawings. Second, Mr. Burrows's opinion is reliable in that it is based upon his extensive professional experience, as applied to the facts presented here. *See United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (stating that an expert's reliability may depend heavily on the "knowledge and experience of the expert, rather than the methodology or theory behind it"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (stating that an expert may draw a conclusion from a set of observations based on extensive and specialized experience). Mr. Burrows possesses years of professional experience as an architect, designer contractor, and manager of construction and architectural projects. He has worked on a number of different types of architectural projects, ranging from personal homes to retail buildings to medical facilities. As

a result, Mr. Burrows has amassed knowledge of the architectural design process, including the interaction between client and architect. The methodology by which he has arrived at his opinions about Plaintiff's plans is one based on experience, rather than scientific method. *See Kumho Tire Co.*, 526 U.S. at 150 (stating that the Rule 702 inquiry is a "flexible one and that the *Daubert* factors may not be pertinent in assessing reliability, "depending on the nature of the testimony at issue, the expert's particular expertise, and the subject of his testimony"). "[A] licensed architect with extensive experience reviewing architectural drawings is qualified to give expert testimony as to whether two different sets of architectural drawings contain meaningful architectural similarities." *Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, Case No. 3:09cv358, 2010 U.S. Dist. LEXIS 66519, at *9 (E.D. Va. July 1, 2010). Therefore, the Court finds Mr. Burrows's method of analysis to be reliable.

In addition, Mr. Burrows may offer opinions regarding characteristics of the Speedy Stop stores' elevation (i.e. exterior material and height), including commonality and aesthetic value of the design features. Such opinions would be relevant to the issue of originality, and thus copyrightability, of Plaintiff's designs. *See Feist*, 299 U.S. at 345 (stating that originality requires, among other things, that the work possess at least a minimal degree of creativity). His opinion in this regard is supported by a methodology drawing on his professional qualifications and architectural design experience, rather than any scientific formula or study. He states that the basis of his opinion is the Speedy Stop store elevations themselves, the "thousands of photographs of buildings in various cities" he has taken, and his own use of design elements in creating architectural designs. (Burrows Report at 2.) Mr. Burrows's methodology—the application of his extensive background knowledge of building design to the specific features found on the Speedy Stop stores—satisfies the "flexible" Rule 702 inquiry because the context in

which Mr. Burrows is offering his opinion does not seem to be one where scientific, peer-tested theories or techniques may be used. *See Kumho Tire Co.*, 526 U.S. at 150; *Harvester, Inc*, 2010 U.S. Dist. LEXIS 66519 at *9 (noting that, other than visual comparison and analysis of architectural drawings, the court was unaware of any other method of reviewing architectural drawings for meaningful architectural similarities).

In sum, Plaintiff's motion to exclude Mr. Burrows testimony is granted in part as to his legal opinions regarding "substantial similarity" and Plaintiff's authorship, and is denied otherwise.

### 4.  Greg Mitchell

Greg Mitchell is one of Defendant Thomas's experts regarding the operation, design, and success of convenience stores. Mr. Mitchell is the President of Toot 'n Totum Food Stores, LLC, which operates a chain of convenience stores in Amarillo and Borger, Texas. (Mitchell Report at 1.) Though Mr. Mitchell did not submit a resume along with his expert report, it appears that he has worked at Toot 'n Totum since his graduation from the University of Oklahoma in 1974. (Mitchell Depo. at 8.) He belongs to the Texas Petroleum and Convenience Store Association and the National Association of Convenience Stores, which are trade organizations (*Id.* at 9.) He states that he has appeared as a guest speaker at trade association meetings and marketing classes at West Texas State University. (*Id.* at 10-11.) He has been interviewed for trade publications on the convenience store industry, though he has never written articles for publication. (*Id.* at 9-10.)

Mr. Mitchell's report provides opinions on a number of issues, including: (1) Plaintiff's plans did not contain "any unique, unusual or original floor plan design elements"; (2) Plaintiff's plans were similar to floor plans used by a convenience store chain called Quik Trip; (3) the Quick Trip convenience store design was not "unique or unusual"; (4) the similarity among

Plaintiff's plans, Defendant Morris's plans, Defendant Hermes's plans and Quick Trip's plans meant that the "original source of the design is certainly not unique to Interplan"; (5) general floor plan designs vary only in small ways from chain to chain and store to store; (6) the custom and practice of working with architects in the convenience store industry; and (7) the factors contributing to the success of any given convenience store.

### a. Opinions that should be excluded

The Court agrees with Plaintiff that Mr. Mitchell's opinions stating that Plaintiff's designs are not "original" or do not contain "original" design elements should be excluded as they are improper legal opinions.[6] Mr. Mitchell's statements on these topics veer too close to a legal conclusion regarding "originality" that is determinative of copyright existence. *See Feist*, 499 U.S. at 345 (1999); *Rottlund Co.*, 452 F.3d at 732 (holding that the trial court's exclusion of expert opinion that there was no direct evidence of copying was proper, since this opinion squarely addressed the ultimate issue of fact).

In addition, Mr. Mitchell's opinions regarding convenience store industry custom to "hire different architects over the course of time" and "to direct each architect to achieve similarity in design" must be excluded. (Mitchell Report at 3.) Mr. Mitchell acknowledged that the sole basis for this opinion was his professional relationship with only two architects, one of which he hired about 12 or 13 years ago. (Mitchell Depo. at 50.) He has not investigated how other convenience store operators interact with architects. (*Id.* at 51.) The extremely small universe of information from which Mr. Mitchell extrapolates evidence of industry custom renders this opinion

---

[6] Mr. Mitchell's opinions regarding the uniqueness, unusualness, or functionality of the Quick Trip designs are appropriate since they "embrace" the issue of fact for the jury, but do not state a legal conclusion. *See Berg v. Symons*, 393 F. Supp. 2d 525, 541 (S.D. Tex. 2005) (stating that a work may be copyrightable even though it is not unique); *Owen*, 698 F.2d at 240.

unreliable. *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987) ("If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury.").

### b.  Opinions that are permissible

Though Mr. Mitchell may not offer legal conclusions regarding the "originality" of Plaintiff's design, he may offer his opinions regarding the variability of convenience store design, his opinion that the Quik Trip design was not unique or unusual, and his opinions regarding the factors that contribute to the success of a convenience store. The first two opinions are relevant to the issue of "originality," which is required to establish a valid copyright. The last opinion is relevant to the "infringer's profits" measure of damages, where Defendants have the burden of establishing that any profits they realized as a result of the copyright infringement were attributable to factors in addition to the infringing activity.

These opinions are also reliable in that they are based upon Mr. Mitchell's twenty-five years of experience in the convenience store industry. *See Hankey*, 203 F.3d at 1169; *Kumho Tire Co.*, 526 U.S. at 1506. Mr. Mitchell has stated that he has worked with the same convenience store company since 1974, as district manager operating eight to twelve different stores and later as President and CEO in charge of sixty-one convenience stores. (Mitchell Depo. at 70-71.) In these roles, Mr. Mitchell oversaw the day-to-day operations of convenience stores, including real estate, construction, sales, and human resources. (*Id.* at 12-13.) With respect to his opinions on convenience store design, Mr. Mitchell's experience has provided him with a detailed knowledge regarding the various ways in which convenience stores may be designed, the interior arrangement of elements, and how some design choices are chosen over others.[7] With

---

[7] In his deposition, Mr. Mitchell illuminates how and why certain store layouts are chosen. For example, if a checkout stand is placed in the middle of the store, "you can put your coolers on the left or right. Because you always want your cooler on an outside wall." (Mitchell Depo. at 73-74.) Once one side is chosen for the coolers,

respect to his opinions regarding the factors for success of a convenience store, Mr. Mitchell may

not be an economist or econometrist who can quantify the exact impact of certain variables, such

as store location, price of goods, cleanliness of bathrooms, upon a convenience store's success.[8]

However, he may offer general, non-quantitative opinions regarding the factors that impact a

store's performance based upon his years of practical experience in the industry.[9] *See Suzlon*

*Wind Energy Corp. v. Shippers Stevedoring Co.*, 662 F. Supp. 2d 623, 665 (S.D. Tex. 2009)

(stating that courts may allow expert opinions on matters within the expert's general expertise,

even if the expert lacks qualifications as to specific matters within that field, as long as their

general expertise allows them to give relevant and reliable opinions).

　　　　Mr. Mitchell's comparison of the Quik Trip floor plan and Plaintiff's floor plan presents

a closer question. A comparison of these plans is relevant to the issue of "originality"—i.e.,

whether Plaintiff's floor plan possessed a minimal degree of creativity and whether Plaintiff

independently created the floor plans (rather than copying them from Quik Trip).[10] *See Feist*, 299

U.S. at 345. However, the reliability of Mr. Mitchell's opinion on this issue is uncertain. Plaintiff

presents two arguments challenging Mr. Mitchell's opinion. First, Plaintiff contends that, since

no expertise is needed to merely overlay floor plans, Mr. Mitchell would not be helpful to the

---

"the only thing that's left is to put everything else on the [other side], which would be your bathrooms and your fountain drinks and your coffee and your fast food." (*Id.* at 74.)

[8] Mr. Mitchell states as much in his deposition: "I can only tell you through experience the way we rank them. Not by percentage but by our experience of what is most important in our stores." (Mitchell Depo. at 57.)

[9] In his deposition, Mr. Mitchell states that, in order to analyze the impact of design upon a store's profitability, he "revert[ed] to [his] long history of being in the convenience store business and the many designs [he has] done." (Mitchell Depo. at 20.) He describes going to courses and reading articles "on marketing and convenience stores. Everything from how you price, how you market, how you merchandise." (*Id.* at 22.) He acknowledges that he has never done any type of regression analysis or quantitative study to measure the exact impact of certain factors upon profitability. (Mitchell Depo. at 117-120.)

[10] His comparison, however, would be irrelevant to the issue of whether Plaintiff's floor plan was "substantially similar" to Quik Trip's floor plan. *See Sahuc*, 300 F. Supp. 2d at 465 (stating that "substantial similarity" must be determined by the trier of fact using a layperson standard).

trier of fact.[11] Second, Plaintiff argues that, even if expertise is necessary to compare the floor

plans, Mr. Mitchell does not possess the requisite professional qualifications to do so as he is not

an architect.[12] The Court believes, though, that Mr. Mitchell's opinion would be helpful to the

trier of fact because he can offer an opinion as to whether Plaintiff's design possesses the

"requisite spark of creativity" as compared to Quik Trip's design in order to qualify the former

for copyright protection. Creativity in architectural works comes not from individual standard

features (such as doors, windows, stairs, etc.), but rather from the combination or *arrangement* of

those features within a space. *See Intervest Constr., Inc. v. Canterbury Estate Homes, Inc.*, 554

F.3d 914, 919 (11th Cir. 2008). Mr. Mitchell's expertise regarding convenience store design can

assist the trier of fact to understand how the various parts of Quik Trip's store layout fit together,

whether Plaintiff's store layout is different, and if so, how. (Mitchell Depo. at 38, 41-42.)

Though Mr. Mitchell does not have an architectural license, his years of experience working to

design and construct convenience stores provide him with the background knowledge of how to

analyze the layout of a store and how to compare one store's design to another's design. Mr.

Mitchell is not required to be *highly* qualified in order to testify about a given issue. Rather,

"[d]ifferences in expertise bear chiefly on the weight to be assigned to the testimony by the trier

of fact, not its admissibility." *Huss*, 571 F.3d at 452 (citing *Daubert*, 509 U.S. at 596); *Floyd v.

Hefner*, 556 F. Supp. 2d 617, 639 (S.D. Tex. 2008) (quoting *S. Cement Co. v. Sproul*, 378 F.2d

48, 49 (5th Cir. 1967)) ("[A] person may become qualified as an expert by practical experience .

. . [.] Professional education is not a prerequisite."). Therefore, the Court declines to exclude Mr.

Mitchell's opinions comparing Quik Trip's and Plaintiff's floor plans.

---

[11] Mr. Mitchell admits that one did not need his training and experience in order to compare the floor plans.
(Mitchell Depo. at 60.) He admits that he concluded that Plaintiff's floor plan was based upon Quik Trip's floor plan
simply because they look similar. (*Id.* at 41.)
[12] Mitchell Depo. at 62-63.

In sum, Plaintiff's motion to exclude Mr. Mitchell's expert opinions is granted in part as to industry custom regarding the use of architects and his statements offering legal conclusions as to "originality," and denied in part otherwise.

### 5.  James Mandel

James Mandel is one of Defendant Thomas's experts regarding damages. Mr. Mandel is a CPA and possesses a Ph.D. in accounting.[13] Mr. Mandel's report offers his opinions on a number of issues: (a) a rebuttal of the method in which Plaintiff's damages expert, Walter Bratic, calculated Defendant Thomas's gross revenue; (b) a calculation of Defendant Thomas's expenses associated with the gross revenue amount propounded by Mr. Bratic; and (c) a calculation of the "economic gain" realized by Defendant Thomas by providing Plaintiff's architectural designs and technical drawings to Defendant Morris.

The Court need not address Mr. Mandel's opinions rebutting Mr. Bratic's calculation of Defendant Thomas's gross revenue because this calculation has been excluded. Neither does the Court address Mr. Mandel's calculation of Defendant Thomas's "economic gain."[14] The Court excludes Mr. Mandel's calculation of Defendant Thomas's deductible expenses because it is premised upon the amount of gross revenues propounded by Mr. Bratic. The Court has already excluded Mr. Bratic's opinion as to the amount gross revenues that should be attributed to the copyright infringement. Without the appropriate gross revenue figure, Mr. Mandel cannot begin to deduct expenses and show which profits, if any, are attributable to factors other than the infringement. *See* 17 U.S.C. § 504(b). Therefore, Mr. Mandel's calculation of the amount of

---

[13] As Mr. Mandel's professional qualifications are not in dispute, the Court does not describe them here. Suffice to say that Mr. Mandel presents himself as having a professional and academic background in economic and business valuation and cost accounting, among other areas. (Mandel Report at 49-61.)

[14] The Court notes that, to the extent Defendant Thomas wishes to use its "economic gain" as the way in which the "infringer's profits" measure of damages is calculated, the statute specifically refers to a defendants' gross revenue as the amount from which any expenses should be deducted. *See* 17 U.S.C. § 504(b). The Court has not yet understood how "economic gain" would be relevant to the damages issues in this case.

deductible expenses and resulting profit would not be helpful to the trier of fact. *See* Fed. R. Evid. 702.

Plaintiff's motion to exclude Mr. Mandel's expert opinions is granted in part as to his calculation of Defendant Thomas's deductible expenses and denied in part otherwise.

### 6.  **Jeff Johanson**

Jeff Johanson is Defendant Thomas's President and Chief Operating Officer, a position he has held since 2003. (Expert Report of Jeff Johanson ("Johanson Report I") at 1.) He has also been designated as one of Defendant Thomas's damages experts. (Doc. No. 75.) Mr. Johanson is a CPA and has worked as an auditor in an accounting firm, a Chief Financial Officer of an oil rig manufacturer, and for the last ten years as the chief financial officer and later President/COO of Defendant Thomas, where he has been in charge of operations of the Speedy Stop stores. (Johanson Report I at 1.) Mr. Johanson's initial expert report offered his opinions regarding a few matters: (1) the various factors that influence the profitability of the Speedy Stop stores, including site selection, competitive pricing, customer service, and store design and layout; (2) his belief that design and layout do not have a direct influence on customer buying decisions, while location, pricing and customer service are the "primary" bases for such decisions; (3) his statement that the Quik Trip design was chosen, in part, as the basis for Plaintiff's design due to personal preference rather than its impact on financial results; and (4) his review of the sales, cost of sales, and potential for profit of the Infringing Stores, used in Mr. Bratic's calculation of Defendant Thomas's gross revenue, shows a loss of over $1.5 million dollars. (*Id.* at 1-3.) Mr. Johanson's supplemental expert report expands upon his calculation of the loss suffered by the stores in question, by first challenging the number of stores that should be at issue in this case and then clarifying that one of the stores at issue showed profit. Ultimately, Mr. Johanson

27

concludes that the total loss of the stores at issue is $4 million dollars. (Supplement to Expert Report of Jeff Johanson ("Johanson Report II") at 3-4.)

First, the Court excludes Mr. Johanson's opinions as to the losses sustained by the stores at issue in this case since, like Mr. Mandel's opinions on this issue, it is premised upon the amount of gross revenues submitted by Mr. Bratic. Mr. Johanson's opinion regarding the amount of loss suffered by certain stores would not be helpful to the trier of fact without the appropriately-calculated gross revenue figure. *See* Fed. R. Evid. 702.

Second, the Court will not exclude Mr. Johanson's opinion regarding the various factors that affect convenience store profitability, such as location, customer service, pricing, and store design, but will exclude Mr. Johanson's opinion regarding the quantitative effect each of these factors has upon the store's profitability. Like Mr. Mitchell, Mr. Johanson is qualified on the basis of his experience to speak to various aspects of convenience store operations, including his perspective on how convenience stores become profitable. He has amassed ten years of experience working in both the financial and operational side of Defendant Thomas's business. (Johanson Report I at 1.) In his role as President/COO, he has been involved in the design and construction of the Speedy Stop stores and the development of the store's retail strategy. (Johanson Report I at 1.) This type of experience would provide him with information, gained over the years, about what parts of Defendant Thomas's business model have worked, what parts have been less than successful, and why. Mr. Johanson may apply his specialized experience to the Speedy Stop stores at issue and generate an expert opinion about whether store design and layout, as compared to other variables, had an impact upon the store's business. *See Hankey*, 203 F.3d at 1169 (stating that an expert's reliability may depend heavily on the "knowledge and experience of the expert, rather than the methodology or theory behind it"); *Kumho Tire Co.*, 526

28

U.S. at 156 (stating that an expert may draw a conclusion from a set of observations based on extensive and specialized experience).

However, Mr. Johanson's opinions regarding the quantitative impact of the various factors upon profitability must be excluded. Mr. Johanson describes his method of assessing store profitability as involving both physical visits to stores and analysis of financial statements. Mr. Johanson states that he examines the financial statements of his stores on a "weekly" and "monthly" basis to review gross profit, labor and other operating expenses, sales trends, promotions and pricing. (Johanson Depo. at 29-30.) In addition, he adverts to the existence of financial information on similar topics provided by the National Association of Convenience Stores that provide guidance on convenience store strategy and success. (*Id.* at 33-34.) When asked how one might validate his opinion regarding the primary drivers of store profitability, Mr. Johanson responds that "[o]ne way would be to take our historical information and to quantify each of these tenets, apply it to these locations, and you would see that the ones that are the most profitable they have – they are the best locations and, of course, in our case, our pricing strategies . . . ." (*Id.* at 38-39.) Mr. Johanson's statements suggest that his opinions regarding the quantitative effect of certain factors upon a store's profitability possess a basis in some methodology or study apart from simply professional experience. Without more information regarding the underlying data and the manner in which store profitability has been calculated, the Court cannot conclude that the results of that analysis are reliable. Therefore, the Court excludes Mr. Johanson's opinions regarding specific amount by which each variable (such as location, pricing, customer service, store design) affects a store's profitability.

Plaintiff's motion to exclude the expert opinion of Mr. Johanson is granted in part as to the calculation of Defendant Thomas's financial losses for the stores in question and denied otherwise.

### 7. Francis Bologna

Francis Bologna is one of Defendant Thomas's experts on damages. He is a certified public accountant, who has provided accounting, tax, and consulting services to various clients, including petroleum marketers. (Bologna Report at 2.) As a result of his specialty in the petroleum marketing industry, he has developed knowledge of "good store design through twenty years of site tours of retail operations." (*Id.*) In addition, he has created tools to assist petroleum marketers with performance benchmarking and measurement of store operations as they are affected by site design, internal operation, and merchandising. (*Id.*) Mr. Bologna was retained by Defendant Thomas to provide an "independent assessment from my experience as to the degree of impact a store's layout and store elevation has on a shopper's buying experience." (*Id.*) Mr. Bologna offers the following opinions in his report: (1) store layout and store elevation have a "significantly small" impact on a shoppers' overall shopping experience, as compared to other store attributes; and (2) the portion of profitability relating to store layout and store elevation, and correlated damages, would be nominal.

The Court agrees with Plaintiff that Mr. Bologna's opinions are improper *ipse dixit* ("because I say so") expert opinions and should be excluded. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co.* v. *Joiner*, 522 U.S. 136, 146 (1997). Mr. Bologna seems to possess the requisite professional experience to render an opinion on the factors that affect a convenience store's profitability, like Mr. Mitchell and Mr.

Johanson. However, Mr. Bologna attempts to go farther than Mr. Mitchell and opine upon the *degree* to which store layout and elevation affect either a shopper's buying experience or a store's profitability. Presumably there is some data that give rise to Mr. Bologna's opinions on these matters. In fact, Mr. Bologna refers to the existence of such data when he states that he "developed . . . balance scorecard programs assessing the operational deficiencies of a store or chain operations from site design to internal operation, merchandising, and product sets." (Bologna Report at 2.) However, Mr. Bologna simply arrives at a conclusory opinion regarding the quantitative impact of store layout and elevation on profitability and shopper experience without describing the data upon which he relied in arriving at that opinion. He does not provide any quantitative analysis of the data nor describe why one would be inappropriate. He does not even describe the other "far more important store attributes" that affect shoppers' habits. (Bologna Report at 3.)  Mr. Bologna attempts to provide quantitative guidance as to the amount of damages that can be attributed to Defendant Thomas without providing any ability to question the manner in which he arrived at this conclusion. *See Gen. Star Indem. Co. v. Sherry Brooke Revocable Trust*, 243 F. Supp. 2d 605, 626 (W.D. Tex. 2001) (stating that conclusory opinions by experts lack the requisite evidentiary reliability because they fail to set forth a discernable methodology).

　　　　Moreover, to the extent that Mr. Bologna's opinion is based upon an application of his extensive professional experience to the facts at hand and no scientific or technical methodology is appropriate here, he fails to state how his background experience has directed his analysis of the present case. *See id.* at 625 (noting that the expert did not explain how he had reached conclusions based on the material he reviewed, but "only that he did review noted information and that he did reach conclusions"); *Viterbo*, 826 F.2d at 424 ("Without more than credentials

31

and a subjective opinion, an expert's testimony that "it is so" is not admissible."). Therefore, Plaintiff's motion to exclude the expert opinion of Francis Bologna is granted.

### 8.  Kenneth Kolkhurst

Kenneth Kolkhurst is Defendant Morris's expert on damages. Mr. Kolkhurst is a certified public accountant and principal of Kolkhurst & Kolkhurst CPAs, an accounting firm in Houston, Texas. (Kolkhurst Report at 1.) Mr. Kolkhurst offered opinions regarding the following issues: (1) that, after calculating the deductible expenses associated with Defendant Morris's gross revenue, Defendant Morris showed a loss on the three design projects it performed for Defendant Thomas; (2) that Plaintiff's project profit percentage should be 15.5% and its resulting actual damages should be $24,267.69; and (3) that Mr. Bratic's calculation of Defendant Morris's gross revenues did not take into account its deductible expenses. (*Id.* at 2-5.)

Plaintiff seeks to exclude Mr. Kolkhurst's decision to use a 15.5% project profit percentage. In his report, Mr. Kolkhurst calculated Plaintiff's project profit percentage using two different methods. First, Mr. Kolkhurst analyzed Plaintiff's profit and loss statements for each of the nine Speedy Stop projects that Plaintiff designed for Defendant Thomas. He added the gross revenue for each of the nine projects to arrive at a total gross revenue figure of $282,588. He then added together the project expenses and overhead cost for each of the nine stores for a total of $162,353. He subtracted the combined project expenses and overhead cost from the gross revenue to arrive at a combined project profit of $120,135. The combined project profit of $120,135 means that Plaintiff's profits constituted 42.5% of the gross revenue it received for Thomas's projects. The second method that Mr. Kolkhurst used to calculate Plaintiff's profit percentage was based on an analysis of its 2003, 2004, and 2005 tax returns. Mr. Kolkhurst added the gross revenue from these three tax returns and then subtracted project expenses and

overhead costs to arrive at a project profit (representing profit associated with *all* of Plaintiff's projects, not just the Speedy Stop projects) of $284,930. This project profit total represents a project profit percentage of 15.5%.

Mr. Kolkhurst then elected to use the 15.5% project profit percentage (calculated using all of Plaintiff's projects) rather than the 42.5% project profit percentage (calculated using only Plaintiff's Speedy Stop projects). His basis for choosing the 15.5% project profit percentage was that he found it "unreasonable that the project profit on the nine Speedy Stop stores would generate a project profit percentage of 42.5% on $282,588 of gross revenue and that the remaining $1,561,208 of gross revenue would generate a project profit percentage of only 10.6%." (Kolkhurst Report at 4.) He believed that Plaintiff's project profit percentage for the Speedy Stop stores should be in line with the overall percentage reported on its tax returns of 15.5%. (*Id.*) Mr. Kolkhurst did not provide any further reasons in his report for why he believed it was unreasonable to use the 42.5% project profit percentage.

Plaintiff argues that Mr. Kolkhurst's choice to use the 15.5% percentage rate is unreliable as it is not based on any principles or methods that suggest an *individual* project percentage rate can be calculated using a corporate tax return covering Plaintiff's *entire* business. (Doc. No. 112 at 3.) Further, Plaintiff argues that Mr. Kolkhurst used a double standard in his report in that he relied upon Defendant Morris's profit and loss statements while disregarding Plaintiff's profit and loss statements. (*Id.*) In its Response, Defendant Morris argues that Mr. Kolkhurst chose not to rely on the 42.5% percentage rate due to the number of inaccuracies in Plaintiff's profit and loss statements. (Doc. No. 118 at 9.) During one of his depositions, Mr. Meijer acknowledged various inaccuracies in Plaintiff's profit and loss statements as well as omissions of certain costs

33

from the "project expenses" category of the statements.[15] Defendant Morris argues that these inaccuracies and omissions had the effect of artificially inflating Plaintiff's project profitability percentage and are unreliable as data upon which to base the profitability calculation.

Mr. Kolkhurst's accounting methodology itself has not been attacked as unsound. Rather, the dispute between the parties centers on which set of underlying data to use as the basis for Mr. Kolkhurst's calculations. Mr. Kolkhurst has calculated a project profitability percentage using both sets of data (Plaintiff's profit and loss statements and Plaintiff's tax returns), selected one percentage as more accurately reflecting Plaintiff's project profitability, and offered his expert opinion recommending use of this percentage. Mr. Kolkhurst's decision to use the 15.5% percentage and reject the 42.5% percentage does not make his expert opinion unreliable. Generally, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo*, 826 F.2d at 422; *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 955-956 (8th Cir. 2007) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)) (stating that the factual basis of an opinion should be examined by an opposing party in cross-examination). Ultimately the jury will determine which measure of Plaintiff's project profitability percentage it finds more persuasive after hearing both Plaintiff's and Defendants' expert opinions on the matter. The Court does not find Mr. Kolkhurst's expert opinion unreliable simply because he chose to use Plaintiff's tax returns as opposed to Plaintiff's profit and loss statements. Therefore, his expert opinion will not be excluded. *See EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739

---

[15] Mr. Meijer acknowledged that the profit and loss statement he prepared for Speedy Stop store no. 59 did not accurately reflect expenses for clerical time and for engineering fees that were separately documented in underlying Excel spreadsheets. (Deposition of Marcel Meijer on January 4, 2010 ("Meijer Depo. II") at 390-392.) Mr. Meijer acknowledged that the profit and loss statements did not contain an allocation for general and administrative (G&A) expenses. (Meijer Depo. II at 406.) Mr. Meijer acknowledged that the tax rate for Medicare and FICA taxes on the profit and loss statements was different from the rates cited by Defendant Morris's counsel. (*Id.* at 416.) Finally, Meijer noted that the profit and loss statements did not reflect certain deductions taken on Plaintiff's tax return for utilities. (*Id.* at 419-421.)

(8th Cir. 2000) (holding that the district court did not abuse its discretion in allowing both

plaintiff's and defendant's expert witnesses to testify as to damages, where each had conflicting

methodologies, since jury left with ultimate decision as to which damages theory was more

sound).

Plaintiff's motion to exclude Mr. Kolkhurst's expert opinion is denied.

### 9. Cecil Spencer

Cecil Spencer is Defendant Morris's architectural and technical expert. He is a licensed

architect in California, where he has been working since 1981, mainly in the field of retail and

commercial architecture. (Spencer Report at 1.) Mr. Spencer has specialized in the area of gas

station, convenience store, and fast food restaurant design.[16] (*Id.*) Mr. Spencer offers the

following opinions in his report: (1) Defendant Morris's actions were proper and consistent with

retail architecture industry standards; (2) Defendant Morris did not inappropriately sign and seal

plans created by others in violation of Texas Board of Architectural Examiner's ("TBAE") Rules

and Regulations of the Board Regulation the Practice of Architecture; (3) Defendant Morris was

justified in interpreting the term "Owner" in Plaintiff's Scope of Document statement on the title

block to mean Defendant Thomas; (4) Plaintiff's drawings were created as prototypical drawings

meant to be copied and used for other of Defendant Thomas's projects; (5) Use of title blocks on

electronic drawings documents as copyright management information under the Federal

Copyright Act is not common or typical in retail architecture and is not industry practice; (6)

Defendant Morris's removal of Plaintiff's title block information did not violate the Federal

Copyright Act; (7) Defendant Morris's removal of Plaintiff's title block was good standard

industry practice required by TBAE Rules, and in fact, benefited Plaintiff; (8) Plaintiff's

drawings contain non-original elements and borrowed elements from other sources, therefore are

---

[16] Though Plaintiff claims that Mr. Spencer is a California architect who is not licensed to practice in Texas,

not purely original as claimed; (9) Plaintiff's drawings may contain some limited original design work, primarily on a limited area on the building exterior elevations; and (10) project profitability for architecture and engineering firms practicing retail architecture historically ranges on average from 10% to 15%. (*Id.* at 4-5.) In addition, Mr. Spencer refers to form contracts prepared by the American Institute of Architects (AIA) in order to rebut the conclusions that Leonard Lane, Plaintiff's architectural expert, made on the basis of these documents. (*Id.* at 8.)

First, Mr. Spencer's opinions regarding the "originality" of Plaintiff's designs, whether Plaintiff's designs were created as prototypical works, and whether Defendant Morris' removal of Plaintiff's title block violated the Copyright Act must all be excluded as improper legal opinions. Similarly, Mr. Spencer cannot offer legal conclusions that Defendant Morris's actions were proper and consistent with retail architecture industry standards, that Defendant Morris did or not violate TBAE Rules and, in fact, its actions constituted good industry practice, and that Defendant Morris was justified in interpreting the term "Owner" in Plaintiff's title block as referring to Defendant Thomas. Mr. Spencer may not offer legal conclusions on these issues because they are within the province of the jury to decide. *See Rottlund Co.*, 452 F.3d at 732; *Izydore*, 167 F.3d at 218; *Owen*, 698 F.2d at 240. Mr. Spencer may certainly offer opinions regarding the general industry practice of creating prototypical works, retail architecture industry standards, TBAE Rules, the use of title blocks within architectural design practice, and his analysis of the amount of creativity generally used in convenience store designs. He may even apply his background knowledge and expertise to the facts of this case to assist the trier of fact to interpret or understand how the architectural design process and industry standards may offer context to the parties' actions. However, what he may not do is offer up the ultimate conclusion

to the trier of fact regarding the questions of fact that will be presented to determine Defendant Morris's liability.

Second, Mr. Spencer's opinion regarding the average project profitability of architecture and engineering firms must be excluded as improper *ipse dixit* opinion. Within his report, Mr. Spencer simply offers this conclusory statement without any further explanation of the underlying data or methodology upon which it is based. (Spencer Report at 5.) During his deposition, Mr. Spencer offered some explanation for this statement by indicating that "[t]hese numbers are drawn from studies that were done . . . where we participated in surveys of architect and engineering firms across the country." (Spencer Depo. at 68.) Though the surveys were conducted by a publishing company, Mr. Spencer acknowledges that these were informal surveys and that the reports he had seen corresponded to the "mid 1990s to the mid 2000s." (*Id.* at 68-69.) Unfortunately, Mr. Spencer's memory of data last viewed approximately five years ago does not serve as a sufficient basis for expert testimony. The Court cannot be sure that Mr. Spencer has remembered the data correctly nor would he be able to address any cross-examination questions about the data since he does not currently possess it. Though the factual basis of expert testimony is generally a matter of credibility for the fact finder, the Court is able to exclude testimony that is "fundamentally unsupported." *Viterbo*, 826 F.2d at 422.

Third, Mr. Spencer's opinion regarding the AIA contract is excluded for the same reasons that Mr. Lane's opinion referring the AIA contract was excluded by the Court on October 4, 2010 (Dkt. No. dated 10/5/2010.) There is simply no evidence presented that any of the parties used, or even considered, the AIA contract during their professional relationship. Reference to the AIA contract would be likely to confuse the issues or mislead the jury. *See* Fed. R. Evid. 403.

Fourth and finally, Mr. Spencer's opinions regarding industry practice surrounding the use of title blocks on electronic drawings documents as copyright management information is permissible. (Spencer Report at 7, 13, 17.) Such an opinion is relevant when examining whether, as a question of fact, the title block used by Plaintiff constitutes protected "copyright management information" and whether Defendant Morris's conduct is considered "circumvention" under the DCMA. Mr. Spencer's extensive professional experience as an architect, and specific experience in the retail, gas station, and convenience store industry, provides him with the basis to opine generally about industry practice regarding the use of title blocks. Therefore, the Court will not exclude Mr. Spencer's opinion regarding this issue.

Plaintiff's motion to exclude the expert opinions of Mr. Spencer is granted in part as to his legal conclusions regarding the propriety of Defendant Morris's conduct under industry standards, Defendant Morris's violation of TBAE Rules, Defendant Morris's interpretation of the term "Owner," Plaintiff's drawings as prototypes, Defendant Morris's violation of the DCMA, the originality of Plaintiff's drawings, average project profitability, and AIA contracts, and denied otherwise.

## III.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

(1)    Defendants' Joint *Daubert* Motion to Exclude the Testimony of Plaintiff's Expert, Walter Bratic (Doc. No. 107) is **GRANTED** in **PART** as to Defendant Thomas's gross revenue and **DENIED** in **PART** as to Mr. Bratic's other opinions:

(2)    Plaintiff's Motion to Strike and Exclude Expert Testimony from (1) Kenneth Kolkhurst; and (2) Cecil R. Spencer (Doc. No. 112) is **GRANTED** in **PART** and **DENIED** in **PART**:

      (a) Mr. Kolkhurst's opinions are not excluded; and

      (b) Mr. Spencer's opinions as to his legal conclusions regarding the propriety of Defendant Morris's conduct under industry standards, Defendant Morris's violation of TBAE rules, Defendant Morris's interpretation of the term "Owner," Plaintiff's drawings as prototypes, Defendant Morris's violation of the DCMA, and the originality of Plaintiff's drawings and his opinions as to average project profitability and AIA contracts are excluded, and his opinions otherwise are denied; and

(3) Plaintiff's Motion to Strike and Exclude Testimony from (1) Andrew M. Noble III; (2) Greg Mitchell; (3) Timothy W. Burrow; (4) James P. Mandel; (5) Francis O. Bologna; and (6) Jeff Johanson (Doc. No. 113) is **GRANTED** in **PART** and **DENIED** in **PART**:

      (a) Mr. Noble's opinions as to the legal standards of copyright law and legal conclusions regarding joint authorship, derivative work and ownership are excluded, and his opinions otherwise are not excluded;

      (b) Mr. Mitchell's opinions as to industry custom regarding the use of architects and legal conclusions regarding originality are excluded, and his opinions otherwise are not excluded;

      (c) Mr. Burrows's opinions as to legal conclusions regarding "substantial similarity" and Plaintiff's authorship are excluded, and his opinions otherwise are not excluded;

      (d) Mr. Mandel's opinions regarding Defendant Thomas's deductible expenses are excluded, and his opinions otherwise are not excluded;

      (e) Mr. Bologna's expert opinions are excluded; and

  (f) Mr. Johanson's opinions regarding Defendant Thomas's financial losses for the

    stores in question are excluded, and his opinions otherwise are not excluded.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 8th day of October, 2010.

            _____

            KEITH P. ELLISON
            UNITED STATES DISTRICT JUDGE