UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INTERPLAN ARCHITECTS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 4:08–cv–03181 |
| | § | |
| C.L. THOMAS, INC., MORRIS & | § | |
| ASSOCIATES ENGINEERS, INC., AND | § | |
| HERMES ARCHITECTS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the following motions:

Filed by Interplan Architects, Inc. ("Plaintiff"):

1. Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108)
2. Motion for Partial Summary Judgment (Ownership of Valid Architectural Works Copyrights (Doc. No. 110)
3. Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111)
4. Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131)
5. Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143)
6. Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114)

Filed by C.L. Thomas, Inc. (the "Defendant" or "Defendant Thomas"):[1]

---

[1] These motions were originally filed jointly by C.L. Thomas, Inc., Morris and Associates Engineers, Inc., and Hermes Architects, since all three were named as defendants in this case. The Court understands that Morris & Associates Engineers, Inc. and Hermes Architects, Inc. have reached a settlement on the record with Plaintiff. As C.L. Thomas, Inc. still remains as a defendant in this case, the Court will treat these motions as pending and decide them. However, the Court will not decide the following motions filed individually by Morris and Associates Engineers, Inc. and Hermes Architects, and will deny them as moot:
Filed by Morris & Associates Engineers, Inc.:
   1.  Motion for Partial Summary Judgment on Plaintiff's DMCA Claims (Doc. No. 109)
Filed by Hermes Architects:
   2.  Motion for Summary Judgment on Plaintiff's Copyright Act Claim (Doc. No. 102)
   3.  Motion for Partial Summary Judgment (Doc. No. 101)
   4.  Motion for Order Regarding Joint & Several Liability (Doc. No. 103)

7. Motion for Summary Judgment (Doc. No. 104)
8. Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119)
9. Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119)
10. Motion to Strike Declaration of Marcel Meijer (Doc. No. 119)
11. Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 138)
12. Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155)
13. Motion for Sanctions Pursuant to Rule 11 (Doc. No. 157)
14. Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105)

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that Plaintiff's Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108) should be denied, Plaintiff's Motion for Partial Summary Judgment (Ownership of Valid Architectural Works Copyrights (Doc. No. 110) should be denied, Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111) is granted in part and denied in part,  Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131) is granted in part and denied in part, Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143) is granted in part and denied in part, Plaintiff's Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114) is denied, Defendant's Motion for Summary Judgment (Doc. No. 104) is granted in part and denied in part, Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119) is denied, Defendant's Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119) is denied, Defendant's Motion to Strike Declaration of Marcel Meijer (Doc. No. 119) is granted in part and denied in part, Defendant's Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 138) is granted in part and denied in part,

Defendant's Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155) is

denied, Defendant's Motion for Sanctions Pursuant to Rule 11 (Doc. No. 157) is deferred,

Defendant's Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability

Act (Doc. No. 105) is deferred, Morris's Motion for Partial Summary Judgment on Plaintiff's

DMCA Claims (Doc. No. 109) is denied as moot, Hermes's Motion for Summary Judgment on

Plaintiff's Copyright Act Claim (Doc. No. 102) is denied as moot, Hermes's Motion for Partial

Summary Judgment (Doc. No. 101) is denied as moot, and Hermes's Motion for Order

Regarding Joint & Several Liability (Doc. No. 103) is denied as moot.

## I.      FACTUAL BACKGROUND

This case arises from alleged violations by Defendant of the Federal Copyright Act and

the Digital Millennium Copyright Act ("DMCA"). Plaintiff is a company whose business

involves architectural planning, architectural design, and preparation of architectural and

construction documents, including, but not limited to, site plans, floor plans, exterior elevations,

interior designs, and construction documents ("Architectural Documents"). Architectural

Documents contain title blocks, which are areas on the document displaying information

identifying the project, the company preparing the Architectural Documents, and information

about the scope of the document.

Defendant Thomas designs and constructs convenience stores in south Texas called

Speedy Stop. (Deposition of Carlton Labeff ("Labeff Depo.") at 19.) In early 2003, Defendant

Thomas hired Plaintiff to design two Speedy Stop stores, No. 59 in Portland, Texas and No. 82

in Columbus, Texas. (Deposition of Marcel Meijer on November 16, 2009 ("Meijer I Depo.") at

33.) Plaintiff submitted proposals to Defendant Thomas describing the services it would provide

in connection with Store Nos. 59 and 82 (the "Design Proposals"). (Meijer I Depo. at 33, 38.)

The Design Proposals contained language asserting Plaintiff's ownership of the Architectural Documents it prepared in connection with the projects, and limiting Defendant Thomas's ability to copy or distribute the plans without Plaintiff's permission. (Doc. No. 104, Exh. O at 49, 83.) The Design Proposals were never signed by Defendant Thomas. (Meijer Depo. I at 35, 38, 243)

During the design process for Store Nos. 59 and 82, Defendant Thomas provided Plaintiff with certain drawings it had prepared in-house as well as drawings and surveys from third-party consultants and vendors. (Labeff Depo. at 25, 73-74; Meijer I Depo. at 290-91; Deposition of Marcel Meijer on January 15, 2010 ("Meijer III Depo.") at 40-41.) However, the extent and content of Defendant Thomas's contribution to Plaintiff's Architectural Drawings is highly disputed.[2]

Plaintiff was hired again by Defendant Thomas to provide architectural design services for Speedy Stop Store Nos. 209 and 201 in Austin, Texas. (Deposition of Marcel Meijer on January 4, 2010 ("Meijer II Depo.") at 386-87.)  Plaintiff sent Design Proposals to Defendant Thomas dated October 14, 2003 for Store Nos. 209 and 201. (Doc. No. 104, Exh. O at 85-88.) Neither of these Design Proposals contained language asserting Plaintiff's ownership of its Architectural Documents nor limiting Defendant's ability to use or distribute Plaintiff's drawings. (*Id.*) Only the Design Proposal for Store No. 201 was signed by Defendant Thomas (*Id.* at 86.) Once again, Defendant Thomas provided Plaintiff with certain drawings for inclusion in the design of Store Nos. 201 and 209. (Labeff Depo. at 74.)

---

[2] *Compare* Labeff Depo. at 25-26 (stating that Defendant Thomas provided Plaintiff with CAD files of the floor plan and site plan, tear sheets, and photos for the design of Store No. 85); Labeff Depo. at 73-74 (stating that Defendant Thomas provided site plans and floor plans for Store Nos. 82 and 59 and later for Store Nos. 209 and 201); Labeff Depo. at 169 (stating that Defendant Thomas provided Plaintiff with elevation drawings) *with* Meijer I Depo. at 290-91 (stating that Defendant Thomas provided a "preliminary site plan"); Meijer III Depo. at 40-41 (for Store No. 59, Defendant Thomas provided only a topographic boundary survey, carwash location, gas island location, and store location on the site); Meijer III Depo. at 49-50 (stating that Plaintiff received a CAD file from Defendant Thomas that may have consisted of a vicinity map); Meijer III Depo. at 66 (acknowledging that Plaintiff always received boundary layouts from clients in order to know the configuration of the land).

Subsequently, in 2003 and 2004, Defendant Thomas hired Plaintiff to design five more Speedy Stop stores, specifically Store Nos. 85 (El Campo, Texas), 70 (Victoria, Texas), 216 (Austin, Texas), 206 (Austin, Texas), and 58 (Corpus Christi, Texas). (Meijer II Depo. at 387-89; Doc. No. 104, Exh. O at 68.) Again, Defendant Thomas provided Plaintiff with some drawings during the design process for at least some of these five stores. (Meijer III Depo. at 49.)

During the period in which Plaintiff and Defendant Thomas worked together, Plaintiff sent Defendant Thomas electronic and hard copies of its Architectural Drawings. Plaintiff's Architectural Drawings contained a title block and a "scope of the document" box.[3] (Doc. No. 54 at ¶ 17.) The title block consisted of Plaintiff's name, logo, the project number, the project title, and the name of the client. (*Id.* at Exh. C.) The "scope of the document" box contained the following text:

> "This drawing indicates the general scope of the project in terms of architectural design concept, the dimensions of the building, the major architectural elements and the type of structural, mechanical electrical systems [sic]. As scope documents, the drawings do not necessarily indicate or describe all work required for full performance and completion of the requirements of the Contract Documents. On the basis of the general scope indicated or described, the contractor shall furnish all items required for the proper execution and completion of the work. These drawings shall not be used for construction unless DATED and noted as ISSUED FOR CONSTRUCTION WORK.
> The information, details and drawings shown by this document can not be reproduced, copied or photocopied in a similar manner without the expressed written consent from the owner INTERPLAN ARCHITECTS, INC."

(*Id.* at Exh. D.) On November 5, 2003, Plaintiff sent Defendant Thomas a set of vellums corresponding to Plaintiff's Architectural Drawings for Store No. 201, unaccompanied by other

---

[3] Plaintiff claims in its Opposition to Defendant's Motion for Summary Judgment (Doc. No. 124) that the Architectural Drawings it sent to Defendant Thomas also contained a "copyright reserved" statement near the Interplan logo. However, Plaintiff does not refer to appropriate summary judgment evidence for this factual claim. Exhibits B-J to Doc. No. 110 purport to be copies of deposit material sent to the Copyright Office, not the Architectural Drawings sent to Defendant Thomas. Pages 8-9 of Doc. No. 64 and Paragraph 17 of Doc. No. 54 make no mention of the "copyright reserved" statement. Finally, Exhibits C and D to Doc. No. 54 only reproduce the title block and "scope of the document" text and do not reproduce the "copyright reserved" statement. On the basis of this evidence, the Court cannot conclude, in light of the many versions of drawings sent between Plaintiff and Defendant Thomas, that any set of Architectural Drawings sent to Defendant Thomas contained the "copyright reserved" statement.

documents restricting Defendant Thomas's use or distribution of the drawings (Meijer I Depo. at 65-66; Labeff Depo. at 75; Doc. No. 104, Exh. O at 113.)

In December 2003, Carlton Labeff, an employee at Defendant Thomas in charge of construction projects, requested from Marcel Meijer, Plaintiff's President, certain drawings that Plaintiff had prepared in connection with the Speedy Stop stores. (Meijer I Depo. at 309-10.) On December 12, 2003, Plaintiff sent a computer disc containing CAD files for Store No. 201 to Defendant Thomas that similarly lacked any accompanying restrictions on Defendant Thomas's use of the CAD files. (Doc. No. 104, Exh. O at 69.)

In February 2004, Jeff Johanson, Defendant Thomas's President and Chief Operating Officer, requested Plaintiff's Architectural Drawings from Mr. Meijer, who agreed to send Defendant Thomas some of the drawings. (Meijer I Depo. at 310-12.) On February 2, 2004 and on October 1, 2004, Plaintiff sent Defendant Thomas vellum copies of its Architectural Drawings for Speedy Stop Store No. 85. In neither of these transmissions were the vellum copies accompanied by documents restricting Defendant Thomas's ability to use or distribute Plaintiff's Architectural Drawings to other parties. (Meijer I Depo. at 69-70; Labeff Depo. at 75; Doc. No. 104, Exh. O at 116, 118.)

On March 2, 2004, Plaintiff sent Defendant Thomas a computer disk containing a full set of electronic files and a set of vellum prints for Thomas's "use and records in the above referenced project [Store No. 85]." (Labeff Depo. at 76; Doc. No. 104, Exh. O at 70.) Plaintiff acknowledged, however, that this transmission did not contain any restrictions limiting Defendant Thomas's use of the electronic files. (Meijer I Depo. at 178-79.)

On November 9, 2004, Plaintiff again sent Defendant Thomas a computer disk containing CAD files for certain drawings related to Store No. 85. (Labeff Depo. at 76; Doc. No. 104, Exh.

O at 59.) Along with computer disk, Plaintiff sent Defendant Thomas a confidentiality agreement (the "Confidentiality Agreement") in which it designated the drawings being sent to Thomas as "confidential information" and prohibited Thomas from using or authorizing any other person to use the drawings in connection with any other projects. (Doc. No. 104, Exh. O at 60-61.) However, the Confidentiality Agreement was never signed by Thomas. (*Id.* at 63.)

In November 2004, Defendant Thomas asked Plaintiff to provide architectural services for additional Speedy Stop stores. However, Plaintiff declined to provide these services, for reasons that are in dispute. (Labeff Depo. at 95.)

At some point in 2004, Defendant Thomas engaged Morris and Associates Engineers, Inc. ("Morris") to provide plans for Speedy Stop Store Nos. 301, 303, and 309. (Labeff Depo. at 36, 63-64.) Defendant Thomas's first telephone call with Morris occurred on July 1, 2004, with their first meeting taking place on July 21, 2004, and subsequent meetings on September 10, 2004 and September 16, 2004. (Deposition of William Morris ("Morris Depo.") at 110, 113; Labeff Depo. at 23, 33, 37.) Morris agreed to produce prototype plans for the Speedy Stop stores and gave Defendant Thomas a discount for providing "client-supplied drawings." (Morris Depo. at 121-24.)

Morris received electronic copies of certain architectural drawings from Defendant Thomas in AutoCAD file format. (Morris Depo. at 36-43.) The AutoCAD files provided to Morris by Defendant Thomas consisted of the "design criteria, floor plans and site plans" for Speedy Stop Store No. 85, a store that had been designed by Plaintiff, and contained Plaintiff's title block. (Doc. No. 108, Exh. G; Doc. No. 108, Exh. I at 5; Morris Depo. at 50.) Morris copied the electronic files containing Plaintiff's Architectural Drawings on to its computer server, and used them as the basis for its own Architectural Drawings. (Morris Depo. at 43-46, 50.) As it

drafted its Architectural Drawings, Morris removed Plaintiff's title block from the AutoCAD files and inserted its own title block on the files. (Morris Depo. at 90.) Morris did not receive permission from Plaintiff to replace Plaintiff's title block on the Architectural Drawings with its own. (Morris Depo. at 90.)

Also in 2004, Defendant Thomas approached Hermes Architects ("Hermes") to design Speedy Stop Store No. 86.[4] (Deposition of William Daren Penewitt ("Penewitt Depo.") at 67.) Defendant Thomas also asked Hermes to take over the production of plans for Store No. 301 that were previously handled by Morris. (Labeff Depo. at 36.) Hermes was later hired to provide plans for other Speedy Stop stores and ultimately completed construction drawings for eleven Speedy Stop stores: Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 305, 306, 311. (Penewitt Depo. at 22.)

For at least some of these stores, Defendant Thomas furnished Hermes with AutoCAD files for a floor plan, an elevation, and a site plan that did not contain any title blocks. (Penewitt Depo. at 35.) On another occasion, Defendant Thomas sent Hermes a set of hard copy drawings containing Plaintiff's title block on them. (Penewitt Depo. at 74; Doc. No. 101, Affidavit of Daren Penewitt ("Penewitt Aff.") at 1; Doc. No. 108, Exh. E at 2.) On yet another occasion, Hermes received from Defendant Thomas AutoCAD files containing Morris's Architectural Drawings in AutoCAD file format. (Penewitt Depo. at 74-75.) Hermes scanned the hard copies of Plaintiff's Architectural Drawings into its computer and saved them as electronic files on its

---

[4] In 2002, Hermes had designed Speedy Stop Store No. 84 for Defendant Thomas, including the interior floor plan and exterior elevation. (Penewitt Depo. at 56-57, 59-64; Labeff Depo at 72.) After completing the design and production of documents for Store No. 84, Hermes did not design any more stores for Defendant Thomas until being approached again in 2004 for the design of Store No. 86. (Penewitt Depo. at 68.) Hermes completed the design of Store No. 84 in approximately January 2003. (Penewitt Depo. at 146-47.)

computer server. (Penewitt Aff. at 1-2; Doc. No. 108, Exh. P.)[5] Hermes used Plaintiff's

Architectural Drawings in order to establish how Defendant Thomas liked its "sheets laid out."

(Penewitt Depo. at 91). During the design process, Defendant Thomas verbally provided Hermes

with feedback on the floor plans and elevation drawings, made revisions directly to AutoCAD

files, and sent these revised files to Hermes. (Penewitt Depo. at 60-63.)

Defendant Thomas did not obtain authorization from Plaintiff to distribute copies of

Plaintiff's Architectural Drawings to Morris and Hermes. (Labeff Depo. at 115.) Neither Morris

nor Hermes received permission from Plaintiff to copy Plaintiff's Architectural Drawings onto

their respective computer servers. (Penewitt Depo. at 96; Doc. No. 108, Exh. D at 10-11; Doc.

No. 108, Exh. E at 6.)

In March 2006, Plaintiff's president, Marcel Meijer, discovered the existence of Speedy

Stop stores that were based upon Plaintiff's Architectural Drawings, but which Plaintiff had not

been involved in designing. (Meijer I Depo. at 22-23.) On June 22, 2006, Plaintiff's president,

Marcel Meijer, wrote to Defendant Thomas about the potential infringement of Plaintiff's

Architectural Works. (Meijer I Depo. at 24; Doc. No. 104, Exh. O at 89.) In his letter, Mr. Meijer

sent a copy of Plaintiff's exterior building elevation and Morris's exterior building elevation and

claimed that both were exactly alike. (Doc. No. 104, Exh. O at 89.) Mr. Meijer informed

Defendant Thomas that it should not release electronic versions of Plaintiff's Architectural

Drawings to any architectural and/or engineering firm or any other entity without Plaintiff's

permission. (*Id.*) Not long after, in June or July 2006, Mr. Meijer went to the offices of Morris to

complain about Morris's use and copying of Plaintiff's Architectural Drawings. (Meijer I Depo.

at 79; Morris Depo. at 61.)

---

[5] The set of hard copies of Plaintiff's Architectural Drawings that Hermes received from Defendant Thomas consists of four sheets while the set of electronic copies of Plaintiff's Architectural Drawings found on Hermes's computer server consists of eight sheets. (*Compare* Penewitt Aff., Exhs. A-D *with* Doc. No. 108, Exh. P.)

Plaintiff subsequently submitted applications for copyright registration of "architectural works" copyrights and "technical drawings" copyrights within 5 years after the first publication of the works. (Doc. No. 108, Exh. H, Declaration of Marcel Meijer ("First Meijer Declaration"), Exhibit A.) The Copyright Office issued certificates of copyright registration for both "architectural works" and "technical drawings" for each of the nine stores on which Plaintiff provided architectural design services for Defendant Thomas: Store Nos. 58, 59, 70, 82, 85, 201, 206, 209, 216.[6] (*Id.*) Thereafter, Plaintiff filed suit against Thomas, Morris, and Hermes, alleging that they infringed upon Plaintiff's copyrights in the nine Speedy Stop stores designed by Plaintiff (Store Nos. 58, 59, 70, 82, 85, 201, 206, 209, 216) by creating drawings and/or constructing thirteen other Speedy Stop stores (Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 303, 305, 306, 309, 311). (Doc. No. 54 at 12-13.) Plaintiff has asserted the following causes of action: (1) copyright infringement of its "architectural works" and "technical drawings" copyrights under 17 U.S.C. § 501(a); (2) violation of integrity of copyright management information under the DMCA, specifically 17 U.S.C. § 1202; and (3) fraud.[7] Defendant Thomas has asserted various defenses to Plaintiff's claims, including, among others, that it is a joint author of Plaintiff's Architectural Documents, that it was granted an implied nonexclusive license to copy and use Plaintiff's Architectural Documents, and that Plaintiff does not hold a valid copyright for architectural works and technical drawings.

---

[6] Architectural works are protected by copyright law under two distinct provisions of the Copyright Act. First, section § 102(a)(5) protects "pictorial, graphic, and sculptural works," which includes "technical drawings, including architectural plans." Second, in 1990, the Architectural Works Copyright Protection Act ("AWCPA") extended copyright protection to "architectural works" as a distinct new category of authorship. *See* 17 U.S.C. § 102(a)(8). Architectural works are defined in section 101 as the "design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101. In order for a work to be protected as both an "architectural work" and a "technical drawing," it must be registered under both categories. *See* 37 C.F.R. § 202.11(c)(4); *Nat'l Med. Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 434 (S.D. W.Va. 2003).

[7] Plaintiff's claim of trade secret misappropriation was dismissed with prejudice by the Court by stipulation of Plaintiff and agreement by Defendant. (Doc. No. 71.)

II.     **EVIDENTIARY MOTIONS**

        Plaintiff and Defendant have filed a number of motions seeking to strike evidence

submitted in support of each others' motions for summary judgment. Each of these evidentiary

motions will be considered in turn below.

        **A.  Legal Standard**

        In deciding motions for summary judgment, a court may consider pleadings, affidavits,

depositions, motions, answers to interrogatories, stipulations and any other material properly

before it. *Munoz v. Int'l Alliance of Theatrical Stage Emp.*, 563 F.2d 205, 207 n.1 (5th Cir.

1977). "The admissibility of summary judgment evidence is subject to the same rules of

admissibility applicable to a trial." *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th

Cir. 1995) (citing *Munoz*, 563 F.2d at 207 n.1). Affidavits submitted in support of or opposed to

a motion for summary judgment must be made based on personal knowledge, state admissible

facts, and show the affiant's competence to testify on the matters stated. Fed. R. Civ. P. 56(e)(1).

Although "an unsworn affidavit is incompetent to raise a fact issue precluding summary

judgment," 28 U.S.C. § 1746 provides a statutory exception to this rule by permitting "unsworn

declarations to substitute for an affiant's oath if the statement contained therein is made 'under

penalty of perjury' and verified as 'true and correct.'" *Nissho-Iwai American Corp. v. Kline*, 845

F.2d 1300, 1306 (5th Cir. 1988) (quoting 28 U.S.C. § 1746).

        If an affidavit refers to any written material, a sworn or certified copy of that material

must be attached to or served with the affidavit. Fed. R. Civ. P. 56(e)(1); *Marshall v. Norwood*,

741 F.2d 761, 764 (5th Cir. 1984). "This means that if written documents are relied upon they

actually must be authenticated by and attached to an affidavit that meets the requirements of

Rule 56(e), and the affiant must be a person through whom the exhibits could be admitted into evidence." *Nolla Morell v. Riefkohl*, 651 F. Supp. 134, 140 (D.P.R. 1986).

An affidavit may be supplemented or opposed by depositions, interrogatories, or additional affidavits. Fed. R. Civ. P. 56(e)(1). "[A] party opposing a motion for summary judgment may proffer an affidavit to show the movant's deponents are not credible, thus raising a genuine issue of fact that must be tried by the jury." *Eisbach v. Jo-Carroll Electric Cooperative, Inc.*, 440 F.2d 1171, 1174 (7th Cir. 1971).

### B.  Motion to Strike Declaration of Marcel Meijer (Doc. 119)

Defendant has moved to strike the declaration of Marcel Meijer, Plaintiff's President, which Plaintiff submitted in support of its motions for summary judgment (Doc. No. 108; Doc. No. 110.) Plaintiff's motions seek summary judgment on, among other things, ownership of valid copyrights in the technical drawings and architectural works at issue. In order to support its motions for summary judgment, Plaintiff submitted Mr. Meijer's declaration (the "First Meijer Declaration"), to which were attached: (a) copies of the certificates of registration issued by Copyright Office for the copyrights at issue, and (b) copies of deposit material submitted by Plaintiff to the Copyright Office in connection with the copyrighted works. (Doc. No. 108, Exh. H, First Meijer Decl.; Doc. No. 110, First Meijer Decl.)

Defendant claims that attachments B-J to the First Meijer Declaration do not accurately represent the deposit materials actually submitted by Plaintiff to the Copyright Office.[8] (Doc. No. 119 at 9-10; Doc. No. 123 at 8-9.) Rather, Defendant argues that the deposit materials Plaintiff submitted to the Copyright Office actually consist of a smaller subset of drawings than what was attached to Mr. Meijer's declaration. For example, Defendant states that, of the sixty-three

---

[8] Defendant does not dispute, however, that the certificates of registration attached as Exhibit A to Mr. Meijer's declaration accurately reflect those issued by the Copyright Office.

drawings that Mr. Meijer's declaration stated had been submitted to Copyright Office for Speedy Stop store No. 59, only twenty-nine drawings were actually submitted. (Doc. No. 119, Cabello Decl., Exh. C at 2-4.) For the "technical drawing" and "architectural works" copyright registrations for Store Nos. 58, 70, 85, 201, 206, 209, and 216, Defendant claims that only two drawings—elevation and floor plans—were submitted to the Copyright Office for each type of registration rather than the larger set of drawings attached to the First Meijer Declaration and that Mr. Meijer claimed had been submitted. (Doc. No. 119, Cabello Decl., Exh. C at 2; Doc. No. 149, Suppl. Cabello Decl., Exh. A at 2-3.)

After Defendant filed its motion to strike Mr. Meijer's declaration, Plaintiff submitted a corrected declaration of Mr. Meijer (the "Second Meijer Declaration"). (Doc. No. 154, Corrected Declaration of Marcel Meijer ("Second Meijer Decl."), Exh. A) In the Second Meijer Declaration, Mr. Meijer states that the First Meijer Declaration was signed under the belief that the deposit materials attached to it actually comprised the deposit materials submitted to the Copyright Office. He states that this belief was based on the fact that Plaintiff created a larger number of drawings than simply the exterior elevation and floor plan drawings that were submitted to the Copyright Office. Plaintiff argues that the discrepancy between the drawings attached to the First Meijer Declaration and the small number of drawings sent as deposit material to the Copyright Office does not implicate its claims of ownership or infringement, and therefore does not prejudice Defendant or otherwise affect the claims or defenses in this case. Defendant moves to strike the First Meijer Declaration on grounds that the best evidence rule requires the submission of certified copies of registration certificates and deposit materials, and that Mr. Meijer's declaration is false, misleading, and unreliable.

Defendant's best evidence rule objection misses the mark. Neither party appears to dispute that copies of the certificates of registration and copies of deposit materials are the best evidence to prove that Plaintiff registered certain copyrights and deposited certain drawings as mandated in the copyright registration process. Plaintiff's belief that copies of the certificates and deposit materials were the appropriate way to support its claims of copyright ownership is what led it to submit those documents, via the First Meijer Declaration, to the Court. Neither do the parties dispute that Rule 56(e)(1) requires that certified or sworn copies of these materials must be attached to Mr. Meijer's affidavit. Rather, the parties essentially dispute whether copies of these documents are sufficiently certified through Mr. Meijer's declaration or whether copies certified by the Copyright Office should be submitted. This is a question of authentication under Federal Rules of Evidence 901 and 902.

Unauthenticated documents are improper as summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192 (5th Cir. 1991). Rule 901 provides that a document may be authenticated by "evidence sufficient to support a finding" that it is "what its proponent claims." Fed. R. Evid. 901. While Rule 901 does not require conclusive proof of authenticity, it requires at least some evidence sufficient to support a finding that the evidence in question is what the proponent claims it to be. *See United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993).

In order to authenticate public records such as the certificates and deposit materials, Plaintiff could provide "testimony that a matter is what it is claimed to be," Fed. R. Evid. 901(b)(1), or evidence that the certificates and deposit materials are obtained from the Copyright Office. Fed. R. Evid. 901(b)(7). Additionally, Plaintiff could submit self-authenticating copies of the certificates and deposit materials that have been certified by the Copyright Office. Fed. R.

Evid. 902(4). Plaintiff chose to authenticate the copyright registration certificates and deposit materials by submitting the First Meijer Declaration as testimony stating that the certificates and deposit materials corresponded to those possessed by the Copyright Office. (Doc. No. 108, Exh. H, Meijer Decl.; Doc. No. 110, Meijer Decl.)

The Court agrees that Plaintiff has failed to properly authenticate the deposit material appearing as Exhibits B-J to the First Meijer Declaration. Plaintiff conceded in the Second Meijer Declaration that "deposit materials do not include the entirety of Exhibits B-J" to the First Meijer Declaration, but only "a subset of those documents." (Doc. No. 154, Second Meijer Declaration at ¶ 4). The Second Meijer Declaration did not purport to authenticate a correct set of deposit materials. Therefore, the deposit materials attached as Exhibits B-J have not been authenticated through any means and must be stricken.

The Court next considers the certificates of registration appearing as Exhibit A to the First Meijer Declaration. The First Meijer Declaration meets the requirements of Rule 56(e) by certifying that the copies of the certificates attached to the declaration are "true and correct" and that this representation is based upon personal knowledge. Unlike the deposit materials, the Second Meijer Declaration does not concede that the certificates attached to the First Meijer Declaration are inaccurate copies of what was issued by the Copyright Office. Though Defendant attacks the entire First Meijer Declaration as false and misleading, it does not specifically note anything false or misleading about the certificates in Exhibit A to the First Meijer Declaration. Moreover, even though, as Defendant argues, copies of the certificates certified by the Copyright Office would be self-authenticating, Rules 901(b)(1) and 901(b)(7) expressly allow Plaintiff to authenticate public records like the certificates of registration through testimony such as the First Meijer Declaration. The Court finds that Plaintiff has made a *prima facie* showing of authenticity

of the certificates by attaching them to the First Meijer Declaration. The ultimate issue of authenticity is a question for the jury. *See United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009); *United States v. Guidry*, 406 F.3d 314, 320 (5th Cir. 2005).

Defendant's motion to strike the declaration of Marcel Meijer submitted in support of Plaintiff's motions for summary judgment is granted in part as to Exhibits B-J of the declaration and denied in part as to Exhibit A.

### C.  Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. 138)

Defendant Thomas moves to strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment[9] on two grounds, each of which will be addressed separately below.

### 1.   Exhibit V's statements about an Implied Nonexclusive License

Defendant claims, in its motion for summary judgment, that it is not liable for copyright infringement or DMCA violations because Plaintiff granted Defendant Thomas an implied nonexclusive license to copy or distribute Plaintiff's drawings. (Doc. No. 104 at ¶ 17.) As evidence of the existence of this license, Defendant cites certain deposition testimony of Mr. Meijer. A representative sample of the deposition testimony relevant to the motion to strike is the following:

> "Q. And you recall the discussion that we saw your floor plan and it was your original work that was taken and used in these soil plans, yes?
> A. To the best of my ability looking at this very bad illustration, it looks like it is my site plan. . . .
> Q. Right. And what that means is that C.L. Thomas had taken your work and had given it to these soils people, these geotechnical experts, and they ended up taking that and including it in their plan without using any of your digital rights management?

---

[9] For purposes of clarity, the relevant documents are the following: Defendant's Motion for Summary Judgment (Doc. No. 104); Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 124); and Defendant Thomas's Reply to Plaintiff's Opposition to Defendant Motion for Summary Judgment and Motion to Strike Exhibit V (Doc. No. 138).

. . .

A. The way you're placing the question, I have to answer yes.

Q. Okay. And that was okay with you because everyone was on the same – on that same project, right?

A. It's okay with me because I'm being paid by my client to do this work.

. . .

Q. Right. And in the course of your daily work they had either an express license from you wherein you said it's okay for you to do that or an implied one that they did it; they sent it to you; and you never said anything about it, right?

. . .

A. If it is a project that I'm the architect of record and I'm being paid to work on, this is okay with me.

Q. Okay. So –

A. I am aware at some point.

Q. All right. That's the point. You're aware of and you are at a minimum implying the license of the use of your drawing there, right?

A. I disagree with the way you asked that question.

Q. Why?

A. Something about the license of that I'm implying. I'm trying to facilitate an exhibit only for the location of this project and this location only, at this piece of land, at this boundary condition in this city of Austin only; and that's acceptable to me, sir.

Q. Okay. And you never said to them – at least I haven't been able to find a document that says, You can only do it on this project?

A. No. I'm sure there's nothing.

. . .

A. Okay. An employee of C.L. Thomas called Joey Dunlap. He's requested this soil report. He gave them an exhibit that he has availability to or access to and the soil report man placed these three bores and there's the exhibit. . . .

. . .

Q. You gave permission, either expressly or by way of the implication of not objecting. Is that fair?

A. That would be a fair statement.

Q. And you never withdrew that permission as reflected there, did you?

A. Correct.

(Meijer Depo. III at 215-20.) Defendant points to portions of this deposition testimony as well as other deposition testimony[10] as evidence that Plaintiff allowed Defendant Thomas to use and distribute Plaintiff's drawings and never limited Defendant Thomas's ability to do so. Plaintiff, in its opposition to Defendant's motion for summary judgment, argues that this deposition testimony reveals only Plaintiff's limited consent to allow the inclusion of its drawings into

---

[10] *See* Mr. Meijer's deposition testimony cited in Defendant's Motion for Summary Judgment. (Doc. No. 104 at ¶¶ 18-19.)

survey reports and other third-party drawings produced for the projects in which Plaintiff was involved, and does not show any intent of Plaintiff to allow its drawings to be used in completely different projects by rival architects. (Doc. No. 124 at 15.) Plaintiff attached to its opposition Exhibit V, an undated declaration of Mr. Meijer in which he states that he was not aware of and did not consent to Defendant Thomas's sharing of Plaintiff's construction plans with other architects or other parties not involved in the projects for which the plans were designed. (Doc. No. 124, Exh. V at ¶ 3.) Defendant now seeks to strike Exhibit V, Mr. Meijer's declaration, as an attempt to contradict his prior sworn deposition testimony without explanation.

The Court rejects Defendant's argument that Mr. Meijer's statements in Exhibit V contradict his prior deposition testimony. Mr. Meijer's deposition testimony at issue makes two key points. First, Mr. Meijer repeatedly states that any explicit or implied license to use Plaintiff's drawings was given only in relation to projects on which Plaintiff served as the architect. Nothing in Mr. Meijer's subsequent declaration contradicts this position. Second, Mr. Meijer states during the deposition that there are no signed documents that limit Defendant Thomas's ability to use Plaintiff's drawings to only Plaintiff's projects with Defendant Thomas. Again, nothing in Mr. Meijer's subsequent declaration contradicts Mr. Meijer's deposition testimony about the non-existence of documents. Rather, Mr. Meijer's declaration focuses on Mr. Meijer's ignorance of and lack of consent to Defendant Thomas's use of its plans and does not contradict his deposition testimony about the non-existence of documents. Defendant Thomas has not cited any deposition testimony, nor can the Court find any, in which Mr. Meijer states that he is aware of Defendant Thomas's provision of Plaintiff's drawings either to other architects or to third-parties not involved in Plaintiff's projects with Defendant Thomas. Even under a generous reading that Mr. Meijer's declaration is slightly at odds with his deposition

testimony, this raises an issue of credibility rather than admissibility. *See Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980) ("In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition.")

### 2.   Exhibit V's Statements about License Fees

Defendant also seeks to strike Exhibit V because, in it, Mr. Meijer states that he would have charged Defendant Thomas $25,000 for a license to use Plaintiff's drawings for each additional store or site. (Doc. No. 124, Exh. V. at ¶ 9.) Defendant claims that Exhibit V should be stricken because (1) this statement fails to set forth the proper measure of actual damages, and (2) gives testimony without cross-examination on an issue that Mr. Meijer was specifically asked about, but could not answer, during his deposition.

The Court agrees with Defendant that Mr. Meijer's statement in Exhibit V regarding the amount he would have charged Defendant Thomas as a license fee should be stricken because it sets forth an incorrect measure of actual damages, and is therefore irrelevant. Section 504(a) of the Copyright Act provides that a copyright owner may recover actual damages he or she suffers as a result of copyright infringement. 17 U.S.C. § 504(a). Courts have construed the "actual damages" measure to include license fees that the copyright owner would have obtained for the infringer's use of the copyrighted material. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 165 (2d Cir. 2001). "[W]here the infringer could have bargained with the copyright owner to purchase the right to use the work, actual damages are "'what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work.'" *Jarvis v. K2 Inc.*, 486 F.3d 526, 533 (9th Cir. 2007) (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985)). The license fee is determined by reference to fair market value, which is an objective

19

analysis rather than a subjective analysis based on what the copyright owner would have charged.[11] *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002); *On Davis*, 246 F.3d at 166. Fair market value may be established where: "(1) a plaintiff demonstrates that he previously received compensation for use of the infringed work; or (2) the plaintiff produces evidence of benchmark licenses, that is, what licensors have paid for use of similar work." *Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1276 (M.D. Fla. 2008).

Mr. Meijer's statement that he "would have charged [C.L. Thomas] a licensing fee of $25,000 for each additional store or site" cannot alone establish the amount of actual damages to which Plaintiff is entitled. Mr. Meijer fails to represent that $25,000 is the fair market value for a licensing fee. He does not claim that Thomas would have agreed to pay such a fee. Mr. Meijer does not state that $25,000 is generally what he charges for a license fee for similar material or that he has ever received this amount as a license fee. Neither has Mr. Meijer produced evidence that this amount is what companies such as C.L. Thomas pay for use of commercial architectural plans. The license fee of $25,000 appears to be nothing more than Mr. Meijer's subjective calculation. On its own, it is not a proper measure of Plaintiff's actual damages. The Court will strike the paragraph in Mr. Meijer's affidavit, but will consider the other portions of his affidavit. *See Mayfield v. Tex. Dep't of Crim. Justice*, 529 F.3d 599, 607 (5th Cir. 2008) (quoting *Aikin v. Q-L Invs.*, 959 F.2d 521, 531 (5th Cir. 1992) ("On a motion for summary judgment the district court should disregard only those portions of an affidavit that are inadequate and consider the

---

[11] Contrary to Plaintiff's argument, *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007), does not support the principle that "actual damages" may be measured by what Plaintiff would have *charged* Defendant for a license. Rather, *Thoroughbred Software* states that actual damages may be measured by what the plaintiff would have *received*, and approves of a calculation based on "the reasonable license fee on which a willing buyer and a willing seller would have *agreed* for the use taken by the infringer." *Id.* at 358-59 (quoting *On Davis*, 246 F.3d at 167) (emphasis added).

rest."). The Court grants Defendant's motion to strike Exhibit V as to Mr. Meijer's statement about licensing fees and denies the motion otherwise.

### D. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. 131)

Plaintiff has objected to and moved to strike various summary judgment evidence submitted by Defendant.[12] Specifically, Plaintiff objects to portions of deposition testimony of Jeff Johanson, Carlton Labeff, Marcel Meijer, William Morris, William Daren Penewitt, Ismail Urfi, and portions of affidavits submitted by Jeff Johanson and William Daren Penewitt. Plaintiff cites to various rules of the Federal Rules of Evidence as the basis for its objections, but has not provided any argument to explain how the summary judgment evidence is objectionable on these grounds. Despite the difficulty in ascertaining why Plaintiff believes the summary judgment evidence to be objectionable, the Court will grant Plaintiff's motion in part as to Mr. Labefff's opinions on the copyrightability of Plaintiff's architectural designs and technical drawings, Mr. Labeff's conclusions about derivative works, Mr. Meijer's testimony about violations of the DMCA, and Mr. Urfi's statements about Mr. Meijer's permission to use third-party drawings, and deny it otherwise.

### 1. Deposition Testimony of Jeff Johanson

Jeff Johanson is Defendant Thomas's President and Chief Operating Officer. Plaintiff objects to portions of Mr. Johanson's deposition testimony where he states that Speedy Stop, LLC, owns the real estate and land on which the Speedy Stop stores are located and that it, not Defendant Thomas, receives the revenue from the stores. This testimony is not objectionable on

---

[12] Plaintiff's objections to and motion to strike is Doc. No. 131. According to Plaintiff, Defendant's motions containing the objectionable summary judgment evidence are Doc. Nos. 101, 102, 103, 104, 105, 106, 107, 109. The Court notes that Doc. No. 103, Hermes' Motion for Order regarding Joint and Several Liability, does not even contain any supporting evidence. Similarly, Doc. No. 106, Defendant's Motion to Exclude Opinions of Leonard Lane, does not contain as supporting evidence any of the deposition or affidavit testimony Plaintiff seeks to strike. Therefore, neither Doc. No. 103 nor Doc. No. 106 should be included among the motions containing objectionable summary judgment evidence.

grounds of the best evidence rule because Mr. Johanson is not attempting to prove the existence or content of a writing. *See* Fed. R. Evid. 1002; *R.R. Mgmt. Co. LLC v. CFS La. Midstream Co.*, 428 F.3d 214, 217 (5th Cir. 2005) (stating that Fed. R. Evid. 1002 requires the original writing in order to prove the content of that writing, but Fed. R. Evid. 1004 allows other evidence of the contents of the writing when the writing is not closely related to the controlling issue). Neither is Mr. Johanson's testimony speculative or without foundation. A review of Mr. Johanson's deposition testimony shows that, as the chief executive of Defendant Thomas, he was heavily involved in reviewing the revenues and expenses of the Speedy Stop stores and has personal knowledge of which entities receive which revenue. In addition, Mr. Johanson's testimony regarding the relationship between Speedy Stop, LLC and C.L. Thomas was not undisclosed expert opinion because he was simply describing what he knows about the relationship and not offering any scientific, technical or other specialized knowledge. *See* Fed. R. Evid. 702.

Mr. Johanson's testimony about the process by which the Speedy Stop store design was created is not objectionable on the grounds of speculation because a review of his deposition shows that he was involved in the design process and testified based on his personal knowledge. *See* Fed. R. Evid. 602. Neither is this testimony objectionable on grounds of the best evidence rule as Mr. Johanson is not referring to the content of any writing. Finally, Mr. Johanson's testimony is not improper expert opinion because he simply describes the process by which Defendant Thomas arrived at a particular design.

### 2.  Deposition testimony of Carlton Labeff

Mr. Labeff is in charge of Defendant Thomas's construction group. Plaintiff objects to portions of Mr. Labeff's deposition testimony in which he discusses Defendant Thomas's involvement in the design process for the Speedy Stop stores, the nature and scope of Defendant

Thomas's in-house design work, his opinions regarding the copyrightability of architectural drawings, and Mr. Urfi's departure from Plaintiff.

None of the excerpts of Mr. Labeff's deposition testimony is inadmissible on the grounds of the best evidence rule because Mr. Labeff does not testify about the contents of a writing. At most, Mr. Labeff testifies about the process of generating a certain drawing or floor plan.

Mr. Labeff's deposition testimony regarding (a) Defendant Thomas's involvement in the design process with Plaintiff and Hermes, (b) the amount of design and drawing work done internally at C.L. Thomas, and (c) Mr. Meijer's statement that Plaintiff could no longer keep up with Defendant Thomas's projects are not inadmissible on grounds of speculation. A review of Mr. Labeff's deposition testimony shows that these statements are based on his personal knowledge. *See* Fed. R. Evid. 602.

However, Mr. Labeff's opinions on the copyrightability of Plaintiff's architectural designs and technical drawings must be stricken as improper expert opinion. Mr. Labeff acknowledged that he does not have any professional licenses and does not claim to be an expert on copyright law. (Labeff Depo. at 13-14.) Therefore, his opinions regarding the ownership of Plaintiff's drawings and architectural designs, and whether architectural designs in general should be copyrightable are improper as Mr. Labeff does not have the qualifications to render an opinion on these matters. *See* Fed. R. Evid. 702. Mr. Labeff's agreement with the statement that Plaintiff's drawings were derived from Defendant Thomas's designs is an improper legal opinion to the extent that Mr. Labeff attempted to offer a legal conclusion regarding a derivative work under copyright law, but proper to the extent that Mr. Labeff was merely describing, based on his personal knowledge, the process by which Plaintiff arrived at its architectural design. *See* Fed. R. Evid. 602, 704.

As to the final portion of deposition testimony to which Plaintiff objects, it is unclear whether Plaintiff objects on grounds of speculation to Mr. Labeff's statement that Mr. Meijer performed very little work in the design process, or to his statement that Mr. Urfi worked for Buckee's after leaving Plaintiff. A review of Mr. Labeff's deposition testimony does not reveal the personal knowledge upon which he based these statements. Regardless of whether the statements were based on Mr. Labeff's personal knowledge, they are irrelevant to any facts at issue in this case and therefore are inadmissible. *See* Fed. R. Evid. 401, 402.

### 3.  Deposition testimony of Marcel Meijer

Mr. Meijer testified in his deposition on November 16, 2009 about being furnished with third-party layouts from food service vendors, removing the names of architects and engineers on those layouts, and placing the layouts in Plaintiff's drawings. Mr. Meijer testified in his deposition on January 4, 2010 about whether a third-party's title block appeared on Plaintiff's drawings and whether removing a third-party's title block from a drawing and subsequently using the drawing in Plaintiff's own drawing is a violation of the DMCA. Finally, Mr. Meijer testified in his deposition on January 15, 2010 that he gave Defendant Thomas permission to use and to share Plaintiff's drawings with third-parties also working on the projects for which Plaintiff served as an architect, and that he never withdrew this permission.

Plaintiff's objections to this testimony on the basis of the best evidence rule miss the mark. Mr. Meijer is not testifying as to the content of the drawings, but as to whether he received the third-party drawings and removed the name of any architect or engineer that appeared on the third-party drawings. Plaintiff also cannot object to this testimony on the grounds of leading questions because Mr. Meijer, as an adverse party to the Defendant, could be interrogated through use of leading questions by Defendant's attorneys. *See* Fed. R. Evid. 611(c). Finally, Mr.

Meijer's testimony is neither speculative nor without foundation since Mr. Meijer's testimony about (a) the process by which Plaintiff generated its architectural designs and technical drawings, and (b) whether he granted permission to Defendant Thomas to share Plaintiff's drawings are based on his personal knowledge.

Mr. Meijer's statement about providing Defendant Thomas with permission to share Plaintiff's drawings with third-parties is not improper expert opinion because Mr. Meijer is providing information about his actions rather than any specialized, technical or scientific knowledge. *See* Fed. R. Evid. 702. However, Mr. Meijer's statement about whether removal of a title block from an architectural drawing constitutes a violation of the DMCA is an improper legal opinion and must be stricken because it attempts to state a legal conclusion that is within the realm of the jury to decide. *See* Fed. R. Evid. 704.

### 4.   Deposition Testimony of William Morris

Mr. Morris is a civil engineer and the principal in charge of Morris. He testifies during his deposition about industry practice as it relates to use of prototype drawings in retail industry projects, circumstances in which notification of a prior engineer is required when using that engineer's drawings, ownership of drawings generally, and what constitutes reasonable diligence in ascertaining ownership of drawings.

Mr. Morris's opinions in this regard are not speculative. Mr. Morris's deposition testimony shows that he is testifying based on his personal knowledge, accumulated over years of work as a licensed professional engineer. Neither does Mr. Morris offer improper expert opinion or improper legal opinions. Mr. Morris is offering specialized knowledge of the process by which engineers receive prototypical plans from their clients, adapt those plans for a particular project, and the extent to which they are required to determine ownership of those

plans. Mr. Morris's professional qualifications and experience in the industry appear to qualify

him to offer these types of opinions. In the portions of his deposition testimony objected to by

Plaintiff, Mr. Morris is only testifying to general industry practice and not to the specific actions

by the parties in this case. As such, he is not offering a legal conclusion about the parties'

ownership of designs or drawings that would be within the realm of the jury to decide.

### 5.  Deposition Testimony of William Daren Penewitt

William Daren Penewitt is a draftsman and project manager with Hermes. In his

deposition testimony, Mr. Penewitt discusses the profitability of Hermes's projects for C.L.

Thomas, the hope that working with C.L. Thomas would eventually lead to profits, his

conversation with Mr. Labeff about why C.L. Thomas needed a new architect, and the

completion date of some of Hermes's drawings.

Mr. Penewitt's testimony on all of these issues is not speculative since it is based on upon

his personal knowledge. Mr. Penewitt states that he created 95 percent of all the documents

prepared by Hermes for Defendant Thomas. (Penewitt Depo. at 24.) In addition, Mr. Penewitt

served as the main contact person at Hermes Architects for Defendant Thomas. (Penewitt Depo.

at 115.)

Neither does the best evidence rule affect Mr. Penewitt's testimony. Mr. Penewitt

testifies about the dates by which certain documents were completed and the overall state of

Hermes's profitability. On neither of these issues is Mr. Penewitt testifying as to the content of a

writing. *See* Fed. R. Evid. 1002.

Finally, it is difficult for the Court to evaluate Plaintiff's hearsay objection because

Plaintiff has not identified how Defendant has used Mr. Penewitt's testimony in its motions. Mr.

Penewitt testifies, in response to a question about why Hermes was hired by Defendant Thomas,

that Mr. Labeff told him that Thomas's current architect couldn't handle the workload given to him. To the extent that Defendant cites Mr. Penewitt's testimony for either the fact that Mr. Labeff made such a statement or that Plaintiff could not handle Defendant Thomas's workload, the Court will disregard it.

### 6.   Deposition Testimony of Ismail Urfi

Ismail Urfi is a former employee of Plaintiff and worked as a draftsman on many of Plaintiff's projects for Defendant Thomas. Mr. Urfi testifies in his deposition about whether Mr. Meijer had permission to use certain third-party and prototype drawings, and the similarity between Plaintiff's drawings and Quik Trip's floor plan.

Mr. Urfi's testimony about whether Mr. Meijer had permission to use third-party and prototype drawings should be stricken as speculative. Mr. Urfi's deposition shows that he had no personal knowledge of Mr. Meijer's interactions with third parties. (Urfi Depo. at 177.)

Mr. Urfi's testimony about whether Plaintiff's drawing looks the same as Quik Trip's floor plan is admissible. He is not speculating about the similarity, but basing his testimony on a comparison of the drawings. In addition, he is not providing expert testimony in the form of specialized or technical knowledge, but offering a lay witness opinion based on his perception about the two drawings. *See* Fed. R. Evid. 701. Finally, Plaintiff's best evidence objection is not well-founded because Plaintiff's drawing and Quik Trip's floor plan are part of the summary judgment record. *See* Fed. R. Evid. 1002.

### 7.   Affidavit of Jeff Johanson

Mr. Johanson submitted an affidavit in support of Defendant's Motion for Summary Judgment (Doc. No. 104). In his affidavit, Mr. Johanson testified regarding conversations he had

with Mr. Meijer about Plaintiff's services, the process by which the Speedy Stop design was created, and Defendant Thomas's working relationship with Plaintiff.

None of Mr. Johanson's statements is inadmissible on the grounds of best evidence. In his affidavit, Mr. Johanson does not refer to the contents of any writing except those of the Confidentiality Agreements. Even then, Mr. Johanson doesn't testify to the actual language of the Confidentiality Agreements, but only makes the point that the terms contained therein were ones that Defendant Thomas had never seen or agreed upon.

Neither are Mr. Johanson's statements speculative. Mr. Johanson clearly states that he worked personally with Mr. Meijer on Plaintiff's projects with Defendant Thomas and had conversations with Mr. Meijer directly about Plaintiff's work. Therefore, Mr. Johanson's statements are based upon his personal knowledge.

Finally, Mr. Johanson's statements are not improper expert opinion. He does not offer specialized or technical knowledge about the construction or architectural design process. Rather, he offers first-hand knowledge of how Defendant Thomas designed and built the Speedy Stop stores at issue in this case and how Defendant Thomas interacted with Plaintiff to that end.

### 8. Affidavit of Daren Penewitt[13]

Plaintiff objects to the portions of Mr. Penewitt's affidavit where he states that Hermes did not receive any electronic copies or CAD drawings with Plaintiff's title block and that it did not remove or alter Plaintiff's title block from any drawing, electronic or hard copy. Plaintiff also objects to Mr. Penewitt's statements that Hermes did not provide the hard copy drawings it received from Defendant Thomas to any third party, and that the hard copy drawings were only to see how Defendant Thomas wanted its drawings laid out and did not serve as the starting point for Hermes's work.

---

[13] "Daren Penewitt" is the same person as "William Daren Penewitt," the civil engineer for Hermes Architects.

Plaintiff's best evidence rule objection is not applicable here. Most of Mr. Penewitt's statements do not testify as to the content of any drawing. To the extent that Mr. Penewitt makes a claim about whether Plaintiff's title block was present on a document, these documents have been attached to his affidavit and made a part of the summary judgment record.

Plaintiff next objects to nine different statements in Mr. Penewitt's affidavit on the grounds that they contradict his prior sworn deposition testimony. However, Plaintiff fails to identify the deposition testimony contradicted by these nine different statements. After reviewing the declaration and deposition testimony submitted in support of Defendant's motions, the Court concludes there is no contradiction that would prove fatal to the declaration's admissibility.

### E.  Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. 143)

Plaintiff objects to and moves to strike certain deposition testimony and affidavits that Defendant cites in its opposition to Plaintiff's motions for summary judgment. Specifically, Plaintiff objects to portions of deposition testimony of Marcel Meijer, William Morris, Greg Mitchell, Ismail Urfi, portions of affidavits submitted by Jeff Johanson and J. David Cabello, and portions of an expert report of Jeff Johanson. Once again, Plaintiff cites to various rules of the Federal Rules of Evidence as the basis for its objections, but does not provide any argument as to why the summary judgment evidence is objectionable on these grounds. The Court will grant Plaintiff's motion in part as to Mr. Meijer's testimony about violations of the DMCA and Mr. Morris's testimony about the originality of Plaintiff's drawings, and deny it otherwise. The reasons are set forth below.

### 1.  Deposition Testimony of Marcel Meijer

Plaintiff objects to portions of Mr. Meijer's deposition testimony where Mr. Meijer (a) acknowledges that certain errors in Plaintiff's profit and loss statement would affect the

calculation of Plaintiff's profitability and may make such statements unreliable, (b) admits that he saw plans for only one store designed by Hermes (Store No. 301) prior to litigation and that Plaintiff's claim against Hermes is based upon that store, and (c) opines on whether removal of a title block constitutes a violation of the DMCA.

As an initial matter, all of Plaintiff's objections based on leading questions are misplaced because, as an adverse party, Defendant's counsel can interrogate Mr. Meijer using leading questions. *See* Fed. R. Evid. 611(c).

None of Plaintiff's objections to Mr. Meijer's testimony about Plaintiff's profitability statements is well-founded. First, the best evidence rule is inapplicable here. Mr. Meijer's testimony about the errors in Plaintiff's profit and loss statements focus not on the content of those statements and errors but rather on whether Mr. Meijer would rely upon those statements if they contained errors. Second, though Mr. Meijer is responding to hypothetical questions, Plaintiff has failed to explain why his responses are not based on personal knowledge or are otherwise improper expert opinion. The Court declines to strike these statements.

Plaintiff's objections to Mr. Meijer's testimony about the factual basis of his claims against Hermes are unfounded. Mr. Meijer's testimony to this effect is based on his personal knowledge that he only remembers viewing one set of plans from Hermes prior to filing suit against Defendant. He acknowledges that, therefore, his claims against Hermes are based on this store's set of plans. This testimony does not purport to offer any specialized, technical or scientific knowledge and cannot be characterized as expert opinion.

Plaintiff's objections to Mr. Meijer's testimony about title block removal and the DMCA, while not speculative, are correct in identifying it as improper expert opinion. Mr. Meijer does

not have any special expertise in copyright law that would allow him to define violations of the DMCA and whether removal of title blocks is proscribed by the DMCA.

### 2.  Deposition Testimony of William Morris

Mr. Morris offers a number of opinions about the creativity, functionality, uniqueness, and originality of elements within a convenience store and its general layout, both with respect to Plaintiff's drawings specifically and convenience stores generally. Plaintiff objects to these opinions on grounds that they are improper expert opinion, speculation, and do not conform to the best evidence rule.

The best evidence rule is inapplicable to Mr. Morris's statements, which do not refer to the content of any architectural plans but rather characterize certain elements as unique, original, creative, or functional elements and make conclusions about similarities between the plans. Neither of Mr. Morris's statements is speculative. He speaks based on his personal knowledge of the plans he developed for Defendant Thomas, his review of Plaintiff's drawings, his comparison of various floor plans, and the general knowledge of the convenience store industry he has developed over the years working in retail store construction. Finally, Mr. Morris's statements are not improper expert opinion because he has sufficient professional expertise to offer his observations regarding the elements of a convenience store, whether these elements are unique, creative or functional, whether these elements are commonly found in convenience stores, and whether Plaintiff's drawings are similar to those of other architects.

To the extent that Mr. Morris offers legal conclusions about the originality of Plaintiff's drawings, these statements will be stricken as improper legal opinions. *See* Fed. R. Evid. 704.

### 3.  Deposition Testimony of Greg Mitchell

Plaintiff objects to two portions of the deposition testimony of Greg Mitchell, one of Defendant Thomas's technical experts. First, Plaintiff objects to Mr. Mitchell's statement that his testimony is necessary to assist the jury to analyze the layout and functionality of the floor plans. Plaintiff claims that this statement is improper expert opinion, undisclosed expert opinion, and speculation. This portion of Mr. Mitchell's testimony is not expert opinion because, in it, he does not express any technical or specialized knowledge. He only states his opinion as to why his knowledge would be relevant or helpful to the trier of fact. Neither is this statement speculative. Mr. Mitchell is making a claim for the relevance of his testimony based on his personal knowledge of the convenience store industry and the details of how layouts of convenience stores are arranged.

Second, Plaintiff objects to Mr. Mitchell's statement that he makes the floor plan of his own convenience store chain, Toot 'n Totum, as identical to that of Quik Trip as he can. Contrary to Plaintiff's arguments, this statement is not improper or undisclosed expert opinion because Mr. Mitchell is not expressing any technical or specialized knowledge about his store's floor plan or Quik Trip's floor plan. He explains, based on his personal knowledge, that he has made his own company's floor plans as similar as possible to another company's floor plans for reasons of functionality.

### 4.  Deposition Testimony of Ismail Urfi

Plaintiff objects to Mr. Urfi's testimony that he did not offer any creativity in generating the floor plan or elevation and that he did not consider himself the author of these drawings. Mr. Urfi's testimony is not speculative since it is based on his personal knowledge of the work that he performed in drafting the Speedy Stop store drawings. The questions posed to Mr. Urfi are not objectionable due to their leading nature because Mr. Urfi was being questioned by counsel for

Defendant. Finally, Mr. Urfi's statements are not expert opinion because he is not providing any expert or technical knowledge, but only his perception of whether he came up with the ideas for the Speedy Stop store layouts and elevations or contributed creative ideas.

### 5.   Expert Report and Supplemental Expert Report of Jeff Johanson

Plaintiff objects to Mr. Johanson's opinions about the primary factors in the Speedy Stop stores' profitability, his belief that store layout and design do not affect customer's buying decisions, and that the allegedly infringing stores' profit and loss statements show a loss of $4 million dollars through December 31, 2009. As discussed more fully in the Court's Memorandum and Order dated October 9, 2010 (Doc. No. 175), Mr. Johanson's statements on these issues are proper expert opinions that are based on his extensive professional experience as an executive of a convenience store chain and his personal knowledge of Speedy Stop's operations. In addition, Mr. Johanson's statements about the factors that affect store profitability, rather than quantitative assessments of each factor's specific effect upon profits, are permissible. These types of statements do not purport to prove the content of any writing and therefore are not objectionable under the best evidence rule. Mr. Johanson's statements about the loss reflected on the allegedly infringing stores' profit and loss statements are also not objectionable because, to the extent these statements are inadmissible, Mr. Johanson is allowed to rely on inadmissible evidence as a basis for his expert report. *See* Fed. R. Evid. 703.

### 6.   Affidavit of Jeff Johanson

Mr. Johanson's affidavit contains several statements to which Plaintiff has objected, including his description of conversations with Mr. Meijer, the practice of using "go-bys," the genesis of Plaintiff's elevation as Hermes' elevation for Store No. 84, and Defendant Thomas's provision of the stores' elevation concept and floor plans to Plaintiff.

Mr. Johanson's statements that Defendant Thomas provided Plaintiff with the ideas for the elevation and floor plan, and that the elevation concept came from Defendant Thomas, are not objectionable on grounds of expert opinion, speculation or best evidence rule. Mr. Johanson makes these statements based on his personal knowledge of Defendant Thomas's and Plaintiff's working relationship, does not refer to the contents of any writing, and does not purport to offer any specialized or technical knowledge. Plaintiff does not explain how these statements constitute hearsay. Accordingly, the Court declines to strike these statements.

As for Mr. Johanson's statements regarding his conversations with Mr. Meijer and the use of Plaintiff's drawing as "go-bys," these are not improper expert opinion or speculation as they are based on Mr. Johanson's personal knowledge of his conversations with Mr. Meijer and do not offer any specialized or technical knowledge. These statements are also unobjectionable on best evidence grounds because they do not refer to the contents of a writing. Plaintiff does not explain how these statement constitute hearsay or how they represent an improper attempt to use an affidavit. The Court declines to strike these statements.

### 7.   Affidavit of J. David Cabello

Plaintiff objects to the declaration of J. David Cabello, attorney for Morris, on several grounds. First, to the extent that Plaintiff objects on grounds of the best evidence rule and hearsay, Mr. Cabello attaches copies of the certified copies of the copyright registration certificates and deposit materials he has received from the Copyright Office for the relevant Speedy Stop stores. These documents are what the Court will examine to determine the exact nature of the certificates of registration and deposit materials; Mr. Cabello's statements regarding these documents will not be stricken. Next, a foundation for Mr. Cabello's statements about the certificates and deposit materials has been properly laid through a description of the process by

34

which Mr. Cabello and his associate personally requested and obtained the documents. Mr.

Cabello's statements will not be stricken on grounds of speculation and lack of foundation.

Finally, Plaintiff objects to the certificates, deposit material, and correspondence between

Mr. Cabello's law firm and the Copyright Office that have been attached to Mr. Cabello's

declaration on the grounds that these were untimely produced. However, Plaintiff fails to explain

in its motion to strike why Defendant had an obligation to produce these documents. After

reviewing the numerous other briefs filed by Plaintiff, the Court has found Plaintiff's argument

in Doc. No. 139 that Defendant was obligated to produce these documents under the Federal

Rules of Civil Procedure and this Court's previous order dated February 25, 2010 (Doc. No. 93).

The Court's order makes clear that Defendant were required to disclose the factual bases for their

affirmative defenses so that Plaintiff could request further documents if necessary during the

discovery period. However, the copyright registration certificates and deposit materials are

relevant to Plaintiff's claim that it owned valid copyrights, rather than Defendant's affirmative

defenses.  "A certificate of registration, if timely obtained, is *prima facie* evidence both that a

copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*,

379 F.3d 131, 141 (5th Cir. 2004). A defendant may rebut the presumption of validity by

showing errors in the registration. *See Berg v. Symons*, 393 F. Supp. 2d 525, 539 (S.D. Tex.

2005). Defendant here was not required to produce the certificates or deposit material they

obtained from the Copyright Office until Plaintiff had attempted to establish that it owned a valid

copyright by submitting copies of these same documents. Further, Defendant's method and

manner of rebutting Plaintiff's evidence are proper. Rule 56(e)(1) provides that an affidavit from

one party may be opposed by affidavits from another party. "[A] party opposing a motion for

summary judgment may proffer an affidavit to show the movant's deponents are not credible,

thus raising a genuine issue of fact that must be tried by the jury." *Eisbach v. Jo-Carroll Electric Cooperative, Inc.*, 440 F.2d 1171, 1174 (7th Cir. 1971). Defendant has proceeded by the method contemplated by the Rules of Civil Procedure and has not violated the Court's prior order.

## III.   MOTIONS TO DISMISS

Before the Court are Defendant's motion to dismiss for lack of subject matter jurisdiction all of Plaintiff's claims based on unregistered works (Doc. No. 119) and Defendant's motion to dismiss for lack of standing all claims based on copyrights registered and owned by Marcel Meijer, individually (Doc. 119). The Court denies both motions as explained below.

### A.  Motion to Dismiss Standard

The court must dismiss a case when Plaintiff fails to establish subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking."  *Stockman v. Federal Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).  A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal quotation marks and citation omitted). "Because standing goes to the constitutional power of a federal court to entertain an action, [a] court has a duty to address it." *James v. City of Dallas*, 254 F.3d 551, 562 (5th Cir. 2001). The burden of establishing federal jurisdiction rests on the party seeking the federal forum.  *Stockman*, 138 F.3d at 151.

### B.  Motion to Dismiss Claims Based on Unregistered Works

Defendant argues that Interplan has failed to invoke the Court's subject matter jurisdiction insofar as Interplan's claims for copyright infringement rest on drawings that have not been registered or deposited with the Copyright Office. Plaintiff responds by stating that the

registration requirement of 17 U.S.C. § 411(a) is not a jurisdictional bar for bringing suit for copyright infringement.

It is clear that this Court possesses subject matter jurisdiction over copyright infringement claims under 28 U.S.C. § 1331 (conferring subject matter jurisdiction over questions of federal law) and 28 U.S.C. § 1338 (conferring subject matter jurisdiction over claims arising under the Copyright Act). However, section 411 of the 1976 Copyright Act imposes a requirement of copyright registration as a precondition to filing a copyright infringement claim. 17 U.S.C. § 411(a). The Supreme Court has held that registration requirement imposed by 17 U.S.C. § 411 is not jurisdictional in nature, but rather a "claims-processing rule." *See Reed Elsevier v. Muchnick*, 559 U.S. --, 130 S. Ct. 1237, 1248 (2010). Therefore, the Court denies Defendant's motion to dismiss for lack of subject matter jurisdiction all claims of infringement of Plaintiff's unregistered works.

### C.  Motion to Copyrights Registered by Marcel Meijer, Individually

Defendant argues that Plaintiff does not have standing to bring copyright infringement claims based on Speedy Stop stores no. 58 and 59 because these copyrights have been registered to Marcel Meijer, individually, who is not a plaintiff in this action.[14] The Court understands Plaintiff to be making two arguments in response. First, Plaintiff argues that it has always been the original owner and copyright claimant, notwithstanding Mr. Meijer's listing on the copyright certificates as copyright author and claimant, because Mr. Meijer created these works on behalf

---

[14] As an initial matter, there are only three copyrights at issue where Mr. Meijer is listed individually as the copyright author and claimant: (1) Speedy Stop Store No. 58's technical drawing copyright (VA 1-368-557) (Doc. No. 108, Exh. B at 22-23.); (2) Speedy Stop Store No. 59's architectural work copyright (VA 1-368-553) (Doc. No. 108, Exh. B at 6-7.); and (3) Speedy Stop Store No. 59's technical drawing copyright (VA 1-368-552) (Doc. No. 108, Exh. B. at 24-25.) A fourth copyright (Speedy Stop No. 58's architectural work copyright VA 1-368-556) does list Mr. Meijer individually as copyright author and claimant, but Plaintiff has submitted a subsequent registration certificate for the same store's architectural work copyright that lists Plaintiff as the copyright author and claimant. Therefore, the Court will only treat the three copyrights—Store No. 58's technical drawing copyright and Store No. 59's technical drawing and architectural works copyrights—as the ones where Plaintiff potentially lacks standing.

of Interplan. This argument seems to attribute Mr. Meijer's authorship to Plaintiff through the "work for hire" doctrine. Second, Plaintiff argues that, to the extent that Mr. Meijer rather than Plaintiff is the copyright author and owner, Defendant cannot raise the issue of standing because Mr. Meijer and Plaintiff do not have a dispute over copyright ownership.

The Court agrees with Plaintiff's first argument and need not reach the second one. Section 501 of the Copyright Act limits the availability of a cause of action for copyright infringement to the "legal or beneficial owner of an exclusive right under a copyright." 17 U.S.C. § 501(b). Copyright ownership vests "initially in the author or authors of the work." 17 U.S.C. § 201(a). An "author" is generally the "party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to a copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989). However, in a "work for hire" situation, an entity other than the actual creator is considered the author and owner of the copyright. A "work made for hire" includes "(1) work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. Mr. Meijer clearly states that he is an employee of Plaintiff for purposes of determining ownership of the architectural drawings. (Doc. No. 139, Exh. A at 2-3.) In addition, Mr. Meijer wrote a letter to the United States Copyright Office in which he states that he had created the works as an "officer" of Interplan Architects. (Doc. No. 124, Exh. L at 3-4.) Therefore, Plaintiff can be deemed the author and owner of the three copyrights under the "work for hire" doctrine. Since copyright registration is not a jurisdictional prerequisite to filing suit for copyright infringement, Plaintiff's failure to obtain corrected certificates of registration listing it as copyright claimant does not deprive this Court of jurisdiction.

## IV.     MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Interplan has moved for summary judgment on its ownership of valid architectural works copyrights (Doc. No. 110), on the infringement of its technical drawings (Doc. No. 108), and on Defendant's affirmative defenses (Doc. No. 111). Defendant has crossmoved for summary judgment on numerous grounds, including joint authorship, the existence of an implied nonexclusive license, statute of limitations, lack of damages, and lack of fraud (Doc. No. 104). Each ground asserted in support of summary judgment is analyzed below.

## A.  Legal Standard for Summary Judgment

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp*., 234 F.3d 899, 902 (5th Cir. 2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id*.

## B.  Defendant's Motion to Strike Interplan's Motions for Summary Judgment (Doc. No. 155)

Before the Court turns to the substance of the parties' motions for summary judgment, it must first address Defendant's motion to strike Plaintiff's motions for summary judgment. Defendant states that Plaintiff's motions for summary judgment (Doc. Nos. 108, 110) are supported by the First Meijer Declaration. Defendant argue that, since the First Meijer Declaration incorrectly represents the deposit material on file with the Copyright Office, it should be stricken. Consequently, Defendant maintains, Plaintiff's motions for summary judgment are without supporting evidence and should also be stricken. Plaintiff responds by stating that any inaccuracies in Mr. Meijer's declaration are immaterial and are cured by the Second Meijer Declaration.

The Court denies Defendant's Motion to Strike Plaintiff's motions for summary judgment. First, the Court has already ruled on Defendant's Motion to Strike Mr. Meijer's declaration in Part II.B, above. The Court has stricken exhibits B-J (copies of deposit materials) to the First Meijer Declaration, but has not stricken exhibit A (copies of certificates of copyright registration) to the declaration. Plaintiff's motions for summary judgment remain supported by evidence in the form of copies of the copyright registration certificates issued by the Copyright Office.

Second, Plaintiff has not improperly altered the remaining summary judgment evidence. The Second Meijer Declaration does not modify the First Meijer Declaration's representation that Exhibit A to the First Meijer Declaration consists of the "true and correct copies of the certificates of registration issued by the United States Copyright Office for the architectural works and technical drawings for Speedy Stop Store Nos. 58, 59, 70, 82, 85, 201, 206, 209, and 216." (Doc. No. 110, First Meijer Declaration at ¶ 3.) Defendant has attacked the certificates of

registration as "unauthenticated and unreliable," but the Court has ruled that the certificates are neither. *See supra* Part II.B.

Therefore, Plaintiff's motions for summary judgment are supported by evidence in the form of Exhibit A to the First Meijer Declaration, and will not be stricken by the Court.

### C.  Violations of the Copyright Act

All parties have moved for summary judgment on various issues related to Plaintiff's copyright infringement claims. In order to establish copyright infringement, a plaintiff must prove "ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *See Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1999)). Defendant has asserted affirmative defenses to copyright infringement, including the existence of an implied nonexclusive license, joint authorship, and others.

#### 1.  Ownership of Valid Copyright

Plaintiff has moved for summary judgment on the basis that it owns valid architectural works copyrights (Doc. No. 110). In addition, Plaintiff moves for summary judgment on the issue of infringement of technical drawings copyrights (Doc. No. 108), which requires a showing that Plaintiff first owns valid copyright in the technical drawings. Finally, Plaintiff moves for summary judgment on Defendant's claims that Plaintiff's copyrights are not valid because the works are not original or copyrightable and contain errors in registration. (Doc. No. 111.)

Copyright ownership is shown by: (1) proof of originality and copyrightability, and (2) compliance with the applicable statutory requirements. *See Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 407-408 (5th Cir. 2004). A plaintiff complies with statutory formalities of copyright registration by submitting a complete application for registration, fee,

and deposit to the Copyright Office. *Geoscan, Inc. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000).

"A certificate of registration, if timely obtained, is *prima facie* evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004). However, the presumption of validity and ownership that a certificate of registration creates is rebuttable. *See Berg v. Symons*, 393 F. Supp. 2d 525, 539 (S.D. Tex. 2005). "The effect of such a certificate is to place the burden of proof on the alleged infringer to disprove the validity of the copyright." *Guillot-Vogt Assoc., Inc. v. Holly & Smith*, 848 F. Supp. 682, 686 (E.D. La. 1994).

Courts may find a registration invalid if the copyright claimant willfully misstated or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application. *Id.* at 542. There must be a showing of "scienter" in order to invalidate a copyright registration. *See St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1201 (11th Cir. 2009). "[A] misstatement or clerical error in the registration application if *unaccompanied by fraud* will not invalidate the copyright nor render the registration certificate incapable of supporting an infringement action." 2 M. Nimmer & D. Nimmer, Copyright § 7.20[B] at 7-208, § 7.18[C][1] at 7-201 (2000) (emphasis added). Once a court determines that errors were inadvertent, courts generally turn to the question of whether the misstatements were material. *Morelli v. Tiffany and Co.*, 186 F. Supp. 2d 563, 565-66 (E.D. Pa. 2002). An error is immaterial if its discovery is not likely to have resulted in the Copyright Office's refusal of the application. *Raquel v. Education Management Corp.*, 196 F.3d 171, 176 (3d Cir. 1999). In sum, immaterial, inadvertent errors in an application for copyright registration will be excused and do

not destroy the validity of the registration. *See Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994).

Plaintiff relies upon certificates of registration as *prima facie* evidence of ownership of valid "architectural works" and "technical drawings" copyrights in nine Speedy Stop stores. Plaintiff has attached copies of certificates of registration for each copyright over which Plaintiff asserts ownership. (Doc. No. 108, Exh. H at Exhibit A; Doc. No. 110, Exhibit A to First Meijer Decl.) In addition, Mr. Meijer's declaration purportedly incorporates the deposit materials submitted to the Copyright Office in connection with the applications for copyright registration for these nine Speedy Stop stores. However, the Court has struck from the First Meijer Declaration the attachments purporting to represent the deposit materials submitted to the Copyright Office. *See supra* Part II.B. Therefore, the Court will consider only the certificates of registration, and not the deposit material, when deciding Plaintiff's motions for summary judgment. Here, the Defendant has challenged the certificates of registration on the following grounds: (1) existence of errors in the certificates themselves; (2) lack of originality; and (3) lack of copyrightability. The Court will review each of Defendant's challenges in turn. Ultimately, the Court concludes that genuine issues of material fact do exist with respect to some issues, and grants in part and denies in part Plaintiff's motion for summary judgment as to ownership of valid copyright in the architectural works and technical drawings, and Plaintiff's motion for summary judgment as to Defendant's claims that its works are not original or copyrightable.

### a.  Errors in Deposit Material Submitted to the Copyright Office

Defendant first claims that the certificates of registration are invalid because Plaintiff did not submit an entire set of construction drawings as deposit material for its applications for copyright registration. Plaintiff responds by stating that the smaller set of drawings that was

submitted as deposit material to the Copyright Office was sufficient to obtain a valid registration of each copyright. Further, Plaintiff argues, even if there were errors in the scope of deposit material submitted to the Copyright Office, Defendant has not shown that these errors were either material or made with intent to defraud the Copyright Office. The Court addresses each type of copyright at issue in this case in turn in order to determine whether Plaintiff has made an error in deposit materials for each type of copyright, and whether these errors are material and fraudulent.

### i. Deposit Materials for Technical Drawings Copyrights

Plaintiff has submitted copies of certificates of registration for the following nine "technical drawings" copyrights: Store No. 58 (VA 1-368-557), Store No. 59 (VA 1-368-552), Store No. 70 (VAu755-524), Store No. 82 (VAu739-454), Store No. 85 (VAu755-523), Store No. 201 (VAu755-526), Store No. 206 (VAu755-527), Store No. 209 (VAu755-525), Store No. 216 (VAu755-528). (Doc. No. 108, Exh. B.; Doc. No. 108, Exhibit A to First Meijer Decl.) Plaintiff claimed in the First Meijer Declaration that it had submitted a certain set of drawings to the Copyright Office as deposit materials for these "technical drawings" copyrights. However, Defendant has shown and Plaintiff has acknowledged in the Second Meijer Declaration that only a subset of the drawings previously claimed by Plaintiff to have been submitted to the Copyright Office were actually submitted. Defendant claims that, for Stores 70, 82, 85, 201, 206, 209, and 216, only two drawings were submitted to the Copyright Office—the elevation drawing and the floor plan drawing. (Doc. No. 150, Exh. A at ¶¶ 8-9.) For Store No. 59, Defendant claims that 29 drawings have been submitted as deposit material to the Copyright Office. (*Id.* at ¶ 11.) For Store No. 58, Defendant has been unable to obtain the deposit material on file with the Copyright Office. (*Id.* at ¶ 14.) Plaintiff has not specifically identified which drawings were actually

submitted as deposit material for the "technical drawings" copyrights but merely stated in the Second Meijer Declaration that the "deposit materials do not include the entirety of Exhibits B-J to my earlier declaration, but a subset of those documents, e.g., the March 2007 set of applications each include sheets A02 and A05, representing the exterior elevation and floor plan of the store. *See, e.g.*, IAI 0008840-928." This representation leaves open the question of what Plaintiff submitted as deposit material for the "technical drawings" copyrights for Store No. 58 (VA 1-368-557) and Store No. 59 (VA 1-368-552).

The Court need not reach the question of whether Plaintiff's errors in deposit material for the "technical drawings" copyrights were inadvertent and immaterial because the Court will dismiss Plaintiff's claims for copyright infringement based on unregistered drawings.

Section 411(a) of the Copyright Act requires that a copyright in a work be registered before a copyright owner brings a suit for infringement of that copyright. 17 U.S.C. § 411(a). The Supreme Court in *Reed Elsevier* clearly stated that § 411(a) is not jurisdictional in nature, though it noted that it is a form of a claims-processing rule. *See Reed Elsevier*, 130 S. Ct. at 1247. *Reed Elsevier* left open the question of how strictly courts should interpret the registration requirement imposed by § 411(a). *Id.* at 1249 (declining to address whether § 411(a) registration requirement is a "mandatory precondition to suit that . . . district courts may or should enforce *sua sponte* by dismissing copyright infringement claims involving unregistered works"). Claims-processing rules "do not limit a court's jurisdiction, but rather regulate the timing of motions or claims brought before the court. Unless a party points out to the court that another litigant has missed such a deadline, the party forfeits the deadline's protection." *Dolan v. United States*, 559 U.S. --, 130 S. Ct. 2533, 2538 (2010).

The Fifth Circuit's leading case on § 411(a)'s registration requirement, *Positive Black*

*Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004), was abrogated by *Reed Elsevier* insofar as *Positive Black Talk, Inc.* held that § 411(a)'s registration requirement was jurisdictional in nature. However, *Positive Black Talk, Inc.*'s holding regarding what constitutes fulfillment of the claims-processing rule imposed by the section 411(a) registration requirement is still good law. The Fifth Circuit "requires only that the Copyright Office actually receive the application, deposit, and fee before a plaintiff files an infringement action," unlike other circuits that require a plaintiff to actually obtain a certificate from the Copyright Office before bringing suit. *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d at 365. In order to determine whether Plaintiff has fulfilled § 411(a)'s registration requirement as construed by the Fifth Circuit, the Court must examine whether the Copyright Office received the application, the required deposit, and fee for the copyrights that are the subject of this suit.

An owner of copyright may obtain registration of his or her copyright by "delivering to the Copyright Office the deposit specified by this section, together with the application and fee." 17 U.S.C. § 408(a); *see also Geoscan, Inc. v. Geotrace Techs., Inc.*, 226 F.3d 387, 393 (5th Cir. 2000). The deposit required by 17 U.S.C. § 408(a) is, "in the case of a published work, two complete copies or phonorecords of the best edition." 17 U.S.C. § 408(b). Plaintiff has acknowledged that it failed to submit a "complete copy" of the material it wished to copyright as "technical drawings." (Doc. No. 154, Second Meijer Declaration at ¶¶ 4-5.) Though such errors might be excused as immaterial and inadvertent for the purposes of assessing a copyright's validity, they are not immaterial insofar as Plaintiff wishes to claim copying of those particular drawings constitutes infringement by Defendant. Plaintiff has failed to state claims of copyright infringement of unregistered technical drawings because it has not shown that it properly deposited those drawings with the  Copyright Office. As such, Plaintiff's claims for copyright

infringement of those drawings not submitted to the Copyright Office as deposit material for the "technical drawings" copyrights are dismissed.[15] Further, since the Court has struck Plaintiff's deposit material that was submitted to the Copyright Office, Plaintiff cannot receive summary judgment on the issue of valid ownership for even some of its technical drawings copyrights. Therefore Plaintiff's motion for summary judgment on infringement of its technical drawings copyright is denied.

### ii.  Deposit Materials for Architectural Works Copyrights

Plaintiff has submitted copies of certificates of registration for the following nine "architectural works" copyrights: Store No. 58 (VA 1-368-556 and VAu739-455),[16] Store No. 59 (VA 1-368-553), Store No. 70 (VAu739-457), Store No. 82 (VAu739-453), Store No. 85 (VAu703-006), Store No. 201 (VAu739-459), Store No. 206 (VAu739-456), Store No. 209 (VAu739-458), and Store No. 216 (VAu739-452). (Doc. No. 110, Exhibit A to the First Meijer Declaration). Plaintiff claimed in the First Meijer Declaration that it had submitted a certain set of drawings to the Copyright Office as deposit materials for these "architectural works" copyrights. However, Defendant has shown and Plaintiff has acknowledged in the Second Meijer Declaration that only a subset of the drawings previously claimed by Plaintiff to have been submitted to the Copyright Office were actually submitted. Plaintiff has not specifically identified which drawings were actually submitted as deposit material for the "architectural works" copyrights. Defendant claims that, for Stores 70, 82, 85, 201, 206, 209, and 216, only

---

[15] The Court notes that Plaintiff has stated that it intends to file supplementary registrations for its technical drawings to include the complete set of construction drawings prepared by Plaintiff. (Doc. No. 154 at 2.) The Fifth Circuit has stated that "a plaintiff who files a copyright infringement lawsuit before registering with the Copyright Office may cure the § 411 defect by subsequently amending or supplementing its complaint once it has registered the copyright." *Positive Black Talk, Inc.*, 394 F.3d at 365. Should Plaintiff wish to subsequently bring claims for copyright infringement of its newly registered technical drawings, the proper manner of doing so would be a motion to amend or supplement its pleading. The Court takes no position on the merits or likely success of any such motion.

[16] Store No. 58 has two copyright registration certificates: VA 1-368-556 has an effective date of June 8, 2006, and the copyright claimant is Marcel Meijer, while VAu739-455 has an effective date of March 23, 2007 and the copyright claimant is Interplan Architects, Inc.

two drawings were submitted to the Copyright Office—the elevation drawing and the floor plan drawing. (Doc. No. 149, Exh. A at ¶¶ 8-9.) For Store No. 59, Defendant claims that 29 drawings have been submitted as deposit material to the Copyright Office. (*Id.* at ¶ 11.) For Store No. 58, Defendant claims that only two drawings (the elevation and the floor plan) for Copyright No. VAu739-455, and have not been able to obtain the deposit material on file for Copyright No. VA 1-368-556.

Plaintiff responds by stating that, even if the registration and deposit materials do not reflect the entirety of drawings related to the stores designed by Interplan, Defendant has not shown that the deposit materials that were submitted fail to convey the "design of the building as embodied in any tangible medium of expression," *see* 17 U.S.C. § 101, or otherwise fail to show the Copyright Office the architectural works of the stores in question. (Doc. No. 139 at 4.)  The burden is upon Defendant to show that the error in deposit material, if any, submitted by Plaintiff was both intentional and material.

First, the Court does not believe that there is an error in the deposit material submitted by Plaintiff for the "architectural works" copyrights. The deposit requirements for "architectural works" copyrights differ from the deposit requirement for "technical drawings." The Register of Copyrights is authorized to alter the statutorily-specified deposit requirements for certain types of works. *See* 17 U.S.C. § 408(c)(1). The corresponding regulations outline special provisions for "architectural works":

> "(xviii) Architectural Works. (A) For designs of unconstructed buildings, the deposit must consist of one complete copy of an architectural drawing or blueprint in visually perceptible form showing the overall form of the building and any interior arrangements of spaces and/or design elements in which copyright is claimed. For archival purposes, the Copyright Office prefers that the drawing submissions consist of the following in descending order of preference:
>
> (1) Original format, or best quality form of reproduction, including offset or silk screen

printing;

(2) Xerographic or photographic copies on good quality paper;

(3) Positive photostat or photodirect positive;

(4) Blue line copies (diazo or ozalid process).

The Copyright Office prefers that the deposit disclose the name(s) of the architect(s) and draftsperson(s) and the building site, if known.

(B) For designs of constructed buildings, the deposit must consist of one complete copy of an architectural drawing or blueprint in visually perceptible form showing the overall form of the building and any interior arrangement of spaces and/or design elements in which copyright is claimed. In addition, the deposit must also include identifying material in the form of photographs complying with § 202.21 of these regulations, which clearly discloses the architectural works being registered. For archival purposes, the Copyright Office prefers that the drawing submissions constitute the most finished form of presentation drawings and consist of the following in descending order of preference:

(1) Original format, or best quality form of reproduction, including offset or silk screen printing;

(2) Xerographic or photographic copies on good quality paper;

(3) Positive photostat or photodirect positive;

(4) Blue line copies (diazo or ozalid process).

With respect to the accompanying photographs, the Copyright Office prefers 8 x 10 inches, good quality photographs, which clearly show several exterior and interior views. The Copyright Office prefers that the deposit disclose the name(s) of the architect(s) and draftsperson(s) and the building site.”

17 C.F.R. § 202.20(c)(2)(xviii). Further, the Register of Copyrights may permit the deposit of

“incomplete copies” or permit the deposit of actual copies in place of “identifying material” that

would otherwise be required. *See* 17 C.F.R. § 202.20(d)(1).

Plaintiff’s submission to the Copyright Office of elevation drawings and floor plans as

deposit material for the “architectural works” is sufficient to satisfy the deposit requirements for

“architectural works.” These drawings show the “showing the overall form of the building and

any interior arrangement of spaces and/or design elements in which copyright is claimed." 17 C.F.R. § 202.20(c)(2)(xviii). Because there is no error in the deposit material associated with the "architectural works" copyrights, the deposit material cannot be a ground for challenging the validity of Plaintiff's architectural works' copyrights.

### b.  The Identification of Derivative Works

Defendant also attacks the validity of the copyright registrations because of conflicting information that appears among the certificates of registration in response to the application's question asking for an identification of any preexisting work that the work being copyrighted is based upon. Defendant notes that, on some registrations, Plaintiff answered "N/A," while in other registrations, Plaintiff answered "Speedy Stop #59 (Portland, Texas)," and yet in others, Plaintiff answered "Speedy Stop # 59 (Portland, Texas) and Speedy Stop #82 (Columbus, Texas)." (Doc. No. 119 at 17-20.) With respect to the "architectural drawings" copyrights, it is clear that these discrepancies are immaterial. For Store No. 58, the original certificate of registration for "architectural works" (VA 1-368-556), where Plaintiff did not disclose any prior material, was replaced by a subsequent certificate of registration for "architectural works" in which Plaintiff disclosed that Store No. 58 was based on Store Nos. 59 and 82. (*Id.* at 17.) The Copyright Office's decision to issue a certificate of registration for "architectural works" once it became aware that preexisting material did exist shows that the Copyright Office would not have rejected the copyright registration applications if this information had been known to them at the time of Plaintiff's initial copyright application.

As for the "technical drawings" copyrights, the certificate of registration for Store No. 70, effective March 23, 2007, states that the "technical drawings" work is based upon "Speedy Stop # 59 (Portland, Texas)." (*Id.* at 18.) The earlier-issued "technical drawings" certificate of

registration for Store No. 58, effective June 8, 2006, lists the response "N/A" in response to the question of whether the current work being copyrighted is based upon previous works. (*Id.* at 17.) Once again, the Copyright Office's willingness to issue a copyright registration when it became aware of the preexisting material is evidence that it would not have rejected Plaintiff's copyright registration for Store No. 58 if it had known about the preexisting work at the time of the earlier application.

Finally, the Court cannot conclude that the discrepancies between the "architectural works" copyrights (listing both Store Nos. 59 and 82 as preexisting works) and the "technical drawings" copyrights (listing only Store No. 59 as preexisting work) create a question of material fact about the validity of the copyright registration. First, Defendant has not shown that such a discrepancy is an error, as opposed to an actual distinction between the preexisting work that the "architectural works" were based upon and the preexisting work that the "technical drawings were based upon. Second, Defendant has not offered any evidence that the omissions, if any, were made with the intent to defraud the Copyright Office. Finally, Defendant has not identified why the Copyright Office would have rejected the "technical drawings" copyrights had it learned that they were based on Store No. 82 in addition to Store No. 59. Therefore, the discrepancies as to the information listed as preexisting work on the copyright certificates does not meet the standard necessary to rebut the presumption of validity of the copyright registrations.

### c.  The Identification of Marcel Meijer as "Author"

Defendant argues that Interplan knowingly misrepresented the author of the "technical drawings" as Marcel Meijer even though he did not actually author these drawings. (Doc. No. 123). An "author" is generally the "party who actually creates the work, that is, the person who

translates an idea into a fixed, tangible expression entitled to a copyright protection." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

After reviewing the evidence submitted by the parties, the Court concludes that there was no error in listing Mr. Meijer as an author on the copyright registrations. Defendant highlights deposition testimony that purportedly shows Mr. Meijer's lack of involvement in the AutoCAD process by which the technical drawings were rendered. Mr. Urfi stated in his deposition that he never once saw Mr. Meijer use AutoCAD in the 13 years that Mr. Urfi worked for Mr. Meijer and that Mr. Meijer supervised the draftsmen in the office who did use AutoCAD. (Urfi Depo., Doc. No. 123, Exh. H at pp.107-08, 111-12). However, Mr. Urfi also stated that Mr. Meijer "used to draw stuff, you know, by hand." (Urfi Depo., Doc. No. 123, Exh. H at p.112). When questioned specifically about Mr. Meijer's working process, Mr. Urfi said:

> "Q. Okay. And so he would give you on a piece of paper, and I presume with a pencil, a drawing?
> A.  Yes.
> Q. And do you know where he got that paper from?
> A. Like – I don't know when the clients come or something, he discuss. He has his own meeting with the clients –
> Q. Uh-huh.
> A. – you know. Then he has all the paper ready. Then he used to call us, whoever will start the work. Hey, start this thing, you know. He give us the guidance, like this looks like this project, so all the drawings, you know, from that directory, start with that.
>        Then he, you know, make a big 24, 36 drawing, and then he used to modify that. Look, this should be like this. Get that, you know, driveway this way, get that this – this way. He used to – on the – on the – on the drawing he used to – by pencil or pen, you know, he used to do like a red mark. It was a red mark.
> Q. Okay.
> A. Yeah. Here's the car wash put it there. Here's the entrance, there's the exit. He's going, put the lane there; landscaping, put it here. Take five feet from the property line right of way, you know, or three feet. . . ."

(Urfi Depo., Doc. No. 123, Exh. H at pp.112-13). Mr. Urfi's deposition testimony, rather than establishing that Mr. Meijer was not the one who "created" the work, shows that Mr. Meijer was intimately engaged with his draftsmen in translating the architectural designs into fixed

drawings. Though Mr. Meijer may not have engaged in computer-created drawings using AutoCAD, he did make hard-copy additions and modifications that resulted in the creation of the copyrightable material. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991) ("Authors are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public."). As described above, under the "work for hire" doctrine, Plaintiff can be considered the "author" of works that Mr. Meijer created within the scope of his employment.

Next, the Court addresses the instances in which Mr. Meijer was listed as "claimant" on the certificates of copyright registration instead of Plaintiff. Improper designation of the copyright claimant is generally not grounds to dismiss an infringement claim unless: (a) the error misleads the public as to the existence of the copyright or true owner of the copyright; (b) otherwise prejudices a defendant. *King Records, Inc. v. Bennett*, 438 F. Supp. 2d 812, 838 (M.D. Tenn. 2006). Neither of these circumstances is present here. In each certificate where Mr. Meijer is listed individually as copyright claimant, "Interplan Architects, Inc." appears under his name. The inclusion of Plaintiff's name provides the public with notice of the true owner of the copyright. There is no evidence that Defendant has been prejudiced by Mr. Meijer's listing individually as copyright claimant. Moreover, this error was unintentional. Mr. Meijer testified that he had very little experience registering copyrights. Therefore, the Court does not find the validity of copyright rebutted on this ground. *See LZT/Filliung Partnership, LLP v. Cody/Braun & Assoc., Inc.*, 117 F. Supp. 2d 745 (N.D. Ill. 2000) (holding that mistakes in the copyright infringement were innocent where the plaintiff had attempted for the first time ever to register plans).

### d.  The Identification of Ismael Urfi as "Author"

Next, Defendant claims that Plaintiff's copyrights are invalid because they assert Plaintiff's authorship of the copyrights as the employer of Ismail Urfi. (Doc. No. 123 at 13-14.) Defendant argue that Mr. Urfi performed his work on the drawings as an independent contractor and not as an employee of Interplan Architects. (Doc. No. 123 at 14-16, Doc. No. 119 at 12-13.) Therefore, Defendant concludes, Interplan is not the author of the technical drawings or architectural works and cannot claim copyright protection in either.

Copyright in a work protected by the Act vests "initially in the author or authors of the work." 17 U.S.C. § 201(a). The Copyright Act affords an exception to the general rule that copyright vests in authors in situations involving works made for hire. A "work made for hire" includes: "(1) work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned . . . if the parties expressly agree in a written instrument signed by them that the work shall be considered a work for hire." 17 U.S.C. § 101. As there is no evidence of a written agreement between Mr. Urfi and Interplan designating Mr. Urfi's drawings as works for hire, Plaintiff may claim ownership of Mr. Urfi's drawings only if he is determined to be an employee of Plaintiff during the period in which the drawings were created.

The determination of whether an individual is an employee or independent contractor for purposes of the "work for hire" doctrine is made using the common law of agency. *See Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989); *Quintanilla v. Texas TV*, 139 F.3d 494, 497 (5th Cir. 1998). In applying the common law of agency, courts consider the "hiring party's right to control the manner and means by which the product is accomplished," which, in turn, involves the application of a number of factors. *Reid*, 490 U.S. at 751.[17]

---

[17] In *Reid*, the Supreme Court outlined a list of non-exhaustive factors that are relevant in deciding whether the hired party is an employee or an independent contractor: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the

Applying the factors enumerated in *Reid*, there are a few indications that Mr. Urfi was an independent contractor. For one, Mr. Urfi states that, throughout his employment at Interplan between the years of 1994-2007, he was a "contract employee." (Urfi Depo. at 16, 20.) He was paid on an hourly basis according to the number of hours worked. (Urfi Depo. at 18, 31.) Mr. Urfi did not receive medical benefits and was not paid for sick time or holidays. (Urfi Depo. at 17, 28-29.)

On the other hand, Mr. Urfi relates characteristics of his position as a draftsman that point towards a conclusion that he was an employee. Most significantly, Mr. Urfi paints a picture of an employment relationship between Mr. Meijer and himself wherein Mr. Meijer controlled the manner and means by which Mr. Urfi and other draftsmen at Interplan performed their work. Mr. Urfi describes Mr. Meijer as having "all the control, how much – or how many works he has, you know. We're not supposed to know that, you know. He was the president of Interplan Architects." (Urfi Depo. at 45.) Mr. Meijer supervised the work of the draftsmen, answered any questions the draftsmen had, provided instructions and specific guidance to the draftsmen on their projects, and possessed the final say in the content of the drawings. (Urfi Depo. at 107-08, 115, 130-31.) Mr. Urfi was required to arrive at the office at a specific time each morning and punch in and out of a time clock. (Urfi Depo. at 18, 26.) During the times relevant to this lawsuit, he received a paycheck from which Social Security taxes, Medicare taxes, and perhaps income taxes were deducted (Urfi Depo. at 17-27.) He was paid for vacation days. (Urfi Depo. at 29.) Though Mr. Urfi describes himself variously as a "contract employee" and "contract labor," he obscures any difference between Interplan's treatment of independent contractors and employees

---

right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. 490 U.S. at 751-52. No single factor is determinative. *Id.*

by also stating that "we were the regular employees, you know, like a contract, but we are regular employees." (Urfi Depo. at 19.)

Defendant does not dispute any of the facts contained in Mr. Urfi's deposition. Nor does Defendant reference the existence of any additional facts that, if known, would assist the trier of fact in making a determination of Mr. Urfi's employment status. Defendant merely states that issues of fact exist as to Mr. Urfi's designation as an employee on the copyright registrations. (Doc. No. 119 at 12-13). However, the employee versus independent contractor determination is a question of law. *See Massingill v. Stream, LTD.*, Case No. 08-cv-0091-M, 2009 U.S. Dist. LEXIS 91959, at *15 (N.D. Tex. Oct. 1, 2009) (stating that employee versus independent contractor determination is a question of law). If the facts necessary to determine employee versus independent contractor status are unsettled, the court cannot make a legal conclusion as to the individual's employment status. *See Easter Seal Soc. for Crippled Children & Adults, Inc. v. Playboy Enterprises*, 815 F.2d 323, 336 (5th Cir. 1987). Here, there are no facts in dispute as to the work Mr. Urfi performed at Interplan Architects, the circumstances of his employment, and the way in which Mr. Urfi interacted with Mr. Meijer. Rather the dispute centers on whether, after taking all these facts into consideration, Mr. Urfi should be classified as an employee or independent contractor. This is a question of law that the Court finds to be amenable to disposition.

Plaintiff, through its president Mr. Meijer, controlled the way in which Mr. Urfi drafted plans and drawings for Interplan's clients. Mr. Meijer assigned Mr. Urfi architectural projects, which were part of Interplan's regular business. Moreover, Interplan's long-running employment relationship with Mr. Urfi, its requirement that he conduct his work during certain hours and at Interplan's office, and its deduction of payroll taxes from his paychecks are all evidence of Mr.

Urfi's status as an employee. Though Mr. Urfi was not given medical insurance or paid for certain days on which he did not work, these factors are not determinative.

Therefore, the Court concludes that Mr. Urfi was an employee of Interplan for the purposes of the "work for hire" doctrine. Interplan is the "author" of any works created by Mr. Urfi during the scope of his employment at Interplan. The copyright registrations listing Interplan as the "author" of the technical drawings and architectural works are valid in this respect.[18]

### e.   Lack of Originality

Plaintiff has moved for summary judgment on Defendant's claim that Plaintiff's copyrighted material is not original, and therefore undeserving of copyright protection. Originality means only that the work was independently created by the author (as opposed to copied from other works) and that it possesses at least some minimal degree of creativity. *Feist Publications, Inc. v. Rural Tel. Servs. Co.*, 499 U.S. 340, 345 (1991). "Practically speaking, because the degree of creativity required is so low, the originality requirement amounts to 'little more than a prohibition of actual copying.'" *Axelrod & Cherveny Architects, P.C. v. Winmar Homes*, Case No. 2:05-cv-711-ENV-ETB, 2007 U.S. Dist. LEXIS 15788, *9 (E.D.N.Y. Mar. 6, 2007) (citing *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 103 (2d Cir. 1951)). In cases where the defendant offers proof that plaintiff copied from other works, the burden shifts to the plaintiff to prove originality. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 97 F.3d 1504 (1st Cir. 1996).

---

[18] Defendant makes the additional argument that Mr. Urfi is not an author of Plaintiff's drawings because he did not contribute any creativity in the design or layout of the Speedy Stop stores. (Doc. No. 123 at ¶ 20.) The Court need not parse out which contributions by Mr. Urfi were creative and which were not. To the extent that Mr. Urfi only transposed the expression of the architectural design onto paper, he did so at the direction and with the feedback of Mr. Meijer. (Urfi Depo. at 94-102.) Therefore, Mr. Meijer may be deemed the author of Plaintiff's drawings. *See Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991) ("Authors are entitled to copyright protection even if they do not perform with their own hands the mechanical tasks of putting the material into the form distributed to the public.").

Defendant's main challenges to the originality of Plaintiff's works all center around whether the works were independently created, as opposed to whether they possess a minimal degree of creativity, and can be distilled into three main arguments. First, Defendant maintains that Plaintiff's Architectural Drawings are not original because they incorporate many drawings generated by third-party vendors and consultants.[19] This contention, even if true, is not sufficient as a legal matter to challenge the originality of Plaintiff's Architectural Drawings. Defendant offers as evidence of the third-party and consultant contributions to Plaintiff's Architectural Drawings a list of the contributions made by these third-parties and consultants. (Doc. No. 119, Exh. G.) These contributions consist of vicinity maps, surveys, property and boundary lines, standards for restroom accessibility, glass mullions standards, climatic zone maps, electrical layouts and specifications, plumbing information, canopy elevations and similar information and drawings. (*Id.*) Even though Plaintiff's architectural drawings may contain such contributions by other parties, they are original due to the selection, arrangement and composition of the elements. *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002); *The Rottlund Co. v. Pinnacle Corp.*, Case No. 01-1980, 2004 U.S. Dist. Lexis 16723, *50 (D. Minn. Aug. 20, 2004).

Second, Defendant states that Plaintiff modeled its Architectural Drawings on the design of another convenience store chain called Quik Trip, and therefore Plaintiff's work cannot be original. The only relevant evidence offered by Defendant is the affidavit of Jeff Johanson. Mr. Johanson's affidavit does not state that Defendant Thomas provided a Quik Trip floor plan or elevations to Plaintiff, or even that Defendant Thomas possessed drawings of Quik Trip's floor plan, but only that Defendant Thomas acquired "some of the ideas for the floor plan by a review of another major convenience store operation, Quik Trip." (Doc. 121, Exh. 9, Affidavit of Jeff

---

[19] This argument is distinguishable from Defendant's claim that Plaintiff is not the sole author of the works due to its incorporation of third-party vendor and consultant drawings.

Johanson at 2.) Defendant also point to the deposition testimony of Ismail Urfi and Greg Mitchell, which acknowledges the similarity of Plaintiff's floor plan to Quik Trip's floor plan. However, these individuals do not offer any personal knowledge of Plaintiff's access to and copying of Quik Trip's floor plan. Defendant has not proffered evidence of either Plaintiff's direct access to Quik Trip's floor plan drawings, or access through Defendant Thomas to the floor plan. Therefore, Defendant has not raised a genuine issue of material fact with respect to Plaintiff's alleged copying of Quik Trip's floor plan.

Third, Defendant contends that Plaintiff's Architectural Drawings are not original because they are based on Defendant Thomas's in-house drawings of both floor plans and elevations. The Court finds that there exist genuine issues of material fact with respect to Plaintiff's alleged copying from Defendant Thomas's floor plan and elevation drawings, and will deny Plaintiff's motion for summary judgment due to this particular issue only. Defendant Thomas and Plaintiff clearly dispute the extent to which Defendant Thomas contributed site plans, floor plans, and elevation drawings for the nine Speedy Stop stores that Plaintiff designed. A reasonable juror could enter a verdict for Defendant Thomas, the non-movant here, on the grounds that Plaintiff's Architectural Drawings were not original because they had been copied from Defendant Thomas's in-house drawings. *See Guillot-Vogt. Assoc., Inc.*, 848 F. Supp. at 689 (denying summary judgment when genuine issues of originality were raised by defendant's provision of drawings to plaintiff). Therefore, the Court denies Plaintiff's motion for summary judgment on Defendant's claim of lack of originality and denies Plaintiff's motion for partial summary judgment on ownership of valid architectural works copyrights.

### f.   Lack of Copyrightability

Plaintiff has moved for summary judgment on Defendant's claim that Plaintiff's copyrighted material does not contain copyrightable subject matter. Defendant contends that "functional" drawings such as Plaintiff's Architectural Drawings are not copyrightable.

With respect to the "technical drawings" copyrights, this material is protected under 17 U.S.C. § 101. The limitation of copyrightability of functional aspects applies only to physical objects, not to drawings of such objects. *Guillot-Vogt. Assoc., Inc.*, 848 F. Supp. at 688-89.

With respect to "architectural works" copyrights, these works are protected by the Architectural Works Copyright Protection Act. The legislative history confirms that architectural works contain many non-protected component parts. See H.R. Rep. No. 101-375, *reprinted in* 1990 U.S.C.C.A.N. at 6949 ("[C]reativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole . . . ."). Congress purposefully excluded any consideration of the utilitarian aspects of architectural design when determining the copyrightability of architectural works. *See id.* at 6951 ("[T]he copyrightability of architectural works shall not be evaluated under the separability test applicable to pictorial, graphic, or sculptural works.") Regardless of the functional nature of aspects of Plaintiff's Architectural Drawings, they are copyrightable as "architectural works" because copyright protection extends to "the gestalt of the plans including things like an architect's choices regarding shape, arrangement, and location of buildings, the design of open space, the location of parking and sidewalks, and the combination of individual design elements." *Axelrod & Cherveny Architects, P.C.*, 2007 U.S. Dist. LEXIS at *32.

Defendant has not raised a genuine issue of material fact regarding the copyrightability of Plaintiff's Architectural Drawings as either "technical drawings" or "architectural works." Plaintiff is entitled to summary judgment on Defendant's claim of lack of copyrightability.

### 2.  Infringement

Plaintiff has moved for summary judgment on the issue of Defendant's infringement of its "technical drawings" copyrights. To succeed on a claim on copyright infringement, a plaintiff must establish valid copyright ownership and demonstrate actionable copying by a defendant. The "copying" inquiry comprises two separate questions. First, a plaintiff must establish factual copying. Second, a plaintiff must establish that the copying involved improper appropriation of copyrightable expression—i.e., actionable copying.

As to the first inquiry, Plaintiff must, as a factual matter, prove that Defendant "actually used the copyrighted material to create his own work." *General Universal Sys. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004). Copying can be proven by direct or circumstantial evidence. *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). Circumstantial evidence must demonstrate both: (1) that Defendant had access to the copyrighted work; and (2) that the two works are "probatively" similar. *General Universal Sys. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004); *Engineering Dynamics v. Structural Software*, 26 F.3d 1335, 1340-1341 (5th Cir. 1994). The access element is satisfied if the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work. *General Universal Sys.*, 379 F.3d at 142. The second element -- probative similarity -- requires a showing that the works, "when compared as a whole, are adequately similar to establish appropriation." *Id.* In some cases, factual copying may be proven without a showing of access "if the two works are so strikingly similar as to preclude the possibility of independent creation." *Id.*

The second inquiry determines whether the copying is legally actionable. Plaintiff must demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar to protectable elements of the infringed work. *See General Universal Sys.*,

379 F.3d at 142; *Engineering Dynamics*, 26 F.3d at 1340-41.[20] Generally, one must compare the original and the copy "side-by-side" to determine "whether a layman would view the two works as substantially similar." *General Universal Sys.*, 379 F.3d at 142. The "substantial similarity" determination is typically left to the ultimate factfinder, but "summary judgment may be appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." *Id.*

Plaintiff's motion for summary judgment on the issue of "technical drawings" copyright infringement cannot be granted. Plaintiff cannot conclusively establish which of its technical drawings were submitted as deposit material for its "technical drawings" copyrights. As a result, a question of material fact exists as to the scope of "copyrighted material" that may have been used by Defendant to create its own work. *See General Universal Sys. v. Lee*, 379 F.3d 131, 142 (5th Cir. 2004). Without knowing which technical drawings have been copyrighted, the Court is unable to determine questions of access, probative similarity, or substantial similarity. *Bridgmon*, 325 F.3d at 577; *Jack Preston Wood: Design, Inc., v. BL Building Co.*, H-03-713, 2004 U.S. Dist. LEXIS 30511, *31-*32 (S.D. Tex. June 22, 2004) (declining to award summary judgment on the issue of infringement when the court did not have one set of plans with which to conduct the necessary side-by-side comparison). Therefore, the Court cannot grant summary judgment to Plaintiff on the issue of infringement of its technical drawings copyrights.

### D.  Fraud Claim

---

[20] "We note that this court stated in *Eng'g Dynamics, Inc.*, 26 F.3d at 1340-1341, and again in *King v. Ames*, 179 F.3d 370, 375-76 (5th Cir. 1999), that with respect to factual copying the test is 'probative similarity' (if relying on circumstantial evidence of copying) and that the test for actionable copying is 'substantial similarity.' *See also Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 397-98 (5th Cir. 2001) (analyzing probative similarity and substantial similarity separately). While it is possible that the same evidence will satisfy both tests, the tests are not the same." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

Defendant moves for summary judgment on Plaintiff's state-law claims of fraud. Specifically, Defendant claims that two of Plaintiff's fraud claims, based on alleged misrepresentations made by Defendant Thomas in December 2003 and March 2004, are barred by the statute of limitations. As to the third fraud claim, Defendant claims that there is no evidence of any misrepresentation made by Defendant Thomas in November 2004.

A cause of action for fraud must be brought within four years after the date the cause of action accrues. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4). The general rule is that actions for fraud must be commenced within four years after the fraud is perpetrated. *Buffington v. Lewis*, 834 S.W.2d 601, 603 (Tex. App.—Houston [1 Dist.] 1992, no writ). However, if "the fraud is concealed or is not known to the injured party," the statute of limitations begins to run when "the plaintiff knew, or exercising reasonable diligence, should have known of the wrongful act causing injury." *Buffington v. Lewis*, 834 S.W.2d 601, 603 (Tex. App.—Houston [1st Dist.] 1992, no writ); *BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 452 (Tex. App.—San Antonio 2008, pet. filed).

Defendant is correct that, if Plaintiff was aware of the alleged fraud at the time Defendant Thomas made its alleged misrepresentations, Plaintiff's fraud claims would accrue beginning the date when the alleged misrepresentations were made. However, Defendant has not offered any evidence that Plaintiff was aware that its Architectural Drawings were being shared with Morris, Hermes, or other third-parties working on projects for which Plaintiff was not the architect. Without such a showing, the Court is not required to apply the accrual rule that requires action for fraud to be commenced within four years of the date of alleged misrepresentations instead of the discovery rule. As a result, Defendant is not entitled to summary judgment that two of Plaintiff's fraud claims are barred by the statute of limitations.

Plaintiff's third fraud claim is based on an alleged representation made by Mr. Johanson in November 2004 that Defendant Thomas needed electronic copies of Plaintiff's Architectural Drawings in order to make minor changes to the construction sites and for archival purposes. (Doc. No. 54 at ¶ 84.) Defendant argues that Plaintiff has not offered any evidence that Mr. Johanson made such a representation in November 2004. Plaintiff directs the Court to only one piece of evidence for its claim that Mr. Johanson made this statement in November 2004: Mr. Meijer's affidavit, subsequent to his depositions, that Mr. Johanson requested electronic copies of Plaintiff's Architectural Drawings "on several occasions." (Doc. No. 124, Exh. V at ¶ 4.) This statement, which does not provide any particulars and is otherwise unsupported by Mr. Meijer's prior deposition testimony, is insufficient to create an issue of material fact. *See Poole v. Marlin Drilling Co.*, 592 F. Supp. 60, 63 (W.D. La. 1984) (rejecting a conclusory statement of ultimate fact made in an affidavit submitted in opposition to summary judgment); *United States v. Dercacz*, 530 F. Supp. 1348, 1350 (E.D.N.Y. 1982) (stating that the party opposing summary judgment must supply "supporting arguments or facts" and "concrete particulars" in order to present a genuine issue for trial). As a result, Defendant has met its burden of showing that there is no evidence in the record to support Plaintiff's claim that a misrepresentation by Defendant Thomas occurred in November 2004. Defendant's motion for summary judgment on Plaintiff's fraud claim based on misrepresentations allegedly made in November 2004 is granted.

### E.  Affirmative Defenses

Plaintiff has moved for summary judgment on all of Defendant's affirmative defenses. Defendant has cross-moved for summary judgment on some of its defenses. The Court will address each of these in turn.

#### 1.  Joint Authorship

Defendant moves for summary judgment on its affirmative defense that Plaintiff's copyrighted works are "joint works" and, therefore, Defendant is not liable under either the Copyright Act or the DMCA for using Plaintiff's copyrighted works. Plaintiff has cross-moved for summary judgment on this issue.

A "joint work" is a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "Authors of a joint work are initial co-owners of the copyright in the work, and are each entitled to equal undivided interest in the whole work." *Jordan v. Sony BMG Music Entm't, Inc.*, 637 F. Supp. 2d 442, 459 (S.D. Tex. 2008). Joint authors cannot be liable to one another for infringement. *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494 (5th Cir. 1998). Authorship is generally a question of fact for the jury. *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 110 (2d Cir. 2002).

The mere fact of collaboration, however, does not make the collaborators "joint authors." *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1068-69 (7th Cir. 1994). "To establish that his contributions were significant enough to make him a joint author**,** a party must show that he and the other party: (1) intended to create a joint work; and (2) each contributed independently copyrightable material." *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009); *Thomson v. Larson*, 147 F.3d 195, 200 (2d Cir. 1998). In the context of architectural works, courts have recognized that, although the "client, the developer, the engineer, and the ultimate inhabitants of a project, may have a voice in the design process . . . only in unusual circumstances will someone other than the architect be the author, the one to give spatial expression to the design ideas." *Fairview Dev. Corp. v. Aztec Custom Homebuilders, LLC*, Case No. CV-07-0337-PHX-SMM, 2009 U.S. Dist. LEXIS 16501, *13 (D. Ariz. Mar. 2,

2009). "[N]ormal client participation does not transform a client into an author or joint author of an architectural work." *Id.* at *13-*14; *M.G.B. Homes v. Ameron Homes*, 903 F.2d 1486, 1493 (11th Cir. 1990) (finding that a client's provision of a thumbnail sketch of a floor plan to his architect did not render the client an "author" of the architectural plans because there was no intent that the sketch become part of the finished expression).

Neither party is entitled to summary judgment at this stage of the proceedings because questions of material fact exist regarding joint authorship. The viability of Defendant Thomas's claim of joint authorship rests on, first, a showing that it made independently copyrightable contributions to Plaintiff's works. However, the parties dispute whether Defendant Thomas gave Plaintiff original site plans, floor plans, and elevation drawings it generated in-house, or simply drawings and surveys from third-party consultants and vendors.[21] (*Compare* Labeff Depo. 25-26, 73-75, 137-38, 169 *with* Meijer I Depo. at 41, 45; Meijer II Depo. at 443-44, 483, 506, 526; Meijer III Depo. at 43, 49-50, 61, 62, 66.) Without knowing the scope of Defendant Thomas's contributions to Plaintiff's Architectural Drawings, the Court cannot make a determination of whether these contributions, if any, were independently copyrightable. *See Guillot-Vogt Assoc., Inc.*, 848 F. Supp. at 689 (denying summary judgment due to questions of authorship raised by defendant's provision of drawings to plaintiff).

Second, the parties dispute whether both Plaintiff and Defendant Thomas intended to be joint authors. "[T]he intent prong does not have to do with the collaborators' intent to recognize each other as coauthors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not on the legal consequences of that collaboration."

---

[21] Defendant appears to argue also that Plaintiff's claim of sole authorship is defeated because of its inclusion of third-party and consultants drawings in its Architectural Drawings. (Doc. No. 119, Exh. G.) However, Defendant Thomas' claim of joint authorship cannot rest on purported contributions by parties other than itself. Therefore, the Court will not consider the contributions of third-parties and consultants when analyzing the question of Defendant Thomas's joint authorship of Plaintiff's Architectural Drawings.

*Janky*, 576 F.3d at 362 (quoting *Erickson*, 13 F.3d at 1068-69). Defendant contends that the requisite intent is shown through Defendant Thomas's high level of decision-making authority over content and revisions to the Speedy Stop store designs. Further, Defendant claims that Plaintiff also intended to share authorship of its plans by failing to obtain signed Design Proposals asserting Plaintiff's sole authorship and ownership of its Architectural Drawings. Plaintiff contends that its intent to be sole author of its Architectural Drawings is shown by the title block and "scope of the document" language contained on its drawings. Further, Plaintiff challenges the level and nature of Defendant Thomas's participation in the design process, arguing that provision of third-party and consultant drawings does not transform Defendant Thomas into joint author. The Court acknowledges that "[a]n important indicator of authorship is a contributor's decisionmaking authority over what changes are made and what is included in a work." *Thomson v. Larson*, 147 F.3d 195, 202-03 (2d Cir. 1998). Here, the parties have offered differing factual accounts of the nature and scope of Defendant Thomas's involvement in the design process such that a jury could properly enter a verdict in favor of Plaintiff, the non-movant. Therefore, the Court cannot grant summary judgment to either party on Defendant Thomas's status as a joint author of the copyrighted works.

### 2.   Implied Nonexclusive License

Defendant has moved for summary judgment on its affirmative defense that Plaintiff granted Defendant Thomas an implied nonexclusive license to copy or distribute Plaintiff's Architectural Drawings. Thus, Defendant argues, it is not liable for either copyright infringement or violations of the DMCA. Violations of the DMCA require that a defendant know or have reason to know that removal of copyright management information would "induce, enable, facilitate, or conceal an infringement" of any right under copyright law. 17 U.S.C. § 1202(b);

*Gordon v. Nextel Communications*, 345 F.3d 922, 927 (6th Cir. 2003). Plaintiff has cross-moved for summary judgment on the basis that Defendant did not plead this defense.

Rule 8(c) requires a party to set forth all affirmative defenses in a responsive pleading. Fed. R. Civ. P. 8(c). "Generally, an affirmative defense not pled is considered waived." *Marine Overseas Svcs., Inc. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1233 (5th Cir. 1986). However, "where the matter is raised in the trial court in a manner that does not result in unfair surprise, . . . technical failure to comply precisely with Rule 8(c) is not fatal." *Lafreniere Park Found. v. Broussard*, 221 F.3d 804, 808 (5th Cir. 2000) (quoting *United States v. Shanbaum*, 10 F.3d 305 at 312).  If the affirmative defense is raised at a pragmatically sufficient time, and the party opposing the defense is not prejudiced in its ability to respond, a court may hold that the defense is not waived. *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008); *United States v. Shanbaum*, 10 F.3d 305, 312 (5th Cir. 1994).

Defendant first unambiguously raised the issue of being granted a license or permission by Plaintiff in the deposition of Marcel Meijer on January 15, 2010, when Mr. Meijer was asked whether Defendant Thomas "had either an express license from you wherein you said it's okay for you to do that or an implied one that they did it; they sent it to you; and you never said anything about it, right?" (Meijer III Depo. at 218.) At the time of Mr. Meijer's Deposition, the close of discovery was one month away on February 15, 2010. (Doc. No. 56.) Plaintiff, along with Defendant, twice moved for an extension of time to conclude expert discovery, both of which were granted. (Doc. Nos. 88, 96.) Defendant filed the present motion for summary judgment on April 5, 2010, and Plaintiff has had ample time to respond to the license defense and prepare for trial on November 8, 2010. Further, Plaintiff has not identified any prejudice that

has resulted from Defendant's late-raised license defense. Therefore, the Court declines to find that Defendant has waived the license defense.

Turning to the defense itself, courts have held that the existence of an implied license to use the copyright for a particular purpose precludes a finding of infringement. *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). An implied nonexclusive license to use a copyrighted work need not be evidenced by a writing, but may be implied through conduct or granted orally. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451 n.5 (5th Cir. 2003). An implied nonexclusive license exists when "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama Ltd. v. Axcess Broadcast Servs.*, 128 F.3d 872, 879 (5th Cir. 1997) (quoting *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1991)). The existence of a license is an affirmative defense and a defendant bears the burden of proving its existence. *Lulirama Ltd.*, 128 F.3d at 884.

Defendant correctly identifies the third prong of the *Lulirama* test—Plaintiff's intent—as the controlling issue here. Defendant claims that Plaintiff's intent to grant a license can be implied from Mr. Meijer's admission that he was aware of and gave Defendant Thomas permission to distribute Plaintiff's Architectural Drawings to third-party consultants and vendors. (Meijer III Depo. at 54, 92, 95, 100, 216, 220.) Mr. Meijer never complained about or objected to Defendant Thomas's use of Plaintiff's Architectural Drawings nor withdrew permission to distribute them. (Meijer III Depo. at 60, 92, 93, 102, 220.) In addition, Mr. Meijer never expected Defendant Thomas to seek Plaintiff's permission before giving a set of Plaintiff's Architectural Drawings to permitting agencies or contractors. (Meijer I Depo. at 153.)

Defendant Thomas also claims that Plaintiff's lack of confidentiality restrictions is evidence of Plaintiff's intent to *not* restrict Defendant Thomas's ability to use and distribute Plaintiff's Architectural Drawings. Plaintiff's Design Proposals that contained language preventing Defendant Thomas from copying or distributing Plaintiff's Architectural Drawings were never signed. (Labeff Depo. at 126; Meijer I Depo. at 35, 38.) Similarly, Defendant Thomas never signed Plaintiff's Confidentiality Agreements that, on at least one occasion, accompanied the computer disks containing Plaintiff's AutoCAD files. (Meijer I Depo. at 68.) Finally, Defendant points to the several occasions when Plaintiff transmitted hard copies and electronic copies of its drawings without ever imposing confidentiality restrictions. (Meijer I Depo. at 62-66, 70-72, 178-79.)

Plaintiff correctly notes that there is no evidence that Mr. Meijer ever consented to Defendant Thomas's use of Plaintiff's Architectural Drawings in connection with projects on which Plaintiff did not serve as the architect. (Meijer III Depo. at 95.) Neither has Defendant shown that Plaintiff ever provided permission for Defendant Thomas to share Plaintiff's works with other architects. Plaintiff has also submitted evidence that he spoke to Defendant Thomas's personnel, Jeff Johanson and Carlton Labeff, and requested that Defendant Thomas keep Plaintiff's Architectural Drawings confidential. (Meijer I Depo. at 321.) In addition, Plaintiff points to the restrictive language contained in the unsigned Design Proposals and Confidentiality Agreements as evidence of Plaintiff's *lack* of intent to allow Defendant Thomas to copy and distribute its copyrighted works.

After considering the summary judgment evidence presented, the Court finds that Defendant has not met its burden of showing that Plaintiff intended for Defendant to copy and distribute its work. The parties' dispute turns on whether Plaintiff intended for its work to be

shared with architects and third parties who did not work on Defendant Thomas's projects with

Plaintiff. *See Johnson*, 149 at 501 (finding that an implied nonexclusive license did not exist

because plaintiff's drawings "were used in a way he never intended"). In similar situations,

courts have examined three factors to determine whether an implied nonexclusive license exists:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an
> ongoing relationship; (2) whether the creator utilized written contracts, such as the
> standard AIA contract, providing that copyrighted materials could only be used with the
> creator's future involvement or express permission; and (3) whether the creator's conduct
> during the creation or delivery of the copyrighted material indicated that use of the
> material without the creator's involvement or consent was permissible.

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 514-16 (4th Cir. 2002). Here, the

first and third factors point away from the existence of an implied nonexclusive license. Plaintiff

and Defendant Thomas were engaged in an ongoing relationship encompassing nine different

Speedy Stop stores. In addition, nothing in Plaintiff's conduct indicated that it was aware, much

less approved of, the use of its Architectural Drawings in projects on which it did not serve as an

architect. The second factor is unhelpful in this case because, although Plaintiff submitted

Design Proposals containing language restricting Defendant Thomas's ability to use or distribute

Plaintiff's works without its permission, these documents were never signed. An application of

the factors enumerated in *Nelson-Salabes* to this case leads to the conclusion that Plaintiff did

not grant an implied nonexclusive license to Defendant Thomas.

Defendant's reliance on *Architettura, Inc. v. DBSI Cumberland at Granbury, L.P.*, 652 F.

Supp. 2d 775 (N.D. Tex. 2009) is misplaced. In *Architettura, Inc.*, the court did not decide the

question of whether the plaintiff granted a license to the defendant because both parties in the

case agreed that defendant had permission to use plaintiff's site plan during the time period in

which defendant showed the site plan to a rival architect. The court instead examined whether

this license was revocable or irrevocable. Here, Plaintiff disputes whether Defendant had

permission to show its Architectural Drawings either to rival architects or to third-parties not involved in Plaintiff's projects.

Defendant also cites *Gordon v. Nextel Communications*, 345 F.3d 922 (6th Cir. 2003), which involved a plaintiff who did not give defendant permission to use his illustrations. The court held that the defendant could not be liable for DMCA violations because there was no evidence that the defendant knew or had reason to know that it was facilitating or concealing an infringement. Here, however, Defendant argues that it possessed an implied nonexclusive license to use Plaintiff's Architectural Drawings. It has not argued that, even if it did not possess a license, it did not know or have reason to know that they would be facilitating an infringement of Plaintiff's copyrighted works.

Ultimately, the Court cannot conclude that the objective evidence of Plaintiff's conduct implied a license for Defendant Thomas to share Plaintiff's drawings with Morris and Hermes. The Court thus declines to grant Defendant's motion for summary judgment on the issue of an existence of an implied nonexclusive license.

### 3.  Statute of Limitations

Defendant has moved for summary judgment that Plaintiff's Copyright Act claims are barred by the three year statute of limitations applicable to such claims. *See* 17 U.S.C. § 507(b). Plaintiff has cross-moved for summary judgment on this affirmative defense due to Defendant's purported failure to produce any evidence on this issue. In the Fifth Circuit, a copyright claim accrues "when [the party] knew or had reason to know of the injury upon which the claim is based." *Jordan v. Sony BMG Music Entm't Inc.*, Case No. 08-20835, 2009 U.S. App. LEXIS 26730 (5th Cir. Dec. 8, 2009) (quoting *Pritchett v. Pound*, 473 F.3d 217, 220 (5th Cir. 2006)). In order for Defendant to obtain summary judgment on this issue, they must establish that that

Plaintiff knew or had reason to know of the alleged copyright infringement prior to October 24, 2005 (Plaintiff filed suit on October 24, 2008). Defendant points to Plaintiff's knowledge in early 2005 that its Architectural Drawings were being used in geotechnical engineering reports. (*See, e.g.*, Meijer III Depo. at 77.) However, all of these geotechnical reports were generated in connection with projects on which Plaintiff served as the architect. (Meijer III Depo. at 77, 78, 79, 84, 91, 92, 99-100.) Plaintiff's copyright infringement claims are based not on projects where it served as an architect and received geotechnical reports, but rather on Defendant's use of Plaintiff's drawings in projects on which Plaintiff *did not* serve as architect—namely, Store Nos. 14, 86, 87, 91, 95, 102, 301, 302, 303, 305, 306, 309, 311). (Doc. No. 54 at 12-13.) Defendant has not proffered any evidence showing that Plaintiff was aware, prior to October 24, 2005, that its Architectural Drawings were being used in connection with these thirteen stores.

Next, Defendant argues that Plaintiff knew or should be charged with constructive knowledge of the alleged infringement by Morris because Morris's design and permitting work was completed as a matter of public record by October 18, 2005. (Morris Depo. at 136-39.) The "public records" that Defendant claims put Plaintiff on notice of the alleged infringement appear to be permits issued by state, local or municipal authorities. (Morris Depo. at 136-39.) The Copyright Act provides that "[r]ecordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document." 17 U.S.C. § 205(c); *Jordan v. Sony BMG Music Entm't Inc.*, 2009 U.S. App. LEXIS 26730 at *8. However, the Copyright Office does not provide that public records in offices other than the Copyright Office, such as a permitting agency, can be used to charge a copyright owner with constructive notice that his or her copyright is being infringed. Copyright holders "are not obligated to seek out instances of potential infringement when they are reasonably unaware of any infringing acts."

*See Jack Preston Wood: Design, Inc., v. BL Building Co.*, Case No. H-03-713, 2004 U.S. Dist. LEXIS 30511, *44 (S.D. Tex. June 22, 2004). Plaintiff should not be expected to regularly comb through the permitting agencies records in order to search for potential instances of infringement. *See Warren Freedenfeld Assoc., Inc. v. Michael P. McTigue, D.V.M.*, 531 F.3d 38, 46 (1st Cir. 2008) ("Architects have no general, freestanding duty to comb through public records . . . in order to police their copyrights."). The Court declines to charge Plaintiff with constructive notice of Morris's allegedly infringing Architectural Drawings through the public recordation of those drawings in permitting offices.

Finally, Defendant has not shown any evidence that Plaintiff was aware of Defendant Thomas's sharing of its Architectural Drawings with Hermes and Morris—the injury upon which Plaintiff's copyright infringement claims are based—prior to October 24, 2005.[22] Plaintiff's claim that it discovered the existence of allegedly infringing stores designed by Morris and Hermes in March 2006 is uncontroverted. Therefore, Plaintiff is entitled to summary judgment on Defendant's affirmative defense of statute of limitations and Defendant's motion on this issue is denied.

### 4.  Lack of Damages

Defendant moves for summary judgment on Plaintiff's damage claims under the Copyright Act and the DMCA.

---

[22] Defendant also argues in various places in their motions that Plaintiff was or should have been aware that Defendant Thomas would hire other architects because Plaintiff was unable to continue providing architectural services. To the extent that Defendant is charging Plaintiff with inquiry notice of the infringing activities, the Court does not find that the events here provided Plaintiff with such notice. *See Warren Freedenfeld Assoc., Inc.*, 531 F.3d at 45 ("There is no presumption that failed business relationships inevitably will give rise to either tortious conduct or disregard or proprietary rights.").

First, Defendant's motion for summary judgment as to Plaintiff's claim for attorney's fees and statutory damages under the Copyright Act is denied. Plaintiff is not seeking attorney's fees or statutory damages under the Copyright Act. (Doc. No. 54 at ¶ 60.)

Second, Defendant's motion for summary judgment as to Plaintiff's claim for statutory damages under the DMCA is denied. Plaintiff has sought statutory damages under 17 U.S.C. §§ 1203(c)(1)(B), 1203(c) for DMCA violations as an alternative to actual damages and infringer's profits. The DMCA provides that statutory damages may be awarded for "each violation of section 1202 in the sum of not less than $2,500 and more than $25,000." 17 U.S.C. § 1203(c)(3)(B). Contrary to Defendant's claim, 17 U.S.C. § 1203(c)(3) does not limit the definition of "violation" to "each instance in which a copy of an infringed [work] was provided to a third party." (Doc. No. 104 at ¶ 28.) Rather, the latter language comes from a case *Goldman v. Healthcare Management Sys., Inc.*, 559 F. Supp. 2d 853, 868 (W.D. Mich. 2008), which held, in that case, that "violation" would mean each time the defendant distributed the infringed program to hospitals. The term "violation" has also been held to mean ""each violative act performed by Defendant." *McClatchey v. AP*, Case No. 3:05-cv-145, 2007 U.S. Dist. LEXIS 40416 (W.D. Pa. June 4, 2007); *see also Stockwire Research Group, Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1267 (S.D. Fla. 2008). Under the latter interpretation, Defendant's removal of Plaintiff's title block could constitute the "violation" contemplated by 17 U.S.C. § 1203(c)(3)(B). *See Gregerson v. Vilana Fin., Inc.*, Case No. 06-1164 ADM/AJB, 2008 U.S. Dist. LEXIS 11727, *21 (D. Minn. Feb. 15, 2008) (recognizing a DMCA "violation" for purposes of calculating statutory damages as Defendant's removal of a digitally embedded watermark from plaintiff's copyrighted photograph rather than Defendant's distribution of plaintiff's photograph in print

and web advertisements). Defendant cannot establish that it did not perform "violations" of the DMCA such that Plaintiff would not be entitled to statutory damages under the DMCA.

Third, Defendant's motion for summary judgment as to Plaintiff's claims for actual damages under the Copyright Act and DMCA is granted. The Copyright Act and the DMCA provide that a copyright owner may recover actual damages he or she suffers as a result of the copyright infringement. 17 U.S.C. § 504(a); 17 U.S.C. § 1203(c)(2). Defendant contends that Plaintiff is not entitled to actual damages because it has proffered no evidence that it sustained any losses due to the alleged infringement of its drawings. However, courts have construed the "actual damages" measure to include license fees that the copyright owner would have obtained for the infringer's use of the copyrighted material. *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001) (noting that, though a copyright "owner may be incapable of showing a loss of either sales or licenses to third parties," the owner may be able to recover as actual damages "owner's loss of the fair market value of the license fees he might have exacted of the defendant"). Plaintiff has offered, as evidence of the license fee it might have obtained from Defendant Thomas, Mr. Meijer's affidavit stating that Plaintiff would have charged $25,000 for each additional store or site for which its plans would be used. The Court has stricken this portion of Mr. Meijer's affidavit for the reasons explained in Part II.C.2, above. Plaintiff has offered no other evidence of the fair market value of license fees for its Architectural Drawings. Therefore, Plaintiff has failed to make a showing sufficient to establish an essential element of its claim for actual damages. Defendant is entitled to summary judgment on Plaintiff's claim for actual damages under the Copyright Act and the DMCA.

Fourth, Defendant's motion for summary judgment as to Plaintiff's claims for infringer's profits under the Copyright Act and DMCA is denied. A copyright owner is entitled to recover

"infringer's profits" as a measure of damages for copyright infringement. "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

Plaintiff has offered evidence of Thomas's gross revenue in the form of the expert report of its damages expert, Walter Bratic. Though the Court excluded Mr. Bratic's expert opinion as to Defendant Thomas's gross revenue, Plaintiff has been allowed to provide another opinion as to the calculation of Defendant Thomas's gross revenue. (Doc. No. 175 at 12.) As a question of material fact exists as to Defendant Thomas's gross revenue attributable to the allegedly infringing activity, the Court will withhold judgment until Plaintiff's resubmission of its expert report regarding Defendant Thomas's gross revenue.

### 5.  Fair Use

Plaintiff has moved for summary judgment on Defendant's affirmative defense of fair use. In determining whether use of copyrighted material constitutes fair use, courts must apply four factors: (1) the purpose and character of the use, including whether such use is of commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994).

The first factor weighs against a finding of fair use since Defendant's alleged use of Plaintiff's copyrighted material was strictly for commercial purposes. *See Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 409-10 (5th Cir. 2004) (stating that commerciality generally weighs against a finding of fair use). Defendant has admitted that its use was for

commercial purposes. (Doc. No. 121 at 11.) Where the primary use of the copyrighted work is for a commercial purpose, the use is "presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright," and the central question is "whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 629 F. Supp. 2d 526, 533 (E.D. Va. 2008) (omitting citations), *aff'd*, Case No. 08-2103, 2010 U.S. App. LEXIS 9299 (4th Cir. May 6, 2010).

The second factor—the nature of the copyrighted material—also weighs against a finding of fair use. Creative or fictional works receive more protection than non-fictional or factual works. *Thomas M. Gilbert Architects, P.C. v. Accent Builders & Developers, LLC*, 629 F. Supp. 2d 526, 534 (E.D. Va. 2008). Architectural designs and drawings have been held to be creative works. *Id.* Defendant has not offered any factual or legal support for considering architectural works or drawings non-creative works. This factor also weighs against a finding of fair use.

The third factor—the amount and substantiality of the portion used in relation to the copyrighted work as a whole—cannot be applied one way or another because Defendant contends in its opposition to Plaintiff's motion for summary judgment on the fair use defense that it did not use Plaintiff's copyrighted work.

The fourth factor—the effect of the use upon the potential market for or value of the copyrighted work—weighs against a finding of fair use here. The parties correctly note that this factor is the most important of the four. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 410 (5th Cir. 2004). "This factor requires courts to consider not only actual harm to the market for the original, but also whether widespread use of the work, like the sort complained of by the copyright-holder, would impair the potential market for the original work and any

derivative works." *Id.* Defendant will have the burden at trial of showing that its alleged commercial use of Plaintiff's Architectural Drawings did not have a significant effect upon the market for or value of the drawings. However, Defendant has not shown that its use of Plaintiff's Architectural Drawings did not significantly impact Plaintiff's ability to sell or license its works. In fact, Defendant acknowledges that Plaintiff's primary business is the design of convenience stores. (Meijer I Depo. at 100-02.) Defendant's argument that Plaintiff's market was not harmed because it did not have the ability to handle its work is also unavailing. Even if Plaintiff was unable to draft new Architectural Drawings itself, Plaintiff would have been able to license the pre-existing Architectural Drawings to Defendant Thomas. Defendant Thomas's alleged commercial use of the plans—sharing them with Morris and Hermes—impaired Plaintiff's ability to derive licensing fees from Defendant Thomas for this use.

Considering all of these four factors together, the Court finds that Defendant Thomas has not shown the existence of essential elements of the fair use defense and that Plaintiff is entitled to summary judgment on this affirmative defense.

### 6. Estoppel

Plaintiff has moved for summary judgment on Defendant's affirmative defense of estoppel because of Defendant's failure to produce evidence regarding any of the elements of estoppel. Under the doctrine of estoppel, a plaintiff is barred from bringing a copyright infringement claim against a defendant if: (1) plaintiff knew about defendant's infringing conduct; (2) plaintiff must intend that its conduct shall be acted on, or must so act that the defendant has a right to believe that it is so intended; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment. *Carson v. Dynegy*, Inc., 344 F.3d 446, 453 (5th Cir. 2003).

In order for Defendant to survive summary judgment, it must identify a genuine issue of material fact. Where, as here, the Defendant will have the burden of proof at trial on the essential elements of the estoppel defense, it must make a showing sufficient to establish the existence of the essential elements. Defendant has not shown sufficient evidence that Plaintiff was aware of Defendant Thomas's sharing of Plaintiff's Architectural Drawings with parties not involved on Plaintiff's projects. There is no genuine issue of material fact that exists regarding Plaintiff's specific knowledge of Morris's and Hermes's use of its Architectural Drawings. Therefore, Plaintiff is entitled to summary judgment on the first element of estoppel. Since all four elements of the estoppel defense are required, Plaintiff is entitled to summary judgment on the estoppel defense as a whole.

### 7.   Laches

Plaintiff has moved for summary judgment on Defendant's affirmative defense of laches. "To establish that a cause of action is barred by laches, the defendant must show (1) a delay in asserting the right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the defendant." *Goodman v. Lee*, 78 F.3d 1007, 1014 (5th Cir. 1996). "Generally speaking, the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002) (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001)). The Fifth Circuit has not addressed whether the laches defense applies in a case where the copyright owner files suit within the three-year statute of limitations applicable to copyright infringement claims. However, other circuits have acknowledged that courts should defer to the statute of limitations rather than decide copyright infringement cases on the issue of laches. *See, e.g.*, *Jacobsen v.*

*Deseret Book Co.*, 287 F.3d 936, 950 (10th Cir. 2002); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 798 (4th Cir. 2001); *Jack Preston Wood: Design, Inc.*, 2004 U.S. Dist. LEXIS at *45-*47. In rare cases, "a statute of limitations can be cut short by the doctrine of laches . . . ." *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 951 (10th Cir. 2002).

The Court has already issued summary judgment in favor of Plaintiff on the issue of whether Plaintiff filed its copyright infringement claim within the three-year statute of limitations. Defendant has not presented evidence of extraordinary circumstances that would warrant the imposition of the laches defense. Plaintiff discovered the alleged infringement in March 2006. Plaintiff wrote to Defendant Thomas in June 2006 about the alleged infringement and asked Defendant Thomas to refrain from releasing Plaintiff's Architectural Drawings to any other architectural firm without Plaintiff's written approval. (Doc. No. 104, Exh. O at 65.) Plaintiff registered its "architectural works" and "technical drawings" copyrights between June 2006 and October 2007. (*Id.* at 103-08.) The approximately year-long delay between the copyright registration process and filing of suit appears due to Plaintiff's interaction with its counsel. (Meijer I Depo. at 25-27.) There is nothing remarkable in Plaintiff's conduct requiring the Court to shorten the statute of limitations by applying the laches defense. Finally, Defendant has not shown how it was prejudiced by Plaintiff's filing of suit in October 2008. Therefore, Plaintiff is entitled to summary judgment on this affirmative defense.

### 8.  Innocent Infringement

Plaintiff has moved for summary judgment on Defendant's affirmative defense of innocent infringement. The use of the innocent infringement defense for claims brought under the Copyright Act differs from its use in alleged violations of the DMCA.

With respect to claims brought under the Copyright Act, innocent infringement is not an affirmative defense to liability for infringement of works created after March 1, 1989. *Bryce & Palazzola Architects & Assocs. v. A.M.E. Group*, 865 F. Supp. 401, 405 (E.D. Mich. 1994). Innocent infringement remains an affirmative defense to an award of statutory damages under 17 U.S.C. § 504(c) for copyright infringement. Here, Plaintiff has not asserted a claim for statutory damages for copyright infringement. Therefore, Defendant cannot assert innocent infringement as an affirmative defense to either liability or statutory damages for copyright infringement.

With respect to DMCA claims, innocent infringement can be an affirmative defense to the award of statutory damages under 17 U.S.C. § 1203(c)(5). Defendant has proffered sufficient evidence that a jury might reasonably conclude that its removal of Plaintiff's title block from its Architectural Drawings was done without knowledge that such removal constituted a violation of the DMCA. Therefore, Plaintiff is not entitled to summary judgment as to Defendant's affirmative defense of innocent infringement to Plaintiff's DMCA claims.

### 9.   Unclean Hands

Plaintiff has moved for summary judgment on Defendant's affirmative defense of unclean hands. In order for the equitable doctrine of "unclean hands" to apply, the plaintiff's misconduct must "in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication." *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979), *cert. denied*, 100 S. Ct. 1277 (1980) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)). The plaintiff's conduct must personally injure the defendant. *Id.* (quoting *Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978). "The defense is rarely effective and is properly denied when the "plaintiff's transgression is of an . . . inconsequential nature." *Los Angeles News Service v. Tullo*, 973 F.2d

82

791, 799 (9th Cir. 1992) (omitting citations). The application of the unclean hands doctrine raises primarily a question of fact. *Id.*

Defendant contends that Plaintiff's purposeful errors in the copyright registration process, failure to disclose that its work was copied from a third party, misstatements in authorship, and failure to disclose that its work was a derivative work are all wrongful acts that bar Plaintiff's recovery under the clean hands doctrine. The Court has already resolved all of these issues in favor of Plaintiff. Plaintiff is entitled to summary judgment on the unclean hands defense.

### 10. Failure to Identify Portions of Infringed Copyrighted Works

Plaintiff moves for summary judgment on Defendant's affirmative defense of failure to identify portions of infringed copyrighted works. Defendant acknowledges that "failure to identify portions of infringed copyrighted works" is not an affirmative defense but claim that it is Plaintiff's burden of proof at trial. Plaintiff contends that it is not required to identify portions of its copyrighted works because, under the substantial similarity test, the fact finder is required to review the work as a whole without dissection to judge the total concept and feel of the structure. In the Fifth Circuit, the "substantial similarity" test requires the plaintiff to "demonstrate that the copying is legally actionable by showing that the allegedly infringing work is substantially similar to *protectable* elements of the infringed work." *General Universal Sys. v. Lee*, 379 F.3d 131, 142 (5th Cir. Tex. 2004) (emphasis added). Therefore, Plaintiff bears a burden of identifying the protectable elements of its Architectural Drawings and presenting evidence that Defendant's Architectural Drawings are substantially similar to those elements. The Court withholds summary judgment on the issue of Plaintiff's failure to identify portions of infringed copyrighted works.

### 11. De Minimis Infringement

Plaintiff moves for summary judgment on Defendant's affirmative defense of de minimis infringement. "To establish that the infringement of a copyright is de minimis, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998) (omitting quotations).

As stated above, genuine issues of material fact exist as to which technical drawings within Plaintiff's Architectural Drawings were copyrighted. Further, there are factual issues in dispute regarding the substantial similarity of Plaintiff's "architectural works" material and Defendant's Architectural Drawings. Therefore, the Court cannot conclude that Defendant has shown no evidence that its potential use of Plaintiff's protected material is below the de minimis level. Plaintiff's motion for summary judgment on this issue is denied.

### 12. Failure to Mitigate Damages

Plaintiff moves for summary judgment on Defendant's affirmative defense that Plaintiff failed to mitigate its damages. Plaintiff first suggests that courts have never recognized a failure to mitigate as a defense in a copyright infringement case. However, a brief search of the case law yields exactly such cases. *See Tingley Sys. v. Healthlink, Inc.*, 509 F. Supp. 2d 1209, 1219 (M.D. Fla. 2007); Frank Betz Assocs. v. J.O. Clark Constr., L.L.C., Case No. 3:08-cv-00159, 2010 U.S. Dist. LEXIS 53437 (M.D. Tenn. May 30, 2010); *Software Publrs. Ass'n v. Scott & Scott, LLP*, Case No. 3:06-CV-0949-G, 2007 U.S. Dist. LEXIS 59814 (N.D. Tex. Aug. 15, 2007).

Second, Plaintiff claims that Defendant has not adduced evidence to support this defense. In response, Defendant cites as evidence Plaintiff's discovery of the allegedly wrongful activity in March 2006 and failing to do anything for over two years until the initiation of this lawsuit in

October 2008. The Court finds that a genuine issue of material fact exists regarding whether Plaintiff properly mitigated the damages it is requesting for copyright infringement, DMCA violations, and fraud claims. Therefore, Plaintiff is not entitled to summary judgment as to Defendant's affirmative defense of failure to mitigate damages.

### 13. Fraud on Copyright Office

Plaintiff moves for summary judgment on Defendant's defense of fraud on the Copyright Office. As explained in Part IV.C.1, above, Defendant has not been able to show that there are genuine issues of material fact relating to Plaintiff's errors in copyright registration, nor that, as a legal matter, Plaintiff committed fraud on the Copyright Office. Therefore, the Court grants Plaintiff's motion for summary judgment as to this defense.

### 14. Impermissible Taking

Plaintiff has moved for summary judgment on Defendant Thomas's defense of impermissible taking. Defendant Thomas has clarified that this defense would only be applicable in the event that a jury awards punitive damages on Plaintiff's fraud claim. The Court withholds summary judgment on this defense.

### 15. Failure to State a Claim

Plaintiff moves for summary judgment on the defense that Plaintiff has failed to state a claim under Rule 12(b)(6). This defense was raised by Hermes, which is no longer a defendant in this case. Therefore, Plaintiff is entitled to summary judgment on this defense.

### 16. Intervening Third Parties

Plaintiff is entitled to summary judgment on the defense of "intervening third parties" as this defense has no applicability to copyright infringement and was raised with respect to the now-dismissed trade secret misappropriation claims.

### 17. Comparative Responsibility

Plaintiff moves for summary judgment on Defendant Thomas's affirmative defense of comparative responsibility. Both parties acknowledge that this defense is inapplicable to copyright infringement claims. As for the fraud claim, Defendant Thomas is correct in stating that comparative responsibility is an affirmative defense under Texas law. However, Defendant Thomas has not identified the facts that would support such a defense. See *Celotex*, 477 U.S. at 323-24 (the nonmoving party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial). Therefore, the Court grants summary judgment to Plaintiff on the affirmative defense of comparative responsibility.

### 18. Sufficient Resources

Plaintiff has moved for summary judgment on the issue of "sufficient resources." Plaintiff and Defendant Thomas agree that there is no affirmative defense of "sufficient resources." Defendant Thomas states that the issue of sufficient resources relates to its defenses of limitations, estoppel and laches since Plaintiff knew that it did not have the manpower to meant Defendant Thomas's requirements and was on notice that other Speedy Stop stores would be built and other architects would be used. Insofar as "sufficient resources" is asserted as a separate defense, the Court grants summary judgment to Plaintiff on this defense.

### 19. Reasonable and Necessary Attorney's Fees

The parties agree that Defendant Thomas's defense of reasonable and necessary attorney's fees is not an affirmative defense. The Court grants summary judgment to Plaintiff as to the affirmative defense of reasonable and necessary attorney's fees.

### 20. Defenses Related to Trade Secret Misappropriation

The Court grants summary judgment to Plaintiff as to the affirmative defenses asserted by Defendant with respect to Plaintiff's trade secret misappropriation claims. These claims were dismissed by agreement and stipulation of the parties.

## V.   MOTION FOR DISCOVERY SANCTIONS

Plaintiff has moved for discovery sanctions against Defendant Thomas due to Defendant Thomas's alleged failure to cooperate in the production of documents, responses to interrogatories, and appropriate disclosures (Doc. No. 114). This motion was originally filed on April 13, 2010. Defendant Thomas responded on April 23, 2010. After a hearing on the motion, the Court issued on an order on May 5, 2010 permitting Plaintiff to conduct an additional deposition of Jeff Johanson, permitting Plaintiff to identify financial information it believed that Defendant Thomas previously had failed to make available, requiring Defendant Thomas to make such financial information available for Plaintiff's inspection, and allowing the parties to file supplemental briefs. The parties have filed supplemental briefs and the motion is ripe for disposition. The imposition of sanctions for failure to cooperate in discovery is within the sound discretion of the district court. *See Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002) (citations omitted). The Court turns to each of the discovery disputes raised by Plaintiff.

### A.  Production of Responses to Plaintiff's Interrogatories 1-4

Plaintiff seeks sanctions because Defendant's responses to Plaintiff's Interrogatories #1-4 occurred on March 30, 2010, over 30 days after this Court's order on February 25, 2010 requiring Defendant Thomas to turn over responsive information. Defendant Thomas correctly points out that the Court's February 25th order contained no deadline for response. Further, a review of Defendant Thomas's response suggests that the process of obtaining the information requested was intensive. Defendant Thomas's delay in producing responsive documents cannot

serve as the basis for sanctions.

Plaintiff also seeks sanctions because Defendant Thomas's responses did not include information about how potentially-infringing architectural documents were used or modified, and the purpose of any modification. Defendant Thomas responds that the reason that such information was not included is because Defendant Thomas is not aware of any modification by third-parties of the architectural drawings it sent to those third parties. To the extent that Defendant Thomas wishes to rely on claims that third-parties, including Morris and Hermes, *did or did not* modify architectural drawings that they were sent by Defendant Thomas, it is barred from relying on such evidence since it has maintained that it does not possess information about the drawings' modification or lack thereof.

### B.  Preclusion Order barring Defendant Thomas's Affirmative Defenses

The Court again declines to award sanctions on the basis that Defendant Thomas's identification of the factual bases of its affirmative defenses was late, because the Court did not set a deadline for response in its February 25th order. As for Plaintiff's argument that Defendant Thomas did not respond in good faith, the Court's order simply required Defendant Thomas to "identify the primary documents on which [Defendant] rely to support the identified affirmative defenses. It will be understood that the documents identified will not be an exhaustive list, but should provide Interplan with notice of the factual basis for these affirmative defenses." (Doc. No. 93 at 2.) Therefore, Defendant Thomas's provision of a list of Bates-numbered documents comports with the Court's order. To the extent that Defendant Thomas raises an affirmative defense not based on the list of Bates-numbered documents provided to Plaintiff on March 30, 2010, the Court will strike such defenses.

### C.  Order in Limine Barring Defendant Thomas from Relying on Financial Summaries

Plaintiff argues that Defendant Thomas should be prevented from presenting and relying upon the financial summaries Thomas prepared as evidence of deductible expenses related to the gross revenue of the Speedy Stop Stores. Plaintiff's first basis for this request is unsupported by fact. Plaintiff claims that Defendant Thomas did not make the "backup" or documents underlying the financial summaries available in a timely manner. Plaintiff refers to an email dated March 22, 2010 in which it requested production of the underlying documents. However, this Court's February 25th order denied Plaintiff's motion to compel the production of documents and stated that, if Plaintiff wished to inspect the summaries' underlying documents, the Defendant only had to make these documents available at its offices for Plaintiff's inspection and limited duplication. Plaintiff's March 22nd email makes no request to access and inspect Defendant Thomas's underlying documents and instead asks for production of these documents. It appears that Plaintiff, not Defendant Thomas, is the party who has not complied with the Court's February 25th order. Plaintiff's inability to conduct a meaningful audit of Defendant Thomas's invoices appears to be due to its own failure to go to Defendant Thomas's offices rather than any purported deficiency in Defendant Thomas's financial summaries.

Plaintiff's second basis for barring Defendant Thomas's introduction of the financial summaries at trial is that these summaries are, in fact, summaries of summaries of summaries and inadmissible under Federal Rule of Evidence 1006. In response to Plaintiff's request for intermediate summaries, Defendant Thomas produced "intermediate level" summaries after this Court's order on May 5, 2010. Plaintiff contends that these "intermediate level" summaries are still improper under Rule 1006. The Court fails to understand what is improper about these summaries and will withhold ruling on this issue until Defendant Thomas attempts to introduce such evidence at trial.

**D.  Preclusion Order Barring Defendant Thomas from Offering Evidence of Attribution of Revenue to Third-Party**

Plaintiff argues that Defendant Thomas should be prevented from offering any evidence that the gross revenues from the Speedy Stop stores are captured by a third-party, such as Speedy Stop Food Stores, LLC, that is not a party to this case. Defendant Thomas has argued in its Motion for Summary Judgment that Thomas only designed and constructed the Speedy Stop stores, but that they are actually owned and operated by Speedy Stop Stores, LLC, a non-party to this litigation. Therefore, Defendant Thomas attempts to disclaim any gross revenue obtained by Speedy Stop Food Stores, LLC, as a way to calculate Defendant Thomas's "infringer's profits" under the Copyright Act and DMCA.

Plaintiff's first argument, that Defendant Thomas failed to timely disclose the existence of Speedy Stop Food Stores, LLC, does raise concerns about Defendant's behavior. On December 5, 2008, Defendant Thomas filed its original answer, in which it clearly stated, "Defendant does not operate Speedy Stop Food Stores. Speedy Stop Food Stores, LLC ("Speedy Stop" herein), formerly known as Speedy Stop Food Stores, Ltd. is in the business of operating Speedy Stop Food Stores. C.L. Thomas, Inc. is Speedy Stop's Manager. Speedy Stop is in the business of designing and constructing convenience stores, and C.L. Thomas, Inc. acts in its role as manager." (Doc. No. 12 at ¶ 19.) Its corporate disclosure statement, made on December 10, 2008, stated, "Defendant, C.L. Thomas, Inc. is not aware of any other entities that are financially interested in the outcome of this litigation. Other than Speedy Stop Food Store, LLC, a Texas limited liability company, of which C.L. Thomas, Inc. is the Manager." (Doc. No. 13 at ¶ 3.) Despite these earlier disclosures, Defendant Thomas stated in response to a question on the Joint Discovery/Case Management Plan ("List anticipated additional parties that should be included, when they can be added, and by whom they are wanted.") that "Defendant is unaware of any

additional parties at this time." Similarly, in its responses to Plaintiff's motion to compel information about the gross revenues of the Speedy Stop stores, Defendant Thomas did not mention that this gross revenue was actually captured by Speedy Stop Food Stores, LLC. (Doc. Nos. 35, 38.) In September 2009, Plaintiff filed a motion for leave to file a first amended complaint, but did not seek to include Speedy Stop Food Stores, LLC as a new defendant. (Doc. No. 51.) Subsequently, Defendant Thomas produced financial information that clearly stated "Speedy Stop Food Stores, LLC" on top of each page. In November 2009, Defendant Thomas filed its first amended answer, in which it once again stated that it did not own the Speedy Stop stores, but that Speedy Stop Food Stores, LLC operated the stores. (Doc. No. 70 at ¶ 19.) Both the expert reports of Defendant's financial experts, James Mandel and Jeff Johanson, referred to financial summaries that contained the words "Speedy Stop Food Stores, LLC" on top of each page. After reviewing these events in detail, the Court concludes that Defendant Thomas's behavior, while less than forthcoming, did not constitute active concealment or delay that is sanctionable.

Plaintiff next claims that the corporate formalities that distinguish Defendant Thomas from related business entities, such as Speedy Stop Food Stores, LLC, and Speedy Stop Food Stores, Ltd., should be ignored. Prior to June 29, 2007, Speedy Stop Food Stores, Ltd., a limited partnership, existed to own the real estate and capture the revenue from the Speedy Stop stores. Defendant Thomas was the sole general partner in Speedy Stop Food Stores, Ltd. Though Plaintiff correctly pointes out that, as a general partner, Defendant Thomas would be liable for any damages or obligations incurred by Speedy Stop Food Stores, Ltd., Plaintiff has not provided legal support for the opposite principle—that Speedy Stop Food Stores, Ltd. is responsible for the obligations of its general partner. It is the latter legal rule that is applicable here. Liability for

copyright infringement, DMCA violations, and fraud in the present lawsuit turn on Defendant Thomas's conduct. Therefore, any award of damages will be awarded against Defendant Thomas, for which Speedy Stop Food Stores, Ltd. is not responsible.

On June 29, 2007, Speedy Stop Food Stores, Ltd. was merged into Speedy Stop Food Stores, LLC. Defendant Thomas is a manager and member of Speedy Stop Food Stores, LLC and owns 1% of the limited liability company. Plaintiff argues that the court should disregard the distinction between Defendant Thomas and Speedy Stop Food Stores, LLC because both are considered a combined entity, have combined financial reporting, have the same employees, and are ultimately both owned by Cliff and Cathy Thomas. However, two of the three cases that Plaintiff cites in support of the alter ego doctrine are no longer good law, having been superseded by statute. Rather, application of the alter ego theory in Texas requires a showing that the owner "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the . . . owner." See Tex. Bus. Corp. Act Ann. art. 2.21(A)(2) (Vernon 2003); Tex. Bus. Org. Code ¶ 21.223; *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex. App. Houston 14th Dist. 2007). After taking the additional deposition of Mr. Johanson, Plaintiff has not offered evidence that Speedy Stop Food Stores, LLC was created for the purpose of wrongful conduct. At most, its creation appears to have been for the purpose of "reduc[ing] franchise taxes." (Deposition of Jeff Johanson on May 14, 2010 at 133.) The Court cannot attribute the revenue of Speedy Stop Food Stores, LLC to Defendant Thomas on the basis of the alter ego theory.

The Court notes, however, that Plaintiff's claim for infringer's profits may not be completely foreclosed. In his deposition, Mr. Johanson acknowledged that Defendant Thomas possesses a 1% ownership interest in Speedy Stop Food Stores, LLC that is reflected on K-1 IRS

form since the LLC is treated like a partnership.

### E.  Attorneys' Fees and Expenses

The Court has not found any of Plaintiff's requests for discovery sanctions to be

meritorious and therefore declines to award attorneys' fees and expenses.

## VI.    MOTIONS FOR RULE 11 SANCTIONS AND ATTORNEYS' FEES AND COSTS

The Court defers Defendant's Motion for Sanctions Pursuant to Rule 11 (Doc. No. 157)

and Defendant's Rule 54(d) Motion for Attorney's Fees and Costs Under the Texas Theft

Liability Act (Doc. No. 105).

## VII.   CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment for Infringement of Technical Drawings Copyrights (Doc. No. 108) is **DENIED;**

2. Plaintiff's Motion for Partial Summary Judgment (Ownership of Valid Architectural Works Copyrights (Doc. No. 110) is **DENIED;**

3. Plaintiff's Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. No. 111) is **GRANTED IN PART** and **DENIED IN PART:**

   a. Plaintiff is entitled to summary judgment on the defenses of lack of copyrightability, statute of limitations, estoppel, laches, unclean hands, fair use, fraud on Copyright Office, failure to state a claim, intervening third parties, comparative responsibility, sufficient resources, reasonable and necessary attorney's fees, and defenses related to trade secret misappropriation claims;

   b. Plaintiff is not entitled to summary judgment on the defenses of lack of originality, joint authorship, implied nonexclusive license, innocent infringement, failure to identify portions of copyrighted works, de minimis infringement, failure to mitigate damages, and impermissible taking;

4. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Evidence (Doc. No. 131) is **GRANTED IN PART** and **DENIED IN PART:**

   a. Mr. Labefff's opinions on the copyrightability of Plaintiff's architectural designs and technical drawings, Mr. Labeff's conclusions about derivative works, Mr. Meijer's testimony about violations of the DMCA, and Mr. Urfi's

statements about Mr. Meijer's permission to use third-party drawings are stricken;

5. Plaintiff's Objections to and Motion to Strike Defendant's Summary Judgment Opposition Evidence (Doc. No. 143) is **GRANTED IN PART** and **DENIED IN PART:**

    a.  Mr. Meijer's testimony about violations of the DMCA and Mr. Morris's testimony about the originality of Plaintiff's drawings are stricken;

6. Plaintiff's Motion for Discovery Sanctions Against Defendant C.L. Thomas, Inc. (Doc. No. 114) is **DENIED;**

7. Defendant's Motion for Summary Judgment (Doc. No. 104) is **GRANTED IN PART** and **DENIED IN PART:**

    a.  Defendant is entitled to summary judgment with respect to Plaintiff's claim that fraudulent misrepresentation was made in November 2004;
    b.  Defendant is entitled to summary judgment with respect to Plaintiff's claim for actual damages under the Copyright Act and the DCMA;

8. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction All Claims Based on Unregistered Copyrighted Works (Doc. No. 119) is **DENIED;**

9. Defendant's Motion to Dismiss for Lack of Standing All Copyrights Registered and Owned by Marcel Meijer, Individually (Doc. No. 119) is **DENIED;**

10. Defendant's Motion to Strike Declaration of Marcel Meijer (Doc. No. 119) is **GRANTED IN PART** and **DENIED IN PART:**

    a.  Exhibits B-J to the First Meijer Declaration are stricken;

11. Defendant's Motion to Strike Exhibit V to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Doc. No. 138) is **GRANTED IN PART** and **DENIED IN PART:**

    a.  Paragraph 9 of Exhibit V is stricken;

12. Defendant's Motion to Strike Plaintiff's Motions for Summary Judgment (Doc. No. 155) is **DENIED;**

13. Defendant's Motion for Sanctions Pursuant to Rule 11 (Doc. No. 157) is **DEFERRED;**

14. Defendant's Rule 54(d) Motion for Attorneys' Fees and Costs Under the Texas Theft Liability Act (Doc. No. 105) is **DEFERRED;**

15. Morris's Motion for Partial Summary Judgment on Plaintiff's DMCA Claims (Doc. No. 109) is **DENIED AS MOOT;**

16. Hermes's Motion for Summary Judgment on Plaintiff's Copyright Act Claim (Doc. No. 102) is **DENIED AS MOOT**;

17. Hermes's Motion for Partial Summary Judgment (Doc. No. 101) is **DENIED AS MOOT**; and

18. Hermes's Motion for Order Regarding Joint & Several Liability (Doc. No. 103) is **DENIED AS MOOT.**

      **IT IS SO ORDERED**.

      **SIGNED** at Houston, Texas, on this the 27th day of October, 2010.

                KEITH P. ELLISON
                UNITED STATES DISTRICT JUDGE